```
 1                  UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NORTH CAROLINA
 2                       EASTERN DIVISION


 3


 4   Wai Man Tom,            -   Docket No. 5:17-cv-98-FL
                            -
 5      Plaintiff,          -   New Bern, North Carolina
                            -   April 24, 2018
 6         v.               -   Motion Hearing
                            -
 7   Hospitality Ventures,  -
     LLC, et al.,           -
 8                          -
        Defendants.         -
 9   ------------------------------


10                TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE LOUISE WOOD FLANAGAN
11               UNITED STATES DISTRICT JUDGE.

12   APPEARANCES:

13   For the Plaintiffs:  Gilda A. Hernandez
                          Michael B. Cohen
14
     For the Defendant:   John R. Hunt
15                        Jordan D. Fishman
                          Susanna Gibbons
16                        Debbie DeWar

17   Court Reporter:      Tracy L. McGurk, RMR, CRR
                          413 Middle St.
18                        New Bern, NC 28560
                          (419) 392-6626
19

20

21

22

23   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.
24

25
```

| | | |
|---|---|---|
| 00:34:01 | 1 | (Commenced at 9:21 a.m.) |
| 00:34:01 | 2 | THE COURT: Good morning. Would the clerk |
| 00:34:02 | 3 | call the calendar. And, counsel, I'll invite you to |
| 00:34:06 | 4 | introduce yourselves on the record. |
| 00:34:09 | 5 | THE CLERK: The Court calls for motion |
| 00:34:10 | 6 | hearing the case of Wai Man Tom versus Hospitality |
| 00:34:14 | 7 | Ventures, LLC, doing business as Umstead Hotel and Spa, |
| 00:34:19 | 8 | SAS Institute, Inc., and NRC Cuisine Ventures doing |
| 00:34:25 | 9 | business as An Asian Cuisine, case 5:17-CV-98 FL. |
| 00:34:32 | 10 | THE COURT: For the plaintiff? |
| 00:34:34 | 11 | MS. HERNANDEZ: Jill Hernandez for the |
| 00:34:39 | 12 | plaintiffs. |
| 00:34:39 | 13 | MR. COHEN: Michael Cohen for the plaintiffs. |
| 00:34:42 | 14 | MR. HUNT: John Hunt for the defendants. |
| 00:34:45 | 15 | MS. FISHMAN: Jordan Fishman for the |
| 00:34:47 | 16 | defendants. |
| 00:34:48 | 17 | MS. GIBBONS: Susie Gibbons for the |
| 00:34:53 | 18 | defendants. |
| 00:34:54 | 19 | THE COURT: You've got your paralegal |
| 00:34:55 | 20 | between you. And who is behind you? |
| 00:34:55 | 21 | MS. DeWAR: Good morning, Your Honor. |
| 00:35:04 | 22 | Debbie DeWar, in-house counsel. |
| 00:35:06 | 23 | THE COURT: Did you want to sit at the |
| 00:35:08 | 24 | table? |
| 00:35:09 | 25 | This is plaintiff's motion. The Court is |

familiar with the paperwork that's been submitted in
support and in opposition to it.

Is there anything you want to highlight in
opening statement, Ms. Hernandez?

MS. HERNANDEZ: Yes, Your Honor. Thank you
very much. First and foremost, thank you so much for
hearing the plaintiff's motion on an emergency basis.
I'd also like to introduce the Court to the witness for
the plaintiffs, Mr. Justin Dillon, who is here to answer
any questions that the Court may have.

Your Honor, just a little bit of background.
Obviously the Court knows that on March 15, 2018 the
plaintiffs filed a motion for a conditional class
certification pursuant to the FLSA and Rule 23.

On March 19, Your Honor, plaintiff's counsel
learned that while this action has been pending for over
one year, and a motion for conditional class
certification was pending, defendant's counsel engaged
in potentially improper communications with putative
plaintiffs and class members.

Specifically on March 19, 2018, we received
a phone call from witness, Mr. Justin Dillon, whom
plaintiff's counsel had never spoken with before or met
in person up until the 19th. We received a phone call
from him -- he is not an opt-in plaintiff at this time,

| | |
|---|---|
| 00:36:22 | 1 |
| 00:36:25 | 2 |
| 00:36:28 | 3 |
| 00:36:31 | 4 |
| 00:36:34 | 5 |
| 00:36:37 | 6 |

but he is a putative Rule 23 class member -- indicating

that he had been contacted by defendant's counsel whom

he later confirmed represented defendant An.  He

contacted us and stated that he had just finished

meeting with the attorneys who he later confirmed or

understood represent defendant An.

        According to Mr. Dillon, Your Honor, after

speaking with counsel for defendants he walked away

feeling completely confused by his communications with

them and essentially did not understand the nature of

those communications or the purpose of that meeting,

Your Honor.

        Defendant's one-sided communications with

putative class members have the potential to eliminate

the majority of the potential class when they are

agreeing to speak with the defendant's counsel, signing

statements without being fully informed of all of the

relevant facts, the status of the pending action, or

their legal rights.

        Defendant's one-sided communications with

putative counsel -- I'm sorry, with the putative class

have actually, again, actually limited or have the

potential to limit or eliminate their potential recovery

in this action.

        Your Honor, to be clear, plaintiffs are not

| | | |
|---|---|---|
| 00:37:38 | 1 | here to argue that the employers may not communicate |
| 00:37:41 | 2 | with putative plaintiffs in most circumstances, but this |
| 00:37:44 | 3 | is one of those exceptions due to the nature of such |
| 00:37:47 | 4 | communications which have caused confusion, |
| 00:37:51 | 5 | misrepresenting the status of the action, the effect of |
| 00:37:54 | 6 | the pending case.  And given the pending motion for |
| 00:37:58 | 7 | notice, which if the Court granted such motion would |
| 00:38:02 | 8 | provide the putative plaintiffs and the Rule 23 class |
| 00:38:05 | 9 | members with impartial Court-authorized notice, |
| 00:38:11 | 10 | eliminating and avoiding any issues that have prompted |
| 00:38:15 | 11 | this motion for protective order. |
| 00:38:18 | 12 | Now, Your Honor, in terms of the governing |
| 00:38:23 | 13 | principles in terms the of limiting communications, |
| 00:38:26 | 14 | courts all agree that they have the authority to control |
| 00:38:30 | 15 | the communications with class members.  These general |
| 00:38:34 | 16 | principles were established by the Supreme Court in Gulf |
| 00:38:38 | 17 | Oil versus Bernard.  In applying the standard pronounced |
| 00:38:43 | 18 | in Gulf Oil, the Court must first determine whether |
| 00:38:46 | 19 | limitation on defendant's communication with putative |
| 00:38:49 | 20 | class members is necessary. |
| 00:38:51 | 21 | As addressed in Slavinski versus Columbia |
| 00:38:55 | 22 | Association, a Fourth Circuit District Court case from |
| 00:38:57 | 23 | 2011, the Court determines that first the movant must |
| 00:39:01 | 24 | show that a particular form of communication has |
| 00:39:05 | 25 | occurred or is threatened to occur.  Second, the movant |

00:39:09 1 must show that the particular form of communication at

00:39:13 2 issue is abusive in that it threatens the proper

00:39:18 3 functioning of the litigation.  A moving party must show

00:39:22 4 that not only that the communication has occurred or is

00:39:26 5 threatened to occur but that the particular form of

00:39:29 6 communication is abusive.  Some of those abusive

00:39:32 7 practices that have been considered sufficient to

00:39:35 8 warrant a protective order include communications that

00:39:38 9 misrepresent the status or the effect of the pending

00:39:41 10 litigation.  They have an obvious potential for

00:39:44 11 confusion.  They can otherwise be characterized as

00:39:51 12 false, misleading or intimidating or are communications

00:39:55 13 which can undermine the cooperation or confidence in

00:39:58 14 class counsel, Your Honor.

00:39:59 15         And in some of the cases, one in particular

00:40:01 16 that comes to mind and is so analogous to the facts in

00:40:05 17 this case, and even in that case, Your Honor, the

00:40:09 18 defendant's counsel in communicating with putative class

00:40:12 19 members actually did so much more, communicated so much

00:40:17 20 more to putative class members than was done in this

00:40:20 21 case.  And that case that I'm referring to, Your Honor,

00:40:22 22 is Quezada versus Schneider Logistics Transloading.

00:40:28 23 It's a 2013 case, Your Honor.  And prior to beginning

00:40:33 24 the conversation with putative class members --

00:40:36 25         THE COURT:  I didn't find that case very

00:40:41 1 similar to the facts here. I recall in that case

00:40:46 2 meetings with current employees were held in a manager's

00:40:51 3 office during work hours, and employees were ordered to

00:40:55 4 report to those meetings either over a loudspeaker or by

00:40:58 5 having a supervisor escort them. I don't think that's

00:41:01 6 one of your better cases.

00:41:03 7 You're really recapping your written

00:41:05 8 material. This is an opening statement. Is there

00:41:10 9 anything that you would in particular seek to highlight?

00:41:15 10 MS. HERNANDEZ: Absolutely, Your Honor. I

00:41:16 11 will simply say that in terms of determining whether

00:41:19 12 precertification communications between the employees

00:41:22 13 and the employers are sufficiently deceptive or coercive

00:41:26 14 warranting relief, the Courts have considered several

00:41:29 15 factors, including whether an employer adequately

00:41:32 16 informed the employees about the details of the

00:41:35 17 underlying suit, the nature and purpose of the

00:41:37 18 communication, and the fact that any defense attorneys

00:41:41 19 conducting the communications represent the employer and

00:41:44 20 not the employee.

00:41:45 21 Now, Your Honor, one thing that I would like

00:41:46 22 to highlight about Quezada is that the Court found while

00:41:51 23 defendant's counsel had provided a great deal of detail,

00:41:54 24 they failed to simply advise these individuals that the

00:41:59 25 information being collected would be utilized, for the

00:42:03 1 purpose of the interviews, to gather evidence and to be

00:42:07 2 used against the employees in the lawsuit. They were

00:42:11 3 not even told that the document they were going to be

00:42:13 4 asked to sign at the close of the interview was a sworn

00:42:16 5 declaration, nor were they apprised of the significance

00:42:19 6 of signing a declaration under penalty of perjury.

00:42:22 7          Those are the types of issues that happened

00:42:25 8 in this case, Your Honor. In this case the

00:42:27 9 communications with Mr. Dillon, who's a putative class

00:42:32 10 member --

00:42:33 11          THE COURT: Mr. Dillon, why don't you step

00:42:36 12 outside the room. I'd rather hear your testimony

00:42:38 13 without the forecast of what you're going to say. And

00:42:42 14 we'll get you right back in as soon as opening statement

00:42:46 15 is done.

00:42:46 16          (Mr. Dillon exits the courtroom.)

00:42:49 17          THE COURT: Okay. What is he going to say?

00:42:52 18          MS. HERNANDEZ: So in this case, Your Honor,

00:42:54 19 as you can see, you could even see from the

00:42:56 20 transcription, just the lack of information, just at the

00:43:03 21 outset when Ms. Erin Whitlock, a paralegal for the

00:43:08 22 defendants, did not even communicate thoroughly the

00:43:10 23 nature of the action, did not communicate thoroughly how

00:43:14 24 the pending status of the action could affect him, did

00:43:17 25 not explain the nature of Wai Man Tom's, the named

00:43:24 1 plaintiff's, allegations, how he was representing not

00:43:26 2 just himself but putative plaintiffs. And more

00:43:29 3 importantly, Your Honor, there's no question that from

00:43:31 4 the transcription Mr. Dillon was confused about who he

00:43:36 5 was speaking to and even said: Well, I'm good friends

00:43:40 6 with Brandon Kelly.

00:43:43 7 At that point, Your Honor, I think the

00:43:44 8 defendants' counsel and their staff should have been on

00:43:49 9 notice to be entirely truthful, transparent, and candid

00:43:54 10 about all of these things, even if they had to

00:43:56 11 repeatedly explain who they represented.

00:44:00 12 Your Honor, I mean, I could go into again

00:44:03 13 just the main point on their failures. I mean, Mr.

00:44:08 14 Dillon was not advised that the document he was asked to

00:44:12 15 sign at the close of the interview was a sworn

00:44:16 16 declaration. They did not, again, thoroughly explain

00:44:18 17 the nature of the lawsuit, did not explain how the

00:44:23 18 purpose of that meeting with him was to use the

00:44:27 19 information for gathering purposes and to be utilized

00:44:32 20 against him potentially and how it could limit his

00:44:35 21 recovery should the class be certified. And these are

00:44:38 22 all communications which are fundamentally misleading

00:44:42 23 and deceptive because he clearly was unaware that the

00:44:46 24 interview was taking place in an adversarial context and

00:44:50 25 that his statement could be used to limit his own relief

00:44:54   1    as a putative plaintiff class member.

00:44:57   2          And now in terms of what defendant's counsel

00:45:00   3    have said, they simply said to him: We're calling about

00:45:03   4    the lawsuit involving An. Ms. Fishman explained in

00:45:10   5    vague terms a lawsuit was going on. So the details go

00:45:12   6    on and on.

00:45:13   7          I certainly do not want to belabor or

00:45:16   8    reiterate the points that have been raised in

00:45:18   9    plaintiff's brief in support of the motion for

00:45:21  10    protective order, but just from comparing, again, the

00:45:25  11    transcription and how he was very candid about feeling

00:45:30  12    frustrated that not just himself but other servers felt

00:45:34  13    frustrated that they were having to tip out to

00:45:38  14    individuals that were not even stepping floor in the

00:45:42  15    front of the house, those are all details -- I mean,

00:45:44  16    that transcription was so lengthy compared to this

00:45:49  17    declaration that he signed.

00:45:50  18          THE COURT: Would you agree with me that the

00:45:55  19    standard for judicial intervention is whether the

00:45:59  20    defendant misrepresented the status or effect of this

00:46:04  21    action, whether the communications had an obvious

00:46:09  22    potential for confusion, whether they were misleading,

00:46:12  23    intimidating, or coercive? Isn't that what this hearing

00:46:16  24    is all about?

00:46:17  25          MS. HERNANDEZ: Yes, it is, Your Honor.

00:46:18 1    THE COURT:  Not about whether there was a

00:46:22 2 mere lack of clarity on the part of defense counsel, or

00:46:26 3 a failure to provide a copy of the affidavit, or a lack

00:46:30 4 of thorough explanation?  Would you agree with me that

00:46:33 5 those items are not sufficient to meet this standard for

00:46:37 6 judicial intervention that's set forth in <u>Gulf Oil</u> and

00:46:42 7 is described in the Manual for Complex Litigation?

00:46:45 8    MS. HERNANDEZ:  I would agree with that,

00:46:47 9 Your Honor.

00:46:47 10    THE COURT:  All right.  Thank you very much.

00:46:48 11    Let's hear from the defendant briefly, then

00:46:50 12 we'll let the plaintiff call the first witness.

00:46:52 13    MR. HUNT:  Thank you, Your Honor.  We also

00:46:55 14 agree that that's the proper, appropriate standard for

00:46:59 15 judicial intervention.

00:47:00 16    And in this case, just briefly, there was

00:47:04 17 absolutely nothing impermissible in our interviewing or

00:47:07 18 attempting to obtain a statement from Mr. Dillon, or

00:47:11 19 anyone else for that matter, who has not filed a consent

00:47:15 20 to sue, was not represented by the plaintiffs.  There's

00:47:20 21 been no certification in this action.  And under the

00:47:23 22 current law, it's more universally recognized defendants

00:47:30 23 can and probably should attempt to interview people that

00:47:35 24 potentially might be members of a class.

00:47:38 25    Moreover, there's no evidence that there was

| | |
|---|---|
| 00:47:41 | 1 |

any kind of coercion or intimidation.  Mr. Dillon, he

doesn't currently work for any of the defendants.

That's, I think a fact which distinguishes his situation

from a substantial number of the cases that the

plaintiffs have attempted to rely on in their brief.

In addition to that, there wasn't any

evidence that there was any offer by the defendants to

try to settle the case or compromise his claim.  There's

no evidence that he was told not to participate in the

case or not to file a consent to sue or that somehow he

was intimidated into meeting with Ms. Fishman and Ms.

Whitlock at a public place in downtown Raleigh.  What

the evidence does show is that he voluntarily spoke with

Ms. Whitlock on two occasions, and he voluntarily

engaged in a series of text message communications with

her.  He also voluntarily agreed to meet with Ms.

Whitlock and Ms. Fishman, and he did so.  He met at the

Starbucks.  And even according to the affidavit that he

submitted to Your Honor in connection with the

plaintiff's motion, he understood, at least even if he

somehow was initially confused, which I don't think was

the case, but even buying that, that he initially was

confused, he knew halfway through the conversation -- he

said this in the affidavit he gave to Ms. Hernandez --

that he fully understood that Ms. Whitlock and Ms.

00:49:27 1   Fishman were representing the defendants in the case;

00:49:29 2   and nonetheless, he continued with the interview. He

00:49:35 3   then provided them with a written statement with a

00:49:40 4   declaration. He also, according to the affidavit that

00:49:43 5   he provided to plaintiff's counsel, edited that

00:49:46 6   affidavit and made whatever changes he wanted.

00:49:51 7         THE COURT: Do you know -- do you have the

00:49:53 8   original affidavit that he made changes on and returned?

00:49:57 9         MR. HUNT: He made them on the computer as

00:50:01 10   this was being done, so we don't have the actual

00:50:06 11   document. What occurred was when they met with him at

00:50:10 12   Starbucks, Ms. Fishman was preparing the affidavit as he

00:50:13 13   was talking based on his comments. Then I believe the

00:50:18 14   testimony will be she showed him the computer, and he

00:50:22 15   made changes.

00:50:22 16         THE COURT: He can testify to that if he

00:50:24 17   remembers.

00:50:24 18         MR. HUNT: In addition to that, then

00:50:26 19   sometime after he spoke to plaintiff's counsel, in fact,

00:50:30 20   the evidence will show that he went ahead and asked for

00:50:35 21   a copy of the affidavit, which he got. It wasn't

00:50:39 22   initially sent to him because of inadvertence, but it

00:50:43 23   was sent to him. And although he said he initially

00:50:45 24   wanted to make changes, he sent Ms. Whitlock a text

00:50:50 25   saying he didn't want to make any changes. So that

00:50:53  1  occurred voluntarily as well.  There wasn't any

00:50:59  2  compulsion on his part to reach out to us to do so.

00:51:03  3          So the defendant's position is they had a

00:51:05  4  First Amendment right to communicate with Mr. Dillon.

00:51:08  5  He's not represented by counsel.  And there's nothing

00:51:12  6  remotely approaching any kind of miscommunication,

00:51:16  7  coercion.  And asking open ended questions about the

00:51:20  8  facts of the case certainly doesn't -- isn't the

00:51:24  9  equivalent of coercion, and asking open-ended questions

00:51:27  10  about the factual basis or about the facts involved in

00:51:31  11  this case also doesn't make those questions misleading.

00:51:34  12  So we think that this simply is a witness interview that

00:51:39  13  happens hundreds of times day across the country in all

00:51:43  14  kinds of different litigation, and we respectfully ask

00:51:46  15  that the motion be denied.

00:51:48  16          THE COURT:  Well, I'll preface going forward

00:51:50  17  with some language from the Fourth Circuit.  I haven't

00:51:54  18  found a case where the Fourth Circuit addressed directly

00:51:57  19  the type of abuse that may trigger District Court

00:52:00  20  intervention in the form of a limiting order, but I did

00:52:04  21  find a case where the Fourth Circuit recently commented

00:52:06  22  upon conduct by an employer defendant in the context of

00:52:11  23  a motion to compel arbitration in the class action case.

00:52:15  24  But does my survey of the Fourth Circuit match yours?

00:52:20  25  Have you found a decision by the Fourth Circuit that's

00:52:23 1 on point here?

00:52:24 2         MS. HERNANDEZ: No. No, Your Honor, not

00:52:26 3 necessarily other than some district court cases.

00:52:28 4         THE COURT: Okay. Have you?

00:52:30 5         MR. HUNT: No, Your Honor. There are some

00:52:32 6 District Court cases, I believe, which we cited in our

00:52:36 7 brief with the proposition that it's acceptable to speak

00:52:40 8 with class members or putative class members prior to

00:52:45 9 certification.

00:52:47 10         THE COURT: Well, in that DeGidio versus

00:52:53 11 Crazy Horse Saloon case, which is a case this year, the

00:52:59 12 Court noted that the employer was disdainful of orderly

00:53:05 13 judicial process and lacking in the respect that

00:53:07 14 opposing parties in an adversary proceeding are due. It

00:53:13 15 found under the facts there that Crazy Horse didn't

00:53:15 16 inform that it was communicating with potential class

00:53:21 17 members about pending litigation; it didn't tell the

00:53:27 18 Court.

00:53:27 19         But the Court goes on to talk about the FLSA

00:53:30 20 opt-in requirement, that it was enacted in response to

00:53:35 21 excessive litigation spawned by plaintiffs lacking a

00:53:40 22 personal interest in the outcome.

00:53:44 23         The requirement seeks to balance employees'

00:53:50 24 interest in pooling resources to bring collective

00:53:53 25 actions and employers' interests in reducing baseless

00:53:56 1  lawsuits.  In order to strike this balance, District

00:54:00 2  Courts must be able to supervise contacts between the

00:54:03 3  parties and their respective counsel to insure that

00:54:07 4  potential plaintiffs are not misled about the

00:54:10 5  consequences of joining a class in an ongoing employment

00:54:15 6  dispute.  The Court's supervisory role helps to insure

00:54:20 7  that employees receive accurate and timely notice so

00:54:23 8  that they can make informed decisions about whether to

00:54:26 9  participate.

00:54:27 10  I think some of that language is helpful

00:54:29 11  here.  And we come back to the fact that what's in front

00:54:32 12  of me isn't whether there was a lack of clarity in and

00:54:39 13  of itself, but it's whether it really strikes to the

00:54:44 14  heart of coercive or misleading or intended to confuse,

00:54:54 15  intimidating.  So that's what I've got in my mind.  And

00:54:58 16  I think both sides agree that that's what I should be

00:55:03 17  looking at.  The communications must be said to

00:55:08 18  misrepresent the status or effect of the pending action,

00:55:12 19  have an obvious potential for confusion, misleading,

00:55:16 20  intimidating, or coercive.

00:55:18 21  So why don't you go and get your witness,

00:55:20 22  and we'll invite him to come up to the bench.

00:55:24 23  Please tell him to watch his step.  We lose

00:55:27 24  a few people when we go from the wooden floor to the

00:55:30 25  carpet.

| 00:55:30 | 1 | MS. HERNANDEZ: You would want him -- |
| 00:55:33 | 2 | THE COURT: He's going to come straight up |
| 00:55:35 | 3 | to Ms. Collins. She's going to administer the oath, |
| 00:55:38 | 4 | then he's going to go into the witness box. |
| 00:56:11 | 5 | THE CLERK: Please place your left hand on |
| 00:56:14 | 6 | the Bible and raise your right hand. State your name |
| 00:56:16 | 7 | for the Court. |
| 00:56:18 | 8 | THE WITNESS: Justin Dillon, J-u-s-t-i-n |
| 00:56:25 | 9 | D-i-l-l-o-n. |
| 00:56:25 | 10 | (Whereupon the witness was sworn by the |
| 00:56:33 | 11 | clerk.) |
| 00:56:33 | 12 | THE CLERK: Please take the witness stand. |
| 00:56:43 | 13 | THE COURT: I'm going to invite Ms. Hernandez to ask you |
| 00:56:45 | 14 | some questions. Then when she's finished, counsel for |
| 00:56:48 | 15 | the defendant has a chance to ask you questions as well. |
| 00:56:50 | 16 | Please proceed. |
| 00:56:50 | 17 | - - - |
| 00:56:50 | 18 | JUSTIN DILLON, DIRECT EXAMINATION |
| 00:56:52 | 19 | BY MS. HERNANDEZ: |
| 00:56:52 | 20 | Q. Thank you, Your Honor. |
| 00:56:56 | 21 | Mr. Dillon, thank you so much for taking the time |
| 00:56:59 | 22 | to be here today. |
| 00:57:04 | 23 | THE COURT: You can question the witness |
| 00:57:06 | 24 | while seated. |
| 00:57:07 | 25 | MS. HERNANDEZ: Thank you. |

| | | |
|---|---|---|
| 00:57:10 | 1 | BY MS. HERNANDEZ: |
| 00:57:10 | 2 | Q.  Mr. Dillon, when you first heard from defendant's |
| 00:57:14 | 3 | counsel, do you recall who exactly contacted you and |
| 00:57:19 | 4 | what they said in reference to this matter? |
| 00:57:22 | 5 | A.  After relooking through the phone messages, I |
| 00:57:27 | 6 | knew a name but not a face to the name.  And it was -- |
| 00:57:30 | 7 | that's pretty much all I got out of it.  I didn't really |
| 00:57:33 | 8 | know exactly who represented who.  As I stated in my |
| 00:57:38 | 9 | text, I was more than happy to be a part of this if it |
| 00:57:42 | 10 | was going to actually come of some sort to where people |
| 00:57:49 | 11 | were being held accountable for what was happening. |
| 00:57:53 | 12 | Q.  And when you subsequently spoke to someone |
| 00:57:56 | 13 | representing the defendant's counsel, do you recall |
| 00:58:01 | 14 | whether you called them or they called you?  And how |
| 00:58:04 | 15 | did they introduce themselves to you? |
| 00:58:06 | 16 | A.  Well, they called me.  I missed the call and I |
| 00:58:09 | 17 | called them back.  Then it was pretty much a -- |
| 00:58:12 | 18 | THE COURT:  Can you give me a name? |
| 00:58:16 | 19 | THE WITNESS:  Erin Whitlock was the name |
| 00:58:18 | 20 | that was on the text.  I don't necessarily remember who |
| 00:58:20 | 21 | I was talking to whenever I was on the phone.  It was a |
| 00:58:23 | 22 | very brief conversation.  And for the most part -- they |
| 00:58:30 | 23 | asked me a couple questions and asked to meet me at |
| 00:58:32 | 24 | Starbucks. |
| 00:58:34 | 25 | BY MS. HERNANDEZ: |

00:58:34 1    Q.  Do you recall if they explained the nature of the

00:58:37 2  lawsuit?

00:58:38 3    A.  No, they did not give me any paperwork, any

00:58:41 4  information.  They just said that it just had to deal

00:58:44 5  with the lawsuit that I had already known about from the

00:58:47 6  year prior, so.

00:58:48 7    Q.  Did you know a year prior what the lawsuit was

00:58:51 8  about?

00:58:51 9    A.  I thought it was for back wages.  And then it

00:58:56 10  turned into -- until I came to your office, I did not

00:59:01 11  even understand that it had to do with anything being,

00:59:04 12  like, tip pool and stuff like that.

00:59:04 13       (Whereupon Ms. Whitlock and Ms. Fishman exit the

00:59:04 14  courtroom.)

00:59:10 15    Q.  I'm sorry.  Could you please repeat that?

00:59:11 16    A.  Until I met with you, I did not know what the

00:59:14 17  actual real true nature of the lawsuit was.

00:59:20 18    Q.  So did they explain to you -- so when you say

00:59:25 19  that you learned about the case being about back wages,

00:59:27 20  is that something that they communicated to you?

00:59:29 21    A.  Before I had quit, Brandon and Wai had already

00:59:34 22  mentioned that they were going to pursue this.  And then

00:59:38 23  a year later is when they contacted me.  So then I had

00:59:42 24  actually had your contact information from when they

00:59:45 25  asked if anybody wanted to join.  And then I had called

00:59:49　1　you because how I felt whenever I left with them.

00:59:52　2　　Q.　And how did you feel when you left the meeting

00:59:55　3　with the defendant's counsel?

00:59:57　4　　A.　That they were trying to sway my words to be

01:00:03　5　different -- they would take three sentences and write

01:00:06　6　it into one.　And the context of what I was reading was

01:00:09　7　not what I said.

01:00:10　8　　Q.　Did they explain to you the significance of

01:00:17　9　signing a declaration under penalty of perjury?

01:00:21　10　　A.　No.　They didn't even give me a copy of it.

01:00:25　11　　Q.　Did they offer you a copy of the declaration?

01:00:28　12　　A.　No.　The printer wasn't working.　She walked off;

01:00:31　13　she printed off one copy and brought it back to the

01:00:36　14　table.　This is after I had already gone through and

01:00:38　15　taken off about two and a half pages of what they had

01:00:42　16　written down.　And I actually didn't really realize they

01:00:45　17　were actually, like, typing what I was saying because I

01:00:49　18　was focused on one person while the other person was

01:00:52　19　writing.　Then they said:　Would you like to review

01:00:55　20　it -- no, halfway through I realized what they said.

01:00:57　21　And I was, like, may I review this?　Then I just started

01:01:01　22　deleting all kinds of stuff because it just seemed

01:01:04　23　really fishy.　They had really weird questions that they

01:01:10　24　were asking.　And it started to really, like, bring up a

01:01:14　25　little bit of doubt in my mind on what was actually

01:01:17   1   happening.

01:01:17   2       Q.  Did they explain to you the nature of the meeting

01:01:19   3   with you?

01:01:20   4       A.  No.  They didn't give me any paperwork.  They

01:01:23   5   didn't give me any -- no.  No.

01:01:28   6       Q.  Did they explain to you -- did they show you a

01:01:31   7   copy of the first amended complaint in this lawsuit?

01:01:33   8       A.  No.  I would have had it.

01:01:35   9       Q.  Did they explain to you at all the nature of the

01:01:38  10   named plaintiff's allegations in this lawsuit?

01:01:40  11       A.  No.

01:01:41  12       Q.  Did they explain to you that they would be

01:01:45  13   utilizing the information gathered from you against the

01:01:51  14   plaintiff's in this lawsuit or potentially in this

01:01:54  15   lawsuit?

01:01:55  16           MR. HUNT:  Objection.  Leading.

01:01:56  17           THE COURT:  Sustained.

01:02:00  18   BY MS. HERNANDEZ:

01:02:00  19       Q.  Did they explain to you that they would be

01:02:04  20   utilizing a declaration signed by you in this lawsuit?

01:02:08  21       A.  No.

01:02:11  22       Q.  Did they explain to you that you could be a

01:02:16  23   potential Rule 23 class member in this lawsuit?

01:02:19  24       A.  No.

01:02:20  25           MR. HUNT:  Objection.  Leading.

01:02:23   1            THE COURT: Overruled.

01:02:26   2   Q. Did they explain to you that you had a right to

01:02:29   3  confer with an attorney before signing a declaration?

01:02:33   4   A. No.

01:02:35   5   Q. Did they explain to you that you had a right to

01:02:37   6  have an attorney present during the course of the

01:02:41   7  communications with them?

01:02:43   8   A. No.

01:02:43   9            MR. HUNT: Objection.

01:02:44  10            THE COURT: Overruled.

01:02:50  11   A. They didn't tell me anything. We just talked and

01:02:52  12  had a casual conversation, and they started asking me

01:02:56  13  questions. And about halfway through it got really --

01:02:58  14  when they started asking about sushi chefs speaking

01:03:02  15  English, I started realizing what was going on. Because

01:03:06  16  it made no sense to me, and I still don't even

01:03:09  17  understand why the sushi chefs even needed to speak

01:03:14  18  English, except we spoke about it that they were tipped

01:03:17  19  out as well. None of it made sense until -- they were

01:03:20  20  very vague, broad questions at first then got very

01:03:23  21  detailed at the very end.

01:03:25  22   Q. Did you feel somewhat -- did you feel confused?

01:03:28  23            MR. HUNT: Objection. Leading.

01:03:30  24   A. I didn't know what was going on.

01:03:32  25            THE COURT: That is a leading question.

01:03:33    1    "How did you feel," would be the question.

01:03:36    2    BY MS. HERNANDEZ:

01:03:36    3        Q.   I'm sorry.   Strike that question.

01:03:38    4        How did you feel, Mr. Dillon, during the course

01:03:41    5    of the communications with defendant's counsel?

01:03:43    6        A.   It was very casual at first.   And there wasn't

01:03:47    7    any kind of questions in my mind about what was going

01:03:50    8    on.   And then about halfway through is when it just --

01:03:55    9    it seemed like one-sided questions to where I was --

01:04:00   10    that just seemed like one-sided questions.

01:04:03   11        Q.   What prompted you to contact plaintiff's counsel

01:04:06   12    after your meeting with them?

01:04:08   13        A.   Because it just seemed off, the entire thing.

01:04:13   14    After I looked at it, like, looked back at it, when I

01:04:18   15    walked out -- like, I'm not the one to really question

01:04:22   16    anything, but that was questionable to me.

01:04:24   17        So I just wanted -- and if anything, whenever I

01:04:28   18    texted you, just out of total transparency, I wanted you

01:04:32   19    to know I had spoken with them.   And I just didn't want

01:04:35   20    to -- that's it.

01:04:39   21        Q.   Did you feel that they fully explained the nature

01:04:46   22    of this lawsuit or what was going on?

01:04:49   23        A.   No.

01:04:49   24            MR. HUNT:   Objection.   Leading.

01:04:52   25        Q.   Prior to asking you these questions.

01:04:54  1   A.  No.  The only information that I had was that

01:04:58  2   quick text where they said, "We represent An.  And that

01:05:05  3   was it.  I didn't know on which side.  No, I did not.

01:05:14  4          MS. HERNANDEZ:  Mr. Dillon, thank you very

01:05:15  5   much.  I have no further questions at this time.

01:05:21  6                    - - -

01:05:21  7          JUSTIN DILLON, CROSS-EXAMINATION

01:05:21  8   BY MR. HUNT:

01:05:21  9   Q.  Mr. Dillon, I'm John Hunt.  I represent the

01:05:25  10  defendants.  You're not a plaintiff in this case,

01:05:27  11  correct?

01:05:27  12  A.  Correct.

01:05:28  13  Q.  You've never filed a consent to sue; is that

01:05:30  14  correct?

01:05:30  15  A.  Correct.

01:05:31  16  Q.  You're not represented by Ms. Hernandez or Mr.

01:05:35  17  Cohen; is that correct?

01:05:36  18  A.  Correct.

01:05:38  19  Q.  Is that correct?

01:05:38  20  A.  Correct.  Yes.

01:05:39  21  Q.  In fact, you quit your employment at An in

01:05:46  22  November 2016; is that right?

01:05:47  23  A.  Yes, sir.

01:05:48  24  Q.  You don't work at the Umstead?

01:05:50  25  A.  No, sir.

01:05:51  1      Q.  You don't work for SAS?

01:05:53  2      A.  No, sir.

01:05:54  3      Q.  In fact, you don't work for any company

01:05:56  4  affiliated with any of those organizations, correct?

01:05:58  5      A.  Not at the moment.

01:06:01  6      Q.  You returned a call that you received on March 2,

01:06:06  7  2018, correct?

01:06:07  8      A.  Yes.

01:06:10  9      Q.  You voluntarily returned that call?

01:06:13  10     A.  Yes.  I didn't know who was calling.  I do not

01:06:15  11  set up my voice mail on purpose on my personal phone.

01:06:19  12  So I had --

01:06:21  13     Q.  No one forced you to return that call?  You went

01:06:24  14  ahead and returned it?

01:06:25  15     A.  I did not know who was calling, so yes, I -- so

01:06:29  16  yes, I returned it.

01:06:30  17     Q.  You could have ignored the call if you chose to

01:06:32  18  do so, right?

01:06:33  19     A.  Normally people don't ignore phone calls.

01:06:35  20     Q.  You could have?

01:06:36  21     A.  Yes, I could have ignored it if I wanted to, but

01:06:39  22  I did not.

01:06:39  23     Q.  When you called the number, the person that

01:06:41  24  answered the phone identified that they were with the

01:06:44  25  Stokes Wagner law firm; is that right?

01:06:47   1                MS. HERNANDEZ:  Objection.  Leading.

01:06:50   2        A.   They told me --

01:06:51   3                THE COURT:  One moment.  Let me rule on the

01:06:53   4    objection.

01:06:54   5                Sustained.

01:06:55   6                MR. HUNT:  I'm sorry, Your Honor.  I thought

01:06:57   7    this was a hostile witness.

01:06:59   8                THE COURT:  That is true.  You can lead.

01:07:02   9    Why don't you repeat the question.

01:07:05  10    BY MR. HUNT:

01:07:06  11        Q.   When you returned the phone call you received,

01:07:08  12    the person who answered the phone said that it was the

01:07:11  13    Stokes Wagner law firm, right?

01:07:13  14        A.   No, they said that they -- my name is Erin

01:07:17  15    Whitlock, and I represent An.

01:07:18  16        Q.   Did you speak with a woman by the name of Sarah

01:07:21  17    St. Pierre?

01:07:22  18        A.   I think that was the secretary that told me to

01:07:25  19    wait.

01:07:26  20        Q.   And when Ms. St. Pierre answered the phone, she

01:07:30  21    identified that you had called the Stokes Wagner law

01:07:34  22    firm, right?

01:07:34  23        A.   I do not recall.  It was a very quick

01:07:37  24    interaction.  And, I mean, it was my day off.  I wasn't

01:07:41  25    paying that much attention on that.

01:07:43   1      Q.  Based on your experience, when you call a

01:07:45   2  business, the business usually --

01:07:47   3      A.  It's my personal phone.

01:07:49   4      Q.  I'm sorry, sir.  If you could wait.

01:07:51   5          When you call a business generally, it's been

01:07:53   6  your experience the business identifies the name of the

01:07:57   7  business when you've reached that number, right?

01:07:59   8      A.  Yes, absolutely.

01:08:00   9      Q.  And sitting here today, you say you can't recall

01:08:04  10  whether Ms. St. Pierre told you it was Stokes Wagner law

01:08:08  11  firm or not, right?

01:08:09  12      A.  I'm sure they did, but I didn't know who you were

01:08:12  13  actually representing and the specifics of --

01:08:15  14      Q.  Ms. St. Pierre told you that she had called you

01:08:20  15  regarding the Tom versus An case, correct?

01:08:26  16      A.  Yes.

01:08:26  17      Q.  So you knew that she had called in connection

01:08:28  18  with the lawsuit, right?

01:08:30  19      A.  Yes.  But I did not know which side.

01:08:32  20      Q.  So she told you that our law firm or Stokes

01:08:37  21  Wagner represented the defendants, represented the

01:08:39  22  restaurant, right?

01:08:40  23      A.  No, she said they represent An.  I didn't know

01:08:43  24  if -- it's very vague to me.  I'm not used to court.

01:08:48  25  I'm not used to lawyers.

01:08:49  1    Q.  So Ms. St. Pierre told you during your initial

01:08:54  2  phone call that she was with a law firm that represented

01:08:59  3  An; am I correct?

01:09:02  4    A.  If you want to break it down to exact words, yes.

01:09:05  5  Understanding of those words was different.

01:09:10  6    Q.  You previously have worked at An, as you told

01:09:14  7  plaintiff's counsel, correct?

01:09:16  8    A.  Yeah.

01:09:16  9    Q.  You also knew prior to the time that you called

01:09:19  10  Ms. St. Pierre that Brandon Kelly and Wai Man Tom had

01:09:27  11  filed a lawsuit against An, correct?

01:09:30  12    A.  Yes.

01:09:30  13    Q.  You also knew --

01:09:31  14    A.  I knew they were going to file a lawsuit.

01:09:34  15    Q.  You also knew that they had tried to encourage

01:09:38  16  other people to participate in that lawsuit including

01:09:41  17  yourself, correct?

01:09:42  18        MS. HERNANDEZ:  Objection.  Form.

01:09:43  19        THE COURT:  Overruled.

01:09:45  20    A.  Yes.

01:09:47  21    Q.  So you had all that knowledge by the time you

01:09:50  22  talked to Ms. St. Pierre, and Ms. St. Pierre informed

01:09:54  23  you that she was calling on behalf of An, correct?

01:09:59  24    A.  Whenever -- okay, so if -- yes.

01:10:06  25    Q.  You spoke to Ms. St. Pierre first, then she

01:10:09   1   transferred you to Ms. Whitlock, correct?

01:10:11   2       A.   Yes.

01:10:12   3       Q.   You then spoke to Ms. Whitlock, right?

01:10:15   4       A.   Yes.

01:10:16   5       Q.   Ms. Whitlock also told you that she was calling

01:10:22   6   you in connection with a lawsuit and it was on behalf of

01:10:25   7   the restaurant, correct?

01:10:27   8       A.   Yes.  But it was very unclear to what extent

01:10:32   9   anything was actually happening or who was represented

01:10:37  10   by who.

01:10:37  11       Q.   Well, you knew that Ms. Whitlock was calling from

01:10:40  12   a law firm that represented the restaurant in this

01:10:44  13   particular lawsuit, right?

01:10:46  14       A.   If I would have known that you guys represented

01:10:49  15   An and were going against them, I would not have met,

01:10:52  16   and I would not have participated in any of this.

01:10:55  17       Q.   Sir, that's not the question I asked you.

01:10:57  18           What I asked you was:  Did you know at the time

01:11:00  19   you talked to Ms. Whitlock -- or you knew at the time

01:11:04  20   that you talked to Ms. Whitlock that she was with a law

01:11:07  21   firm that was representing the defendants, that is, An,

01:11:11  22   in the case that had been filed by Mr. Kelly and Mr.

01:11:15  23   Tom, correct?

01:11:16  24           MS. HERNANDEZ:  Objection.  Asked and

01:11:17  25   answered.

01:11:18   1              THE COURT:  Overruled.

01:11:20   2       A.   It's all on paper.  You submitted it.  Yes.  I

01:11:26   3   mean.

01:11:26   4       Q.   The answer to my question is:  Yes, you

01:11:28   5   understood all that?

01:11:29   6       A.   I understood that I was speaking to an attorney

01:11:32   7   or a paralegal for a law firm.  I was not aware of who

01:11:37   8   was being -- I didn't understand who was being

01:11:44   9   represented.  You can say An, but that could mean

01:11:48  10   anything to me whenever I'm not familiar with all this

01:11:51  11   stuff.

01:11:52  12       Q.   You worked at An and you understood there was a

01:11:56  13   lawsuit that had been filed by former servers against

01:12:00  14   An, correct?

01:12:01  15       A.   Yes.

01:12:01  16       Q.   So you knew that information at the time you

01:12:04  17   talked to Ms. Whitlock?

01:12:05  18       A.   It had been a year later.  I -- there was

01:12:09  19   vagueness in what I understood was going on.

01:12:13  20       Q.   Ms. Whitlock wanted to ask you -- well, there

01:12:16  21   wasn't anything vague in her telling you we represent

01:12:19  22   the restaurant, was there?   I mean, you understood that

01:12:22  23   you'd worked at the restaurant, and we were representing

01:12:26  24   the restaurant; is that correct?

01:12:28  25       A.   The simple answer, yes.

01:12:31  1     Q.  Ms. Whitlock then proceeded to ask you a number

01:12:35  2   of questions about the case, correct?

01:12:38  3     A.  And you're speaking at Starbucks or on the phone?

01:12:41  4     Q.  Well, let's talk about on the telephone.  Ms.

01:12:44  5   Whitlock asked you a number of questions about your

01:12:47  6   employment with An, correct?

01:12:49  7     A.  Yes.

01:12:49  8     Q.  And during the course of that conversation Ms.

01:12:51  9   Whitlock told you that your participation in the

01:12:55  10  conversation was voluntary; did she not?

01:12:57  11    A.  Yes.  She caught me on a good day off, and she

01:13:00  12  said:  Meet me on Tuesday at Starbucks.  And I had the

01:13:03  13  day off.

01:13:04  14    Q.  Sir, what I asked you was:  During the

01:13:06  15  conversation you had with Ms. Whitlock on the phone, she

01:13:09  16  told you that your participation in a telephone

01:13:12  17  conversation was voluntary, correct?

01:13:14  18    A.  I don't recall, but sure.  I mean, I don't

01:13:17  19  recall.  That was a long -- that was -- I'm a busy

01:13:21  20  person.  I don't remember just random phone calls.

01:13:25  21    Q.  You've had an opportunity to review the

01:13:29  22  transcript of that telephone conversation, correct?

01:13:31  23    A.  Yes, I have.  And I was not aware I was being

01:13:34  24  recorded as well.

01:13:35  25    Q.  The transcript was a true and accurate copy of

| | | |
|---|---|---|
| 01:13:39 | 1 | the conversation you had with Ms. Whitlock? |
| 01:13:42 | 2 | A.   I mean, I assume so.  You guys submitted it. |
| 01:13:46 | 3 | MR. HUNT:  Your Honor, I'd like to submit a |
| 01:13:48 | 4 | copy of the transcript as Defendant's Exhibit 1. |
| 01:13:50 | 5 | THE COURT:  All right. |
| 01:13:55 | 6 | MR. HUNT:  May I approach? |
| 01:14:10 | 7 | THE COURT:  You may. |
| 01:14:14 | 8 | (Document is handed to the Court.) |
| 01:14:22 | 9 | THE COURT:  You haven't marked this? |
| 01:14:24 | 10 | MR. HUNT:  I apologize, Your Honor. |
| 01:14:26 | 11 | THE COURT:  We'll get a sticker from the |
| 01:14:28 | 12 | clerk.  Are you going to be examining the witness on |
| 01:14:33 | 13 | this? |
| 01:14:33 | 14 | MR. HUNT:  No, I would just like to move it |
| 01:14:38 | 15 | into evidence, Your Honor. |
| 01:14:38 | 16 | THE COURT:  The clerk will mark it as |
| 01:14:42 | 17 | Exhibit Number 1.  And this is the same complete |
| 01:14:49 | 18 | transcript that was included in your response? |
| 01:14:52 | 19 | MR. HUNT:  Yes, Your Honor.  That's correct. |
| 01:14:54 | 20 | THE COURT:  Okay.  Any other questions? |
| 01:15:01 | 21 | BY MR. HUNT: |
| 01:15:02 | 22 | Q.   You also, after you spoke with Ms. Whitlock on |
| 01:15:04 | 23 | the phone, you had a number of exchanges of text |
| 01:15:07 | 24 | messages with her, correct? |
| 01:15:09 | 25 | A.   After the meeting? |

01:15:11   1    Q.   No.

01:15:12   2    A.   You're talking about whenever we were to meet at

01:15:14   3  Starbucks?

01:15:15   4    Q.   Prior to the meeting.

01:15:16   5    A.   Yeah.  I had asked her what Starbucks and where.

01:15:20   6  That was about it.

01:15:24   7    Q.   You agreed to meet with her, correct?

01:15:27   8    A.   Yes.

01:15:29   9    Q.   And she responded to your text messages, and you

01:15:33  10  responded to her text messages, correct?

01:15:36  11    A.   I said:  My GPS is going crazy.  What Starbucks

01:15:42  12  are you talking about?  I don't get out often.

01:15:46  13         She said:  The one under the Marriott on

01:15:48  14  Fayetteville.

01:15:50  15         So then, yes, I met them.

01:15:52  16    Q.   You voluntarily agreed to meet with Ms. Whitlock

01:15:56  17  and Ms. Fishman at Starbucks, correct?

01:16:00  18    A.   Yes.

01:16:02  19    Q.   No one forced you to meet with them?

01:16:05  20    A.   No.

01:16:06  21    Q.   You arrived at the Starbucks in Raleigh around

01:16:11  22  2:30 in the afternoon on March 19?

01:16:13  23    A.   Yes, sir.

01:16:14  24    Q.   That's a public place?

01:16:17  25    A.   As far as I know, yes, sir.

01:16:19   1     Q.   There were other people in the Starbucks?

01:16:21   2     A.   There was one other person sitting behind us, but

01:16:25   3   other than that -- they were sitting at a long table,

01:16:28   4   and they were the only two females there.  They said:

01:16:31   5   Look for two females; I'm wearing a flowered shirt or

01:16:35   6   flowered blouse, or something like that.

01:16:37   7     Q.   People came and went as you were talking to Ms.

01:16:39   8   Whitlock and Ms. Ms. Fishman?

01:16:43   9     A.   As far as I know people weren't coming or leaving

01:16:48   10   when I was there.

01:16:49   11     Q.   You could have left at any time you wanted during

01:16:51   12   that conversation with Ms. Whitlock and Ms. Fishman?

01:16:56   13     A.   Yes, but I'm not that type of person.  I'm not

01:16:59   14   rude.

01:16:59   15     Q.   No one forced you to be there; no one forced you

01:17:04   16   to communicate with them?

01:17:05   17     A.   No, sir.

01:17:07   18     Q.   When you arrived at the table, Ms. Fishman

01:17:09   19   introduced herself, correct?

01:17:10   20     A.   Actually, no one introduced themselves except for

01:17:13   21   when I actually sat down.  I found two girls with two

01:17:15   22   laptops and a printer sitting by themselves and assumed

01:17:19   23   that that's who I was looking for.

01:17:21   24     Q.   So your testimony is you just sat down with these

01:17:26   25   two people and started talking about your employment at

01:17:29    1    An?

01:17:29    2        A.    I made, like, the non-vocal, like, look, nod.

01:17:34    3            And:    Justin?

01:17:36    4            So then that's when it started.

01:17:38    5        Q.    They just launched into questions about your

01:17:41    6    employment at An?

01:17:43    7        A.    I mean, yeah, they didn't really -- they didn't

01:17:47    8    give me any paperwork.  They didn't give me any kind of

01:17:51    9    true understanding of what was going on.  But, yeah,

01:17:54    10    they started asking me questions.

01:17:56    11        Q.    They asked you about your experiences at An with

01:17:59    12    respect to the tip pool and what different employees did

01:18:05    13    during the course of employment, correct?

01:18:07    14        A.    Yes.

01:18:08    15        Q.    They never asked you to settle the case, correct?

01:18:12    16        A.    To what?

01:18:12    17        Q.    They never made a settlement proposal to you,

01:18:15    18    correct?

01:18:16    19        A.    No.

01:18:17    20        Q.    Did they ask you to settle your claim in any

01:18:21    21    fashion or any claim you had?

01:18:23    22        A.    No.  But in all honesty, I would have thought

01:18:26    23    they were going to at the end of the conversation.

01:18:28    24        Q.    So you thought that they might ask you, but they

01:18:31    25    never did?

01:18:31  1    A.  Once I realized the questions and where they were

01:18:34  2  going, I thought that they were just going to make me

01:18:37  3  sign something just to -- and pay me off to not say

01:18:40  4  anything.

01:18:41  5    Q.  So you were aware during the course of that

01:18:43  6  conversation that they represented An, that they

01:18:46  7  represented the defendants, right?

01:18:47  8    A.  At the very end, about halfway through to the

01:18:49  9  very end is whenever I actually knew.  Because I had to

01:18:52  10  ask them.  So I was, like:  You guys do not represent

01:18:55  11  Brandon?  Because I still did not -- I was not aware

01:18:58  12  that even Wai Man was the one that filed the suit.  I

01:19:01  13  thought it was Brandon.

01:19:03  14    Q.  So halfway through your conversation with Ms.

01:19:06  15  Fishman and Ms. Whitlock you fully understood, according

01:19:12  16  to yourself, that they represented the restaurant?

01:19:15  17    A.  Yes.  Because after they asked me if the sushi

01:19:18  18  chefs spoke English, I asked them who did they

01:19:20  19  represent.

01:19:21  20       They said:  We represent the restaurant.  Like,

01:19:25  21  as in, we do not -- like, this is, like, a

01:19:30  22  lawsuit-lawsuit.  Like, we are doing this, and we are

01:19:33  23  the opposing side.

01:19:35  24       And that's whenever I started getting antsy.

01:19:41  25    Q.  You continued to talk with them after you learned

01:19:44  1    that they represented the restaurant, right?

01:19:46  2       A.  Well, we had more conversations about Jordan's

01:19:50  3    ring and everything than we did -- after that, once I

01:19:53  4    actually brought that up, they started calming down on

01:19:57  5    the questions and the aggressiveness of the questions.

01:19:59  6       Q.  They continued to ask you some questions, though,

01:20:02  7    about the restaurant, right?

01:20:03  8       A.  Yeah.

01:20:04  9       Q.  You all didn't just make chitchat the rest of the

01:20:07  10   time?  They actually asked you questions about your

01:20:10  11   employment at the restaurant, correct?

01:20:12  12      A.  It would be more along the lines of we had

01:20:14  13   conversation, then there was a question here and there

01:20:17  14   once I started questioning stuff about what they were

01:20:19  15   saying and their intentions.

01:20:22  16      Q.  Ms. Fishman at one point in the conversation

01:20:25  17   asked you to review a statement or a declaration on her

01:20:29  18   laptop, right?

01:20:30  19      A.  I asked to see it and review it.  She did not

01:20:35  20   willfully offer that to me.

01:20:37  21      Q.  She did show it to you though, correct?

01:20:39  22      A.  Yeah.  She let me revise it.  And I took out

01:20:42  23   about two and a half pages of stuff that was not right

01:20:47  24   and very misconstrued statements.

01:20:50  25      Q.  So you asked to review your statement?

01:20:52   1      A.   Yes.

01:20:52   2      Q.   She then provided you with access to her laptop?

01:20:55   3      A.   Uh-huh.

01:20:57   4      Q.   Correct?

01:20:57   5      A.   Yes, sir.

01:20:58   6      Q.   Then you edited the statement?

01:21:01   7      A.   Yes.

01:21:02   8      Q.   Then Ms. Whitlock went to the Marriott to obtain

01:21:08   9  a copy of the statement, correct?

01:21:10  10      A.   Yes.

01:21:10  11      Q.   You then signed the statement, right?

01:21:13  12      A.   Yes.  Because it was -- she asked:  Sign here.

01:21:17  13  So I signed.

01:21:19  14      Q.   The statement says that it's executed under

01:21:22  15  penalty of perjury right above your signature, correct?

01:21:25  16      A.   It was my day off.  I was wanting -- I did not --

01:21:29  17  I was not fully aware -- okay, yeah.  If I needed to

01:21:33  18  read more, then I should have read more.  But that was

01:21:36  19  not on the actual computer whenever she was showing me

01:21:41  20  the thing.  I was only reading the computer.  So

01:21:43  21  whenever she brought me what she had printed off, I just

01:21:47  22  signed it.  There was just a bunch of bullets and, like,

01:21:54  23  sentences whenever I was revising it.  Then whenever she

01:21:59  24  brought the paper to me it actually had the signing --

01:22:01  25  like, the signing, like, line on the bottom.

01:22:06  1      Q.  Right above that line it said, "Executed under

01:22:09  2  penalty of perjury," correct?   You saw that?

01:22:13  3      A.  Did I read it?   No.

01:22:15  4      Q.  I thought you told us you read the affidavit

01:22:18  5  before you signed it.

01:22:20  6      A.  I read everything on the computer.  When she

01:22:24  7  brought what was printed off, I just assumed that

01:22:28  8  whatever was on the computer was what was there.

01:22:33  9      Q.  She provided you with an opportunity to review

01:22:35  10  the affidavit?

01:22:36  11      A.  Yes, she did.  I did not.

01:22:38  12      Q.  She didn't rush you out of there?

01:22:40  13      A.  No, I wouldn't say she rushed me out of there.

01:22:45  14      Q.  You had time to review it?  You had time?  As you

01:22:48  15  said, you made corrections on the computer?

01:22:50  16      A.  I made the corrections on the computer.  And out

01:22:53  17  of trust I assumed that everything would have been the

01:22:55  18  same, so I signed it.

01:23:00  19              MR. HUNT:  Your Honor, if I could approach.

01:23:12  20              (Document is handed to the Court.)

01:23:18  21              THE COURT:  You've handed up something

01:23:19  22  that's been marked Exhibit A.

01:23:22  23              MR. HUNT:  Just to lessen the confusion of

01:23:23  24  the numbers, this was Exhibit A to our response to --

01:23:28  25              THE COURT:  So this is your Exhibit Number

| | | |
|---|---|---|
| 01:23:30 | 1 | 2? |
| 01:23:31 | 2 | MR. HUNT:  Correct.  This would be Exhibit |
| 01:23:32 | 3 | Number 2. |
| 01:23:33 | 4 | THE COURT:  And you would ask the clerk to |
| 01:23:34 | 5 | mark it as such? |
| 01:23:35 | 6 | MR. HUNT:  Yes, please.  Thank you. |
| 01:23:42 | 7 | If I could show that to Mr. Dillon. |
| 01:23:47 | 8 | THE COURT:  Do you have an understanding of |
| 01:23:49 | 9 | how to work our equipment in this courtroom? |
| 01:23:52 | 10 | MR. HUNT:  Probably not, Your Honor. |
| 01:23:53 | 11 | THE COURT:  So where are you from? |
| 01:23:55 | 12 | MR. HUNT:  Atlanta. |
| 01:23:57 | 13 | THE COURT:  Who is your local counsel? |
| 01:24:01 | 14 | MS. GIBBONS:  Susanna Gibbons, Your Honor. |
| 01:24:07 | 15 | THE COURT:  You should be able to work that |
| 01:24:10 | 16 | equipment. |
| 01:24:11 | 17 | MS. GIBBONS:  I'm sorry, Your Honor. |
| 01:24:13 | 18 | THE COURT:  Now is the time to start.  Walk |
| 01:24:16 | 19 | over and pull up the -- I've asked the clerk to go over |
| 01:24:20 | 20 | and help a little bit. |
| 01:26:28 | 21 | BY MR. HUNT: |
| 01:26:28 | 22 | Q.  Mr. Dillon, do you see what's been marked as |
| 01:26:31 | 23 | Defendant's Exhibit Number 2? |
| 01:26:35 | 24 | THE COURT:  Let's clear the arrow.  Don't |
| 01:26:43 | 25 | touch the screen.  If they ask you to mark it -- this is |

01:28:04  1  meant to improve efficiencies, but everybody's got to

01:28:09  2  know how it works.  We'll keep on going.

01:28:13  3  BY MR. HUNT:

01:28:13  4    Q.  Mr. Dillon, I'm going to show you what's been

01:28:16  5  marked Defendant's Exhibit Number 2.  Is this a copy of

01:28:19  6  the declaration that you provided to Ms. Whitlock and

01:28:24  7  Ms. Fishman at the meeting at the Starbucks in Raleigh?

01:28:29  8    A.  Uh-huh.

01:28:30  9    Q.  Yes?

01:28:30  10    A.  Yes, sir.

01:28:31  11    Q.  If you could, on the second page of the

01:28:37  12  declaration, is that your signature at the bottom?

01:28:40  13    A.  Yes, sir.

01:28:41  14    Q.  Immediately above that does it say, "I declare

01:28:43  15  under penalty of perjury under the laws of the State of

01:28:47  16  North Carolina that the foregoing is true and correct"?

01:28:50  17    A.  Yes, sir.  But whenever I'm reading it, even now

01:28:53  18  looking at it it all looks like one big sentence.  Under

01:28:59  19  Title 11.

01:29:03  20    Q.  Mr. Dillon, during the conversation that you had

01:29:06  21  with Ms. Whitlock and Ms. Fishman, did they threaten you

01:29:10  22  at any time?

01:29:11  23    A.  No.

01:29:11  24    Q.  Did they yell at you at any time?

01:29:13  25    A.  No.

01:29:13  1      Q.  Did they raise their voice at any time?

01:29:15  2      A.  No.

01:29:16  3      Q.  Were you scared of Ms. Fishman?

01:29:18  4      A.  No.

01:29:19  5      Q.  Were you scared of Ms. Whitlock?

01:29:21  6      A.  No.

01:29:23  7      Q.  In fact, when you left the meeting, did you

01:29:29  8   basically make a gesture with your middle finger with

01:29:32  9   respect to An?

01:29:39 10      A.  Probably.  So is that on here?

01:29:43 11      Q.  You were trying to indicate your contempt for the

01:29:46 12   defendants, correct?

01:29:47 13      A.  No, halfway through the meeting I realized who I

01:29:50 14   was talking to.  I would have never spoken with you

01:29:52 15   guys; I would have never been part of this.

01:29:54 16      Q.  And after you -- and according to your testimony,

01:29:58 17   after this revelation came to you, you continued to

01:30:02 18   talk, correct, and participate in the meeting?

01:30:05 19      A.  Because I was sitting in front of two women and

01:30:07 20   was being asked questions does not mean that I wanted to

01:30:10 21   continue.  I thought that I was supposed to continue.

01:30:13 22      Q.  You could have left at any time, right?

01:30:15 23      A.  Yes.

01:30:16 24      Q.  You could have discontinued the conversation?

01:30:19 25      A.  But it's called rude.

01:30:21   1      Q.   You could have excused yourself politely and

01:30:24   2   left, right?

01:30:25   3      A.   Still had no reason to.  I mean, it's not like

01:30:28   4   someone was calling me and I've got to go answer my

01:30:30   5   phone.

01:30:31   6      Q.   Following the meeting that you had with Ms.

01:30:33   7   Whitlock and Ms. Fishman, you texted Ms. Whitlock,

01:30:38   8   correct?

01:30:40   9      A.   I texted Ms. Whitlock?   No, I called them

01:30:43  10   immediately whenever I walked out.  And then after I

01:30:46  11   spoke with them, then I texted her.

01:30:48  12      Q.   So by "them" you mean plaintiff's counsel, Ms.

01:30:52  13   Hernandez?

01:30:53  14      A.   You're confusing me now, your broad generalities.

01:30:59  15   You said once I walked out, but then how long?  Days?

01:31:02  16   Weeks?  Minutes?

01:31:03  17      Q.   Once you left the meeting, that afternoon, did

01:31:06  18   you call Ms. Hernandez and Mr. Cohen?

01:31:08  19      A.   Yes.

01:31:09  20      Q.   You knew they represented Mr. Kelly and Mr. Tom,

01:31:13  21   correct?

01:31:14  22      A.   At that point I did.

01:31:16  23      Q.   And you'd known that since Mr. Kelly had

01:31:21  24   contacted you about the case back in 2017?

01:31:24  25      A.   All right.  So whenever Brandon had sent me that

01:31:27   1   text, there was no name of a law firm attached with a

01:31:31   2   number.  I just knew a number.  When I realized that you

01:31:36   3   guys represented An as going against them, I looked back

01:31:41   4   through my text and called the number that he had sent

01:31:44   5   me, and that's who answered.  I did not know who I was

01:31:49   6   calling.

01:31:50   7       Q.  So you called a number that Mr. Kelly had sent

01:31:52   8   you?

01:31:52   9       A.  Absolutely.

01:31:54  10       Q.  You then in the course of your text messages you

01:31:58  11   asked Ms. Whitlock for a copy of the declaration you

01:32:05  12   signed, right?

01:32:06  13       A.  Yes.  I had to go out of my way to ask her for a

01:32:09  14   declaration after I had spoken with them because they

01:32:12  15   made it very clear -- I was not given any information.

01:32:14  16       Q.  In fact, she told you at the end of the

01:32:17  17   conversation that she couldn't give you the declaration

01:32:19  18   right there without having to go back to the Marriott to

01:32:22  19   print it off, correct?

01:32:23  20       A.  That's not true.

01:32:24  21       Q.  So you -- but when you asked her through the text

01:32:29  22   message for the declaration, she provided it to you?

01:32:33  23   She emailed it to you?

01:32:35  24       A.  She sent it to me over email, but I had to go out

01:32:38  25   of my way to ask for it.

01:32:39  1    Q.  You texted her back after getting it and after

01:32:42  2  having it in your possession and said you weren't going

01:32:45  3  to make any changes to it, right?

01:32:46  4    A.  Yes.  Because I had felt -- I just wanted to

01:32:49  5  relook over what I had said.  And I'm still comfortable

01:32:53  6  with everything that's on here.

01:32:55  7    Q.  So there's nothing in the declaration that you

01:32:57  8  disagree with?

01:32:59  9    A.  I mean, maybe the fact that I just quickly

01:33:03  10  overlooked, "I declare under the penalty."  That's about

01:33:07  11  the only thing.  I went and looked through it.  I feel

01:33:10  12  confident with what I had to edit and make and what I

01:33:14  13  signed.  Yes.

01:33:16  14    Q.  Did Ms. Fishman or Ms. Whitlock at any time ever

01:33:19  15  ask you to do anything other than tell them about the

01:33:24  16  facts concerning your employment at An?

01:33:27  17    A.  No.

01:33:29  18              MR. HUNT:  Thank you.  I don't have anything

01:33:30  19  further -- one more.  I'm sorry, one more thing, Your

01:33:34  20  Honor.

01:33:34  21              Your Honor I would like to move Exhibits 1

01:33:36  22  and 2 into evidence.

01:33:37  23              THE COURT:  All right.  Let them be

01:33:39  24  received.

05:25:52  25              (Whereupon Defendant's Exhibits 1 and 2 are

01:33:43   2                   - - -

05:25:54   1  admitted into evidence.)

01:33:43   3       JUSTIN DILLON, REDIRECT EXAMINATION

01:33:44   4  BY MS. HERNANDEZ:

01:33:44   5    Q.  Mr. Dillon, I just have a couple questions.

01:33:46   6  Going back to Defendant's Exhibit A, which is a

01:33:48   7  transcription of the discussion that you had with Ms.

01:33:51   8  Whitlock, if you -- do you have a copy of Defendant's

01:33:55   9  Exhibit A in front of you?

01:33:57  10    A.  I do not.

01:34:01  11       THE COURT:  Okay.  We're going to call it 1

01:34:03  12  or 2.  So you're referring to, I believe, 2, which is

01:34:07  13  the transcript.

01:34:08  14       MS. HERNANDEZ:  It's Exhibit 1, Your Honor.

01:34:09  15       THE COURT:  Exhibit 1.  And that was the --

01:34:13  16  what was that?

01:34:14  17       MS. HERNANDEZ:  This was the transcription

01:34:16  18  of the recording of the recorded discussion between

01:34:21  19  defendant's paralegal -- defendant's counsel's

01:34:25  20  paralegal, Ms. Erin Whitlock, and Justin Dillon.

01:34:29  21       THE COURT:  So we don't have that in

01:34:31  22  evidence?

01:34:34  23       MR. HUNT:  Yes, Your Honor.  I think that

01:34:35  24  was Exhibit 1, the transcript.

01:34:37  25       THE COURT:  I thought you were talking about

01:34:39  1   transcript of a telephone -- yes, this is the phone

01:34:42  2   recording.  Okay.

01:34:45  3            MS. HERNANDEZ:  I just thought that Mr.

01:34:46  4   Hunt, defendant's counsel, had handed up the copy.

01:34:51  5            THE COURT:  Well, you can pull up your

01:34:52  6   camera and turn it on and open it up to any page, and it

01:34:56  7   will show on the witness's screen.

01:35:05  8            THE WITNESS:  I would like to hear that

01:35:07  9   recording.

01:35:07  10           THE COURT:  You'll have to switch the camera

01:35:09  11   over.  And both of you need a lesson in this.  Would the

01:35:14  12   clerk go over.  And she's going to get some additional

01:35:19  13   information to you.

01:35:20  14           MS. HERNANDEZ:  I can assure you, Your

01:35:22  15   Honor, after this hearing we will do everything we can

01:35:24  16   to make sure we're trained.

01:35:29  17           THE COURT:  We'll get you both some

01:35:31  18   training.

01:35:34  19           MS. HERNANDEZ:  I think Mr. Cohen's already

01:35:38  20   figured it out.

01:35:47  21           THE COURT:  So what page are you on?

01:35:49  22           MS. HERNANDEZ:  Your Honor, I am on page 9

01:35:51  23   of the transcription.

01:35:52  24           THE COURT:  All right.

01:35:57  25   BY MS. HERNANDEZ:

01:35:57  1    Q.  Mr. Dillon, you see page 9 of the recorded

01:36:00  2  conversation that you had with defendant's counsel's

01:36:03  3  paralegal, Ms. Erin Whitlock?

01:36:06  4    A.  Yes.

01:36:06  5    Q.  And just so that the Court and counsel here for

01:36:12  6  the parties are clear, do you understand that this was a

01:36:17  7  recording of the discussion that you had with Ms.

01:36:20  8  Whitlock?

01:36:21  9    A.  I am, once again, trusting that this is exactly

01:36:27  10  to word-for-word for what was said.  Yes.  I don't know

01:36:30  11  how that works whenever you have to write it down.

01:36:32  12    Q.  And just for the record, Mr. Dillon, were you

01:36:36  13  advised that your discussion with Ms. Whitlock would be

01:36:38  14  recorded?

01:36:39  15    A.  No, I was not.

01:36:40  16    Q.  So turning to page 9 here, line 12, it says

01:36:51  17  here -- you say, "I mean, definitely -- and for the

01:36:54  18  restaurant, we had people from back of the house

01:36:57  19  stepping on front of the house soil and we were tipping

01:36:59  20  out back of the house, which is also illegal."

01:37:01  21        Do you see that, Mr. Dillon?

01:37:03  22    A.  Yes.

01:37:04  23    Q.  And then line 17 Ms. Whitlock asks you, "What do

01:37:09  24  you mean by stepping on front of the house soil?"

01:37:13  25        And then going to line 19, it says here, "So

01:37:18  1   whatever ... back of the house ... legally if you are a

01:37:23  2   kitchen position, you are not allowed to be tipped out

01:37:25  3   by front of the house.  If you are back of the house,

01:37:27  4   you're not allowed out of the kitchen, you are supposed

01:37:34  5   to stay there and cook or do your job and they

01:37:34  6   definitely" -- going to page 10, "I was tipping out

01:37:36  7   somebody that never set foot on front of the house."

01:37:39  8          Did I read that correctly, Mr. Dillon?

01:37:41  9     A.   Yes, ma'am.

01:37:42 10     Q.   Then Ms. Whitlock said, "Okay.  So you were

01:37:50 11   tipping out somebody that was back of the house."

01:37:52 12          Did I read that correctly?

01:37:53 13     A.   Yes.

01:37:53 14     Q.   Then line 5 you said, "A back of the house

01:37:55 15   person, yeah.  He was expo, or expediter."

01:37:57 16     A.   Yes.

01:37:58 17     Q.   Did I read that correctly?

01:37:59 18     A.   Yes, ma'am.

01:38:00 19     Q.   And then line 8, it says there, "But he never

01:38:03 20   once stepped foot on the front of the house soil and

01:38:06 21   that -- I know that for a fact as management, I know

01:38:10 22   that's illegal."

01:38:11 23          Did I read that correctly?

01:38:12 24     A.   Yes, ma'am.

01:38:12 25     Q.   What did you mean when you made those statements,

01:38:16  1    Mr. Dillon?

01:38:17  2        A.   I know that legally -- oh, the position that he

01:38:22  3    was hired for does not require a front of the house tip

01:38:28  4    out, period.   Any restaurant I've ever worked at in my

01:38:34  5    entire life, even when I got into management, that was

01:38:37  6    something that had always been instilled to me.   You

01:38:40  7    don't tip out a chef; you don't tip out expediters.

01:38:44  8    It's a back of the house position.   That's an hourly

01:38:46  9    position.   That's not tipped.

01:38:47  10       Q.   So, Mr. Dillon, if I understood you correctly,

01:38:50  11   are you suggesting that an expo, his position is back of

01:38:53  12   the house and not front of the house?

01:38:55  13       A.   Expediter is a back of the house position.   It is

01:38:58  14   paid by back of the house hourly.

01:39:02  15       Q.   So a back of the house expo position is not

01:39:05  16   engaging in client interaction; is that correct?

01:39:07  17                MR. HUNT:   Objection.   This is beyond the

01:39:09  18   scope of the hearing, Your Honor.   I think she's

01:39:11  19   getting --

01:39:11  20                THE COURT:   How does this fit in?

01:39:13  21                MS. HERNANDEZ:   Your Honor, the only reason

01:39:15  22   I'm bringing this up is there are some discrepancies

01:39:17  23   here from what he testified to in this recorded

01:39:20  24   discussion versus what's in the declaration, another

01:39:23  25   suggestion that the information was not entirely clear

01:39:28    1    to Mr. Dillon in terms of the nature of the declaration

01:39:31    2    he was signing and the purpose of the evidence being

01:39:35    3    gathered and what it was going to be used for.

01:39:38    4            THE COURT:  Okay.  Well, let's try to move

01:39:42    5    it along.

01:39:44    6    BY MS. HERNANDEZ:

01:39:47    7    Q.  And now turning to Defendant's Exhibit Number 2,

01:39:51    8    Mr. Dillon.

01:40:17    9            So, Mr. Dillon, turning to Defendant's Exhibit

01:40:19   10    Number 2, this is the declaration that you signed for

01:40:24   11    defendant's counsel, correct?

01:40:25   12    A.  Yes, ma'am.

01:40:26   13    Q.  And as you sit here today, Mr. Dillon, is it

01:40:32   14    appropriate to say that there is no case caption,

01:40:35   15    there's nothing here to suggest that -- what the case --

01:40:37   16    the nature of the case is or anything like that; is that

01:40:40   17    correct?

01:40:40   18            MR. HUNT:  Objection.  Leading.

01:40:43   19            THE COURT:  Well, I mean, I can see it.

01:40:49   20    BY MS. HERNANDEZ:

01:40:49   21    Q.  Mr. Dillon, if you turn to paragraph 7 it says

01:40:53   22    here in Defendant's Exhibit Number 2, "Nick would come

01:40:57   23    to the front of the house while working as an expo."

01:41:02   24    Would you agree that that information is somewhat

01:41:05   25    inconsistent with the recorded discussion you had with

01:41:08  1    Erin Whitlock?

01:41:09  2        A.   Yes.

01:41:10  3             MR. HUNT:  Objection.  Objection, leading.

01:41:12  4    I'd also like to ask him about his testimony on page --

01:41:17  5    excuse me.

01:41:18  6             THE COURT:  You will get a chance to do a

01:41:21  7    recross.

01:41:24  8             MR. HUNT:  Thank you.

01:41:24  9             THE COURT:  And it is leading, and that

01:41:26  10   objection is sustained.

01:41:29  11   BY MS. HERNANDEZ:

01:41:30  12       Q.   In reading paragraph number 7, Mr. Dillon, could

01:41:33  13   you please read that out loud?

01:41:35  14       A.   "Nick would come to the front of the house while

01:41:37  15   working as an expo.  Expo was responsible for making

01:41:40  16   sure food got to the right table.  Nick did it on his

01:41:43  17   own accord instead of yelling for runners.  He wanted

01:41:46  18   the food to go out on time, when it needed to go out and

01:41:50  19   he would carry the food to the table.  But his position

01:41:52  20   was back of the house."

01:41:54  21       Q.   And could you just simply clarify what you mean

01:41:58  22   by this paragraph, Mr. Dillon?

01:42:00  23       A.   All right.  So as I explained it to you, if I'm a

01:42:04  24   server, and I see that I need a steak cooked, and it's

01:42:07  25   taking too long, if I go step behind the kitchen and

01:42:10  1    cook a steak, it's not my responsibility or my job.  He

01:42:15  2    takes it upon himself to go do that because he just

01:42:17  3    wants to go see people.  It was not his job.

01:42:21  4        Q.  And, Mr. Dillon, as you sit here today, do you

01:42:24  5    recall why defendant's counsel were asking you questions

01:42:28  6    about the nature of Nick Pappas's position at An?

01:42:35  7        A.  To tell you the truth, I thought that Brandon and

01:42:39  8    Wai were suing over back pay.  I didn't even know that

01:42:44  9    Nick Pappas was even a part of it when they were asking

01:42:48  10   these questions.  That's when I started getting the

01:42:50  11   weird feeling.

01:42:51  12            MS. HERNANDEZ:  Thank you very much, Mr.

01:42:52  13   Dillon.  I have no further questions.

01:42:52  14                         -  -  -

01:42:52  15            JUSTIN DILLON, RECROSS-EXAMINATION

01:42:55  16   BY MR. HUNT:

01:42:55  17       Q.  Mr. Dillon, I'd like to ask you a few questions

01:42:59  18   in light of counsel's questions.

01:43:02  19            Exhibit 1, if you could turn to page 11.

01:43:05  20       A.  I can't turn the page.

01:43:07  21            MR. HUNT:  I'm sorry.

01:43:09  22            THE COURT:  We're not that technically savvy

01:43:12  23   yet.

01:43:24  24   BY MR. HUNT:

01:43:24  25       Q.  If I could direct your attention, this is page 11

01:43:28   1    of the transcript of the telephone call.  And at number

01:43:36   2    12 -- or, excuse me, line 12, Ms. Whitlock says, "The

01:43:44   3    right food to the right table.  What do you mean like

01:43:47   4    by... like how do they do that?"

01:43:49   5         You said, "So they ... the kitchen puts food in

01:43:52   6    a -- on a shelf."

01:43:54   7         She said, "Uh-huh."

01:43:55   8         You replied, "And then the expo takes the food,

01:43:57   9    makes sure it's to the right table."

01:44:00   10        So do they take it to the table?

01:44:02   11   A.   The right food to the table means that you call

01:44:05   12   for hands and you tell them:  Table 3, position 1.  You

01:44:08   13   don't take the food.  That is -- this is -- you need to

01:44:13   14   work in restaurants to understand what I'm saying.

01:44:15   15   Q.   Then let me ask you about page 12 where Ms.

01:44:27   16   Whitlock said, "But are they taking it to the table?"

01:44:29   17        And you said, "No.  They will -- they will take

01:44:33   18   it to the table, and then that's why they felt obligated

01:44:37   19   that we tip them out."

01:44:39   20   A.   It's not their job.  And because someone demands

01:44:42   21   money does not mean that that is the rule for the

01:44:45   22   restaurant.

01:44:46   23   Q.   Sir, I understand that that's your opinion.

01:44:49   24   But --

01:44:50   25   A.   That's one sentence.  You're misconstruing it.

01:44:53   1     Q.  You told --

01:44:53   2              THE COURT:  One second.  Did you have

01:44:56   3     another answer?

01:44:56   4              THE WITNESS:  Yes.

01:44:57   5     A.  You're misconstruing that.  I did not mean it

01:44:59   6     like that.  That is how it was written out, or that's

01:45:01   7     how it sounds, but that is not what I meant.

01:45:04   8     Q.  You told Ms. Whitlock that on occasion Mr.

01:45:09   9     Pappas, the expediter, would take food to the table; is

01:45:13  10     that correct?

01:45:13  11     A.  He would take it upon himself.  Just as I said,

01:45:16  12     if your neighbor's grass needed cut, if you want to go

01:45:19  13     cut it, are you going to ask him for money?

01:45:23  14     Q.  So Mr. Pappas would take food on occasion to the

01:45:27  15     table, correct?

01:45:28  16     A.  On his own accord, not his job.

01:45:31  17     Q.  You weren't in management at An, correct?

01:45:34  18     A.  No, I was not.

01:45:35  19     Q.  You weren't -- you didn't supervise Mr. Pappas,

01:45:38  20     correct?

01:45:39  21     A.  No.

01:45:40  22              MR. HUNT:  Thank you.  Nothing further, Your

01:45:44  23     Honor.

01:45:44  24              THE COURT:  All right.  Are we finished with

01:45:46  25     this witness?

01:45:47  1              MS. HERNANDEZ:  I am, Your Honor.  Thank

01:45:48  2   you.

01:45:48  3              THE COURT:  Thank you.  You can step down.

01:45:51  4              Do you have another witness?

01:45:53  5              MS. HERNANDEZ:  No, Your Honor.

01:45:54  6              THE COURT:  Any other evidence?

01:45:55  7              MS. HERNANDEZ:  No other evidence, Your

01:45:57  8   Honor.

01:45:57  9              THE COURT:  Okay.  Well, let's turn our

01:45:59  10  attention to the defendant.

01:46:00  11             Do you have a witness?

01:46:01  12             MR. HUNT:  Well, Your Honor, I would like to

01:46:04  13  have Ms. Whitlock --

01:46:05  14             THE COURT:  And this witness is excused.  I

01:46:07  15  don't know if he came by subpoena.

01:46:11  16             THE WITNESS:  No, I didn't come by subpoena.

01:46:14  17  Can I shake hands with everybody?

01:46:17  18             THE COURT:  Certainly.

01:46:22  19             MR. HUNT:  I would like to have Ms. Whitlock

01:46:25  20  testify, and perhaps briefly Ms. Fishman, if that is

01:46:29  21  okay.

01:46:29  22             THE COURT:  All right.  And thank you for

01:46:38  23  sequestering her.

01:47:02  24             THE CLERK:  Please come forward and stand in

01:47:04  25  front of the clerk's bench.  Place your left hand on the

01:47:09    1    Bible and raise your right hand.

01:47:10    2                    State your name for the Court.

01:47:12    3                    THE WITNESS:  Erin Whitlock.

01:47:13    4                    THE COURT:  Spell your name for the Court.

01:47:14    5    E-r-i-n  W-h-i-t-l-o-c-k.

01:47:19    6                    THE CLERK:  Thank you.

01:47:20    7                    (Whereupon the witness was sworn by the

01:47:27    8    clerk.)

01:47:27    9                    THE CLERK:  Please take the witness stand

01:47:29   10    and be seated.

01:47:31   11                             - - -

01:47:31   12                    ERIN WHITLOCK, DIRECT EXAMINATION

01:47:31   13    BY MR. HUNT:

01:47:31   14       Q.  Ms. Whitlock, where do you work?

01:47:41   15       A.  I'm sorry.  What?

01:47:42   16       Q.  Where do you work?  For whom do you work?

01:47:44   17       A.  Stokes Wagner in Atlanta.

01:47:46   18       Q.  What is Stokes Wagner?

01:47:47   19       A.  I'm a paralegal.

01:47:48   20       Q.  Stokes Wagner is a law firm that represents --

01:47:52   21       A.  Yes, it's a law firm in Atlanta, Georgia.  We

01:47:56   22    have offices all over, but...

01:48:00   23       Q.  You have worked in connection with the lawsuit

01:48:05   24    that's been filed against An Restaurant and other

01:48:10   25    defendants here in court, correct?

01:48:11 1    A.    Correct.

01:48:12 2    Q.    During the course of that work have you ever had

01:48:15 3    any contact with Mr. Justin Dillon?

01:48:18 4    A.    Yes, I have.

01:48:19 5    Q.    When was the first occasion that you had contact

01:48:22 6    with him?

01:48:22 7    A.    I believe it was early March.  I don't recall the

01:48:28 8    exact date.  But a colleague of mine, Ms. Sarah St.

01:48:34 9    Pierre, transferred a call to me from him.

01:48:43 10   Q.    How did that conversation begin?

01:48:45 11   A.    Ms. St. Pierre said that she was -- wanted to

01:48:50 12   make sure that I confirmed his understanding of things.

01:48:54 13   She -- as we had worked together to contact people, she

01:48:58 14   would go, kind of, over a script with them.  And she

01:49:03 15   just wanted to make sure he understood the points to

01:49:08 16   that.  And so when I began to speak with him, I

01:49:11 17   confirmed that he understood who we represented and that

01:49:14 18   it was voluntary, I think were the first two things I

01:49:17 19   said.

01:49:17 20   Q.    That what was voluntary?

01:49:18 21   A.    That he -- I said he could stop talking at any

01:49:22 22   point in time.

01:49:23 23   Q.    Did you record the conversation?

01:49:26 24   A.    Yes.

01:49:27 25   Q.    Was a recording of that transcribed?

01:49:32    1    A.  Yes.

01:49:33    2    Q.  Have you had an opportunity to review that

01:49:34    3    transcription?

01:49:35    4    A.  Yes, I have.

01:49:37    5    Q.  Was that a true and accurate transcription of

01:49:39    6    your conversation with Mr. Dillon?

01:49:40    7    A.  Yes.

01:49:45    8    Q.  During your conversation -- and I don't want you

01:49:51    9    to repeat it line for line, but what kinds of questions

01:49:55   10    did you ask him?

01:49:57   11    A.  Just questions about his employment and what he

01:50:02   12    remembered from working at the restaurant.

01:50:08   13    Q.  Did he express any reluctance to you to answer

01:50:11   14    those questions?

01:50:12   15    A.  No.  There was only one question that he said he

01:50:15   16    didn't want to answer, and that was -- had something to

01:50:19   17    do with his prior employment.

01:50:22   18    Q.  During any time -- or at any time during that

01:50:26   19    conversation did the subject of settlement or resolving

01:50:30   20    any claim Mr. Dillon might have come up?

01:50:34   21    A.  No.

01:50:35   22    Q.  Did you ask him to consider settling any claim he

01:50:41   23    might have in any way?

01:50:42   24    A.  No.

01:50:42   25    Q.  At that time had Mr. Dillon filed a consent to

01:50:50  1  sue?

01:50:50  2      A.  No.

01:50:53  3      Q.  Did you ask him not to file a consent to sue?

01:50:56  4      A.  No.

01:50:58  5      Q.  Did you tell him not to participate in the case

01:51:02  6  in any fashion?

01:51:03  7      A.  No.

01:51:06  8      Q.  About how long was your conversation with Mr.

01:51:09  9  Dillon?

01:51:09  10     A.  I think it was around 15 minutes, 15 or 16

01:51:14  11  minutes.  I'm not sure.

01:51:16  12     Q.  Was there anything other than the nature of his

01:51:22  13  employment at An that the two of you discussed?

01:51:26  14     A.  No.  We -- I mean, I went through just asking him

01:51:32  15  questions about how he felt about things at An.  Then I

01:51:36  16  said that there may be somebody else at our office that

01:51:39  17  may want to speak with him.  And I asked him if he was

01:51:42  18  willing to give a statement.

01:51:45  19     Q.  Following the conversation, what, if any, was

01:51:48  20  your next contact with Mr. Dillon?

01:51:51  21     A.  I sent him a text message asking if he would be

01:51:58  22  willing to meet.

01:52:01  23     Q.  Over the course of the next couple of weeks did

01:52:07  24  you send other text messages to Mr. Dillon?

01:52:10  25     A.  Yes.

01:52:12  1    Q.  Did Mr. Dillon respond to those text messages?

01:52:15  2    A.  Yes.

01:52:15  3    Q.  Have you had an occasion to review those text

01:52:18  4  messages?

01:52:19  5    A.  Yes.

01:52:20  6    Q.  Have you had an occasion to make copies of those

01:52:23  7  text messages?

01:52:24  8    A.  To make copies of the text messages?

01:52:27  9    Q.  The text messages would appear on your cell

01:52:31  10  phone, correct?

01:52:32  11   A.  Yes.

01:52:33  12       MS. HERNANDEZ:  Objection.  Leading.

01:52:34  13       THE COURT:  Well, it's helpful.  She's

01:52:37  14  confused.  All right.

01:52:42  15  BY MR. HUNT:

01:52:42  16   Q.  From the text messages that were on your cell

01:52:44  17  phone, what did you do with them?

01:52:47  18   A.  I took, like, a screen shot of them so that

01:52:52  19  everybody else could view them.

01:52:57  20   Q.  You took screen shots of the text messages from

01:53:03  21  your phone?

01:53:03  22   A.  Yeah, between me and Justin Dillon.

01:53:06  23   Q.  Then what did you do with the screen shots?

01:53:10  24   A.  I sent them to our team so that they could see.

01:53:16  25   Q.  Did you ever have any occasion to print out those

01:53:19  1   screen shots?

01:53:20  2      A.  Yeah, I think I actually printed them out right

01:53:23  3   when I took the screen shots.

01:53:25  4              MR. HUNT:  Your Honor, if I could approach.

01:53:27  5   I like to show her an exhibit.

01:53:51  6              THE COURT:  Did you want to show them to the

01:53:53  7   witness?

01:53:53  8              MR. HUNT:  Yes, Your Honor.

01:53:56  9              THE COURT:  Did you give her a copy?   Don't

01:54:00  10  you want to show them to the witness and ask her to

01:54:03  11  identify?

01:54:03  12             MR. HUNT:  Yes, I do.

01:54:09  13             THE COURT:  Is that your only copy?

01:54:10  14             MR. HUNT:  We have one more.

01:54:16  15             THE COURT:  These aren't in evidence yet.

01:54:16  16             (Document is given to the witness by the

01:54:27  17  Court.)

01:54:27  18             THE COURT:  You can just look through it,

01:54:28  19  then he's going to ask you a couple questions about

01:54:31  20  whether that's an accurate representation.

01:54:38  21             THE WITNESS:  Okay.

01:54:40  22  BY MR. HUNT:

01:54:40  23     Q.  Ms. Whitlock, you have seen these documents

01:54:43  24  before?

01:54:43  25     A.  Yes.

01:54:44    1        Q.   What are these?

01:54:45    2        A.   The screen shots that I took from my phone.

01:54:47    3        Q.   Screen shots of what?

01:54:48    4        A.   Of text messages between Justin Dillon and

01:54:51    5    myself.

01:54:51    6        Q.   Are these true and accurate copies of the text

01:54:55    7    messages that you exchanged with him --

01:54:58    8        A.   Yes.

01:54:58    9        Q.   -- during -- let me finish.

01:55:00   10        Are these true and accurate copies of the text

01:55:03   11    messages that you exchanged with him during March of

01:55:06   12    2018?

01:55:07   13        A.   Yes.

01:55:11   14             MR. HUNT:  Your Honor, I'd like to move the

01:55:13   15    admission of Defendant's Exhibit Number 3.

01:55:15   16             THE COURT:  Any objection?

01:55:16   17             MS. HERNANDEZ:  No, Your Honor.

01:55:17   18             THE COURT:  Let it be received.

05:25:52   19             (Whereupon Defendant's Exhibit 3 is admitted

05:25:56   20    into evidence.)

01:55:22   21    BY MR. HUNT:

01:55:23   22        Q.   In the course of the text messages did you and

01:55:26   23    Mr. Dillon discuss meeting?

01:55:34   24        A.   Meeting, yes, we did.

01:55:36   25        Q.   What did the two of you discuss?

01:55:38  1    A.  I asked if he had time to meet for, you know,
01:55:42  2  coffee.
01:55:43  3        And he said that that was fine; and said:
01:55:45  4  Downtown?
01:55:45  5        And I suggested a Starbucks and gave him an
01:55:50  6  address of a Starbucks that I looked up and was located
01:55:55  7  downtown.
01:55:55  8    Q.  What day did you agree to meet?
01:55:57  9    A.  I believe it was -- I said Monday, but I think
01:56:02  10  that that was the 19th.  I'm not sure.  I'd have to look
01:56:07  11  at a calendar.
01:56:09  12    Q.  You believe it was March 19, 2018?
01:56:11  13    A.  Yes.
01:56:13  14    Q.  Did you meet with Mr. Dillon at the Starbucks?
01:56:16  15    A.  I did.
01:56:18  16    Q.  Who arrived first?
01:56:20  17    A.  I arrived and Jordan Arkin Fishman, who is an
01:56:27  18  attorney from our firm; we arrived first.
01:56:33  19    Q.  How long were you there before Mr. Dillon
01:56:35  20  arrived?
01:56:36  21    A.  I think it was only a few minutes.  I had texted
01:56:42  22  Mr. Dillon and let him know what I was wearing and my
01:56:46  23  hair color so that he could recognize me when he got
01:56:49  24  there.  But I think it was only a few minutes.
01:56:54  25    Q.  How did the conversation with -- or how did you

01:56:58   1   recognize Mr. Dillon?

01:56:59   2       A.   He said -- I think the term he used was Gamecock

01:57:06   3   or something.  But he had a sweatshirt on that had -- I

01:57:11   4   think it was a Gamecock logo or something like that.

01:57:15   5   But he looked kind of hesitant, and he walked up to us.

01:57:19   6   I said:  Oh, hey Justin, I'm Erin.

01:57:22   7       Q.   What occurred next?

01:57:23   8       A.   Jordan, she had never talked to him before, so

01:57:28   9   she introduced herself.  And then we sat down and

01:57:32  10   thanked him for coming and started talking to him about,

01:57:39  11   like -- Jordan went over a brief statement of this is

01:57:42  12   what the case is about and who we represented.  Then we

01:57:47  13   said:  We're going to ask you some questions.  And

01:57:49  14   Jordan said, you know, I understand you previously

01:57:52  15   talked to Ms. Whitlock.

01:57:55  16       Q.   When you say that Jordan, Ms. Fishman, introduced

01:57:59  17   herself, what did she say during that introduction?

01:58:01  18       A.   I don't remember, like, the exact words; but I

01:58:05  19   think she just said:  I'm Jordan Fishman from Stokes

01:58:10  20   Wagner.

01:58:10  21       Q.   Did she say she was talking to him about the

01:58:13  22   case?

01:58:13  23       A.   Yes.

01:58:15  24       Q.   Did she say who she or you represented?

01:58:20  25       A.   I believe she did.  Yeah.  I mean, we said -- I

01:58:24  1   just -- yeah.  She said -- she said we represented -- I

01:58:28  2   don't think she used the exact names of the defendants

01:58:32  3   was the thing.  She was, like, we represent An, SAS

01:58:40  4   maybe.  I don't recall the exact statement that she

01:58:43  5   said, but she did say who we represented.

01:58:45  6        Q.   There was a statement at the beginning of the

01:58:47  7   conversation, though, where she indicated who the two of

01:58:50  8   you were there -- or on whose behalf you were there for?

01:58:53  9        A.   Yeah.

01:58:54 10        Q.   What occurred during the conversation?

01:58:56 11        A.   We just talked to him about his work at An, what

01:59:02 12   his position was, what he did prior, you know.  He made

01:59:08 13   it very clear that he did not think that the tip pool

01:59:14 14   was -- or he said any tip pools are illegal -- are

01:59:24 15   illegal.  He talked about the other people working

01:59:27 16   there.  He talked about his work around town.  At that

01:59:34 17   point actually he did disclose where -- his prior

01:59:37 18   employment.  He -- I think that's all I really remember.

01:59:45 19        Q.   At the end of the conversation did you ask him to

01:59:50 20   sign anything?

01:59:54 21        A.   Yes.

01:59:54 22        Q.   What was that?

01:59:55 23        A.   So I was -- I was typing notes on my computer,

01:59:59 24   and Jordan was typing the actual declaration as he was

02:00:07 25   talking.  And so she said, you know, as we've been

02:00:13  1  talking we've been typing up a declaration of what

02:00:17  2  you've been saying.  And she handed him the computer and

02:00:23  3  said that he could make any edits that he wanted.  Then

02:00:26  4  he went over some edits that he had, and we made them.

02:00:29  5  I don't think that -- he might have made a few himself,

02:00:34  6  but I don't remember clearly.  But he did have her

02:00:37  7  computer.  And then my printer wouldn't work.  And so I

02:00:43  8  walked next door to the Marriott to print it out and

02:00:46  9  came back over, and he signed it.  We read over it

02:00:51  10  again, I think, because Jordan made sure that he had

02:00:54  11  read over it once again just to make sure it was the

02:00:57  12  final copy.

02:00:58  13      Q.  Did he ask you to add anything to the

02:01:02  14  declaration?

02:01:03  15      A.  Yeah.  I know that one thing that he asked us to

02:01:10  16  add was he was just talking about Brandon Kelly at one

02:01:14  17  point, I don't remember at what exact point it is, but

02:01:18  18  he asked us to add Wai Man Tom because he didn't want it

02:01:23  19  to only be -- you know, to Brandon, or I don't know his

02:01:27  20  exact words.

02:01:29  21      Q.  Did you make that change?

02:01:30  22      A.  Yeah.  Yes.

02:01:32  23      Q.  Did the number of changes that he made to the

02:01:41  24  document, how extensive were those?

02:01:46  25      A.  They weren't very extensive.  Well, and the

02:01:50 1 changes that were made, it was like, you know, a

02:01:53 2 spelling error or adding that person's name or -- I

02:02:00 3 don't -- I think that's it. I don't know that any,

02:02:03 4 like, large substantive changes that were made to the

02:02:06 5 document.

02:02:07 6 Q. After the meeting at the Starbucks, did you have

02:02:11 7 any other communication with Mr. Dillon?

02:02:16 8 A. He sent me a text message; I believe it was on

02:02:22 9 the 21st. And he, you know, stated that he had

02:02:31 10 contacted plaintiff's counsel and stated that he wanted

02:02:37 11 to edit his statement. And I confirmed that he was not

02:02:46 12 represented by counsel at that time. And I emailed

02:02:53 13 him -- I got his email, and I emailed him the statement.

02:02:57 14 And he said he did not have any changes.

02:03:01 15 Q. I just direct your attention to Exhibit 3. If

02:03:05 16 you could look at the last page of the document, the

02:03:14 17 text message that says, "No edits, just been reeling it

02:03:20 18 over and my head and just wanted hard copy, thank you."

02:03:26 19     Is that your message, or is that Mr. Dillon's

02:03:29 20 message?

02:03:29 21 A. That's Mr. Dillon's message.

02:03:32 22 Q. It says, "Okay!  Thank you!"  That is also your

02:03:37 23 message?

02:03:37 24 A. "Okay!  Thank you!" is from me.

02:03:39 25 Q. So in this exhibit the text messages that are in

02:03:43   1   blue are the ones that you sent, and the ones that are

02:03:46   2   in gray are the ones that Mr. Dillon sent?

02:03:48   3       A.   Correct.

02:03:54   4       Q.   After the conversation -- or, excuse me, after

02:03:57   5   the exchange of text messages with Mr. Dillon, after the

02:04:01   6   meeting at Starbucks, did you have any further contact

02:04:05   7   with him?

02:04:06   8       A.   No.

02:04:13   9       Q.   At any time during the course of your

02:04:15  10   conversations did you ever attempt to ask Mr. Dillon or

02:04:21  11   encourage Mr. Dillon not to participate in the lawsuit

02:04:25  12   that's been brought against An?

02:04:28  13       A.   No.

02:04:48  14       Q.   During the course of your conversations with Mr.

02:04:51  15   Dillon did you ever say anything that was negative or

02:04:56  16   critical of Ms. Hernandez or Mr. Cohen or their law firm

02:05:01  17   or plaintiff's counsel?

02:05:02  18       A.   No.

02:05:03  19       Q.   During the course of your conversations did you

02:05:06  20   discuss Ms. Hernandez or Mr. Cohen in any fashion?

02:05:11  21       A.   No, I don't think so.  No.

02:05:14  22       Q.   That is, other than the email where -- or, excuse

02:05:18  23   me, text message where Mr. Dillon said he had spoke with

02:05:23  24   them?

02:05:23  25       A.   Right.

02:05:24  1    Q.  And following your receipt of that you confirmed

02:05:27  2  that he was not represented by them, right?

02:05:32  3    A.  Right.

02:05:33  4         MR. HUNT:  Thank you, Ms. Whitlock.  I don't

02:05:35  5  have anything further.

02:05:36  6         THE WITNESS:  Okay.

02:05:40  7         THE COURT:  Any questions?

02:05:40  8         MS. HERNANDEZ:  Yes, Your Honor.  Just a few

02:05:40  9  questions.

02:05:41  10                    - - -

02:05:41  11         ERIN WHITLOCK, CROSS-EXAMINATION

02:05:42  12  BY MS. HERNANDEZ:

02:05:42  13    Q.  Ms. Whitlock, did you tell Mr. Dillon in your

02:05:49  14  first telephonic discussion with him that you would be

02:05:52  15  recording the discussion?

02:05:53  16    A.  No.

02:05:55  17    Q.  Did you, before asking him questions about his

02:05:59  18  employment with defendant An, did you explain the nature

02:06:04  19  of the lawsuit?

02:06:05  20    A.  Again, that would be something that Sarah St.

02:06:10  21  Pierre would have gone over.  And, you know, I think we

02:06:15  22  had kind of a script for her to go over.  And that's why

02:06:20  23  when she called she wanted to make sure that he wasn't

02:06:23  24  confused with who we represented.  But I did not talk

02:06:26  25  about that, no.

02:06:27  1      Q.  Did you explain that the action brought by Wai

02:06:35  2  Man Tom was brought as a collective class action?

02:06:37  3      A.  I did not, no.

02:06:39  4      Q.  Did you explain to him that he could be a

02:06:42  5  potential class member in the action?

02:06:45  6      A.  No.

02:06:47  7      Q.  Did you ask him if he was represented by counsel?

02:06:52  8      A.  I believe that Ms. St. Pierre had asked that.  I

02:06:57  9  did not, no.

02:07:00  10     Q.  Did you explain to him that upon completion of

02:07:07  11  the questions with him that you would be -- that you

02:07:13  12  would have him sign a declaration and that he would get

02:07:18  13  a copy of it prior to actually signing it?

02:07:26  14     A.  Are you speaking about when we met with him in

02:07:28  15  person?

02:07:29  16     Q.  First I'm speaking about your initial telephonic

02:07:32  17  discussion with him.

02:07:33  18     A.  Uh-huh.

02:07:36  19     Q.  Did you explain to him that you would be

02:07:39  20  gathering the information -- strike that question.

02:07:43  21          Did you explain to him the nature of why you

02:07:49  22  wanted to speak with him?

02:07:51  23     A.  I guess I'm not clear on your question.  I asked

02:07:56  24  him if he would be willing to give a statement.  But at

02:07:59  25  that time we hadn't -- that was all I asked him in

02:08:04  1    relation to my talking to him.

02:08:05  2        Q.  Okay.  Let me rephrase the question.  Did you

02:08:09  3    explain to him why you wanted to speak with him?

02:08:14  4        A.  I don't believe so.  I may have just said talk

02:08:19  5    about your employment.  I don't know.

02:08:24  6        Q.  And, Ms. Whitlock, turning your attention to the

02:08:30  7    Defendant's Exhibit Number 3, which are the text

02:08:39  8    messages between you and Mr. Justin Dillon.

02:08:44  9        A.  Uh-huh.

02:08:45  10       Q.  If you look at the very first page of the text

02:08:49  11   messages which I believe you started on March 14 -- am I

02:08:53  12   reading that correctly?

02:08:54  13       A.  Yes.  Uh-huh.

02:08:55  14       Q.  And I guess the first text message from you to

02:08:58  15   him was, "Hey Justin, it's Erin Whitlock.  We spoke last

02:09:03  16   week about the An case.  Do you have time to grab a

02:09:06  17   coffee or something on Monday?"

02:09:08  18           Did I read that correctly?

02:09:09  19       A.  Yes.

02:09:09  20       Q.  Then he answered, "That's fine, downtown?"

02:09:13  21           Did I read that correctly?

02:09:14  22       A.  Yes.

02:09:15  23       Q.  Then if you go down to the bottom where he

02:09:18  24   indicates, "Which one ... I work downtown, don't really

02:09:21  25   get to explore."

02:09:22  1          Your response was, "Hahah.  Hear ya!"

02:09:25  2          Did I read that correctly?

02:09:27  3     A.   Yes.

02:09:27  4     Q.   Is that the way that you normally communicate

02:09:29  5   with putative plaintiffs in these types of cases?

02:09:34  6     A.   Yeah.  Yes, I guess.  I mean, I was just being

02:09:40  7   friendly.

02:09:42  8     Q.   And then if you look at the next page of the text

02:09:46  9   messages where he says, "See you Monday."

02:09:51  10         You say, "Okay cool see you there!"

02:09:54  11         Did I read that correctly?

02:09:55  12     A.   Yes.

02:09:56  13     Q.   Again, that's just the way you would normally

02:09:58  14   communicate with a putative class member, you

02:10:02  15   representing the defendant?

02:10:03  16     A.   Well, it's the way I would just communicate with

02:10:06  17   anybody.

02:10:07  18     Q.   But even in a professional context that's how you

02:10:10  19   would communicate with someone?

02:10:12  20     A.   Yes.

02:10:12  21     Q.   In an adversarial context?

02:10:15  22     A.   That's just how I would communicate with people

02:10:17  23   in general.  That's how I talk.

02:10:20  24     Q.   And during the course of your communications with

02:10:25  25   Mr. Dillon, both telephonically and in person, was there

02:10:32    1   an explanation about the allegations that were made in

02:10:37    2   the first amended complaint by Mr. Wai Man Tom?

02:10:41    3       A.  Not by myself.  I have understanding and was

02:10:44    4   present for one explanation.

02:10:52    5               MS. HERNANDEZ:  Ms. Whitlock, I have no

02:10:54    6   further questions.

02:10:56    7               MR. HUNT:  Nothing further, Your Honor.

02:10:57    8               THE COURT:  You can step down.  Thank you.

02:11:00    9               Any other witness?

02:11:01   10               MR. HUNT:  Yes.  One brief witness, I think,

02:11:03   11   Your Honor.  Ms. Fishman.

02:11:43   12               THE CLERK:  Please come forward and stand in

02:11:45   13   front of the clerk's bench.

02:11:48   14               Place your left hand on the Bible and raise

02:11:50   15   your right hand.  State your name for the Court.

02:11:53   16               THE WITNESS:  Jordan Fishman.

02:11:53   17               THE CLERK: Spell your name for the Court.

02:11:56   18               THE WITNESS:  J-o-r-d-a-n F-i-s-h-m-a-n.

02:12:01   19               (Whereupon the witness was sworn by the

02:12:07   20   clerk.)

02:12:07   21               THE CLERK:  Thank you.  Please take the

02:12:09   22   witness stand and be seated.

02:12:17   23                        - - -

02:12:17   24               JORDAN FISHMAN, DIRECT EXAMINATION

02:12:18   25   BY MR. HUNT:

02:12:18   1        Q.   Ms. Fishman, what do you do?

02:12:25   2        A.   Sorry?

02:12:26   3        Q.   What do you do?

02:12:27   4        A.   I'm an attorney.

02:12:28   5        Q.   Where do you work?

02:12:29   6        A.   I work at a law firm called Stokes Wagner.

02:12:33   7        Q.   Where is that located?

02:12:34   8        A.   It's -- well, I practice in Atlanta.  We have

02:12:37   9   offices all over the country.

02:12:39  10        Q.   You have worked on a case involving Wai Man Tom

02:12:44  11   and Brandon Kelly versus An, North Carolina Culinary and

02:12:53  12   SAS, and other defendants?

02:12:54  13        A.   Yes.

02:12:56  14        Q.   During the course of that work did you have an

02:12:59  15   occasion to speak with Justin -- a gentleman by the name

02:13:02  16   of Justin Dillon?

02:13:04  17        A.   Yes, I did.

02:13:05  18        Q.   When was the first time you spoke to Mr. Dillon?

02:13:09  19        A.   The first time I spoke with Mr. Dillon was on

02:13:12  20   March 19 around 2:30 in the afternoon at a Starbucks in

02:13:18  21   Raleigh.

02:13:19  22        Q.   How did you come to speak with him on that day?

02:13:23  23        A.   My paralegal, Erin Whitlock, had spoken with him

02:13:28  24   on the phone previously, and she set up the interview.

02:13:35  25        Q.   During the discussions with Mr. Dillon prior to

02:13:40  1    the meeting, was he told that he -- one of the purposes

02:13:49  2    of the meeting would be to obtain a statement from him?

02:13:51  3        A.   Yes.   Erin Whitlock informed me that when she

02:13:55  4    spoke with him, she told him about the background of the

02:13:58  5    case and said that she -- we wanted to meet with him to

02:14:01  6    get a statement.

02:14:02  7        Q.   When you met with Mr. Dillon at Starbucks, did

02:14:06  8    you also tell him that?

02:14:08  9        A.   Sorry?

02:14:08  10       Q.   When you met with Mr. Dillon at the Starbucks,

02:14:11  11   did you also tell him that you wanted to obtain a

02:14:14  12   statement from him?

02:14:15  13       A.   Yes.

02:14:19  14       Q.   On that day who arrived first at the restaurant?

02:14:22  15       A.   Erin Whitlock and I arrived first at the

02:14:25  16   Starbucks and just sat down at one of the larger tables

02:14:30  17   there that had six chairs at it and set up our laptops.

02:14:37  18       Q.   Mr. Dillon arrived how much later?

02:14:40  19       A.   I don't recall exactly how much later.   I think

02:14:44  20   it was five or ten minutes.

02:14:46  21       Q.   And how did you know it was him?

02:14:48  22       A.   He was kind of searching around.   He looked like

02:14:53  23   a person that was kind of searching around looking for

02:14:57  24   someone.   And he kind of walked over to us, and I think

02:14:59  25   we said, you know:   Justin?

02:15:05    1          And he said:  Oh, hi.

02:15:07    2          And I think he said -- he either said:  Are you

02:15:10    3    Erin?  Or, Erin?

02:15:12    4          And we introduced ourselves.

02:15:15    5      Q.  How did you introduce yourself?

02:15:18    6      A.  Initially I stood up and I just said:  I'm Jordan

02:15:22    7    Fishman, nice to meet you.  And Erin shook his hand, I

02:15:26    8    shook his hand.  Then when we sat down I did a more

02:15:29    9    formal introduction.

02:15:30    10     Q.  Could you describe that more formal introduction

02:15:33    11    for us.

02:15:34    12     A.  My formal introduction was similar to

02:15:38    13    introductions I've done in the past with witness

02:15:42    14    interviews.  I said, you know:  Hello/good afternoon, my

02:15:45    15    name is Jordan Fishman.  I'm an attorney with Stokes

02:15:50    16    Wagner.  This is Erin Whitlock; she's my paralegal.  We

02:15:53    17    are representing defendants in this lawsuit that was --

02:15:58    18    I said:  Defendant An Asian Cuisine, a defendant in this

02:16:05    19    lawsuit that was brought by Brandon Kelly and Wai Man

02:16:10    20    Tom.

02:16:14    21     Q.  Did he appear to be confused in any way to you?

02:16:17    22     A.  No.

02:16:17    23     Q.  Did he ask you any questions about who you

02:16:19    24    represented?

02:16:20    25     A.  No.

02:16:21   1      Q.   Did he express any uncertainty about who your

02:16:25   2   clients happened to be?

02:16:27   3      A.   No, he didn't ask any questions about who my

02:16:30   4   client was.

02:16:33   5      Q.   What occurred next?

02:16:34   6      A.   So I explained to him who we were and that we

02:16:41   7   represented the restaurant.  I then -- I said something

02:16:45   8   along the lines of:  I believe when you spoke with Erin

02:16:49   9   Whitlock she told you this is -- you meeting with us is

02:16:52  10   voluntary.  We greatly appreciate you taking time out of

02:16:55  11   your day to meet with us.  We just want to ask you a

02:16:59  12   couple questions about the factual allegations in the

02:17:06  13   complaint that was filed by the plaintiffs.  We're

02:17:09  14   interested in the truth and only the truth.

02:17:11  15         So I think I also advised him that I was taking

02:17:15  16   notes in real time on my laptop.  And I told him that

02:17:20  17   I'm going to take notes in real time so that I can try

02:17:23  18   to get as accurate of a statement as possible.

02:17:27  19      Q.   You said that at the outset of the conversation?

02:17:29  20      A.   Yes.

02:17:30  21      Q.   What kinds of questions or what kinds of topics

02:17:34  22   did you ask him about during your meeting?

02:17:37  23      A.   As I've done with other witness interviews, I

02:17:43  24   ask -- I kind of start with:  When did you work at An?

02:17:49  25   What was your position at An?   Where have you worked

02:17:53    1    previously?

02:17:53    2        So he spent some time talking about his previous

02:17:58    3    employers and the positions he's held for his previous

02:18:01    4    employers.  I believe it's in his declaration he was a

02:18:06    5    Swiss Army knife for one of his employers.  I didn't

02:18:09    6    know what that meant, so I asked him.  Basically meaning

02:18:12    7    he had worked in every position in the restaurant.  So

02:18:14    8    we talked about that for a while, and then started

02:18:19    9    focusing on:  Has he worked with Nick Pappas?  He said

02:18:25   10    he had; he said he trained with him.  I asked him about

02:18:28   11    what kind of training he did with Nick.  Then I got into

02:18:34   12    whether Nick was out in the front of the house.  I asked

02:18:40   13    him for the facts regarding Nick and his involvement in

02:18:45   14    serving customers.  I asked him about the sushi chefs

02:18:51   15    and whether they spoke English, whether they interacted

02:18:55   16    with guests.  I asked him questions -- well, I guess at

02:19:00   17    the beginning when I told him what the lawsuit was

02:19:02   18    about, that it was about allegations regarding an

02:19:06   19    improper tip pooling arrangement, he expressed to me

02:19:11   20    that he, throughout the course of our interview, that he

02:19:14   21    thought all tip pools were illegal.  Obviously I didn't

02:19:19   22    feel inclined to give him legal advice on that. I just

02:19:22   23    said:  We've taken the position that the tip pool at An

02:19:25   24    was legal.  And so I think that was the majority of the

02:19:30   25    topics that we covered.

02:19:32  1      Q.  How did the meeting end?

02:19:35  2      A.  The meeting ended with me saying, you know, thank

02:19:39  3   you so much for your time.  As I discussed earlier, I've

02:19:43  4   been typing all of this in real time on my laptop.  I

02:19:47  5   want you to review everything that I've written to make

02:19:52  6   sure that it's 100 percent accurate.  If you believe

02:19:55  7   that I've misstated anything, please feel free to

02:19:58  8   correct it.  I'm going to literally hand you my laptop

02:20:02  9   so you can make any edits that you wish.

02:20:05  10      So then I proceeded to turn my laptop around, and

02:20:09  11  he sat there looking at my laptop reviewing the

02:20:13  12  statement, which is, I believe, like, a page and a half

02:20:16  13  long.  And so he had the opportunity to change it

02:20:20  14  himself, but he actually asked me to make the changes.

02:20:23  15  So we kind of just looked on together, and he told me to

02:20:27  16  change the spelling of a restaurant that he had worked

02:20:30  17  at.  He told me to add Wai where I had just had Brandon

02:20:38  18  because he said he didn't want to single anyone out.  So

02:20:41  19  I said okay, so I added Wai's name where I had Brandon's

02:20:46  20  name.

02:20:46  21      Then he also asked me to change the wording of --

02:20:52  22  one of the paragraphs in the last page because I think

02:20:55  23  he said that he didn't like the way it sounded.  So I

02:21:02  24  did all those changes that he asked me to do.

02:21:04  25      And then Erin -- I said that our printer wasn't

02:21:12  1   working, or Erin said -- one of us told him our printer

02:21:16  2   wasn't working, so we were going to go to the Marriott

02:21:20  3   next door to print out the statement.  So Erin went and

02:21:24  4   printed out the statement.  I sat there with him.

02:21:27  5        And I don't remember exactly what we discussed,

02:21:30  6   but we were talking about his family.  He talked about

02:21:32  7   his sister and how he looked up to her.  She had

02:21:36  8   multiple degrees.  And then he was talking about some

02:21:39  9   race that she runs where her and other people -- it's

02:21:43 10   kind of a social thing where they run, then they get to

02:21:47 11   a stopping point and drink a beer and keep running.  So

02:21:51 12   I don't remember what else we talked about, but I

02:21:53 13   remember us talking about his sister and her

02:21:56 14   accomplishments.

02:21:57 15        And then Erin came back from the Marriott with

02:22:02 16   the printed out statement, and he looked over the

02:22:07 17   statement again.  You know, I said:  Again, please look

02:22:10 18   over this, make sure it's accurate.  And then he signed

02:22:13 19   the statement.

02:22:19 20   Q.  You referred to him making a number of changes to

02:22:24 21   the affidavit.  Did the changes amount to two pages

02:22:27 22   worth of changes?

02:22:28 23   A.  No.

02:22:29 24   Q.  Did they amount to two paragraphs worth of

02:22:31 25   changes?

02:22:32   1        A.   No.

02:22:33   2        Q.   Were they just a few words here and there that he

02:22:37   3   changed?

02:22:37   4        A.   Yes.   A few words here and there, then I deleted

02:22:41   5   a sentence, or I changed the wording of a sentence.

02:22:43   6        Q.   Toward the end of the meeting or as the meeting

02:22:46   7   was ended, what, if any, kind of gestures did Mr. Dillon

02:22:49   8   make?

02:22:51   9        A.   He --

02:22:54  10             MS. HERNANDEZ:   Objection.   Form.

02:22:57  11             THE COURT:   You can answer it.   Do you

02:23:01  12   understand the question?

02:23:03  13             THE WITNESS:   Yes.

02:23:04  14        A.   He threw his middle fingers up and said:   F'

02:23:10  15   them.   And I believe that was in reference to An, saying

02:23:15  16   F' them to An.   And:   I hope Tom and Brandon, you know,

02:23:19  17   get money from this.

02:23:24  18        Q.   After he was shown the printed declaration, did

02:23:28  19   you give him an opportunity to review it?

02:23:30  20        A.   Yes.

02:23:32  21        Q.   How much time did he take to review the printed

02:23:35  22   declaration?

02:23:36  23        A.   Four or five minutes.   It wasn't long.   It was a

02:23:40  24   page and a half.   So I think four or five minutes.   He

02:23:43  25   could have had as much time as he wanted; I just sat

| | | |
|---|---|---|
| 02:23:46 | 1 | back and let him read it. |
| 02:23:47 | 2 | Q.  Did he appear to be rushed in any way? |
| 02:23:50 | 3 | A.  No. |
| 02:23:50 | 4 | Q.  Did you tell him he had to be done by a |
| 02:23:52 | 5 | particular time? |
| 02:23:53 | 6 | A.  No. |
| 02:23:53 | 7 | Q.  Did you tell him you had to be somewhere at any |
| 02:23:56 | 8 | particular time? |
| 02:23:57 | 9 | A.  No. |
| 02:23:57 | 10 | Q.  Did he voluntarily end the meeting? |
| 02:24:00 | 11 | A.  Sorry. |
| 02:24:01 | 12 | Q.  Did he voluntarily end the meeting? |
| 02:24:06 | 13 | A.  Yes.  Right.  He signed is it, and then I think |
| 02:24:10 | 14 | we all casually said bye to each other, and I said thank |
| 02:24:15 | 15 | you.  It was a very casual ending to the meeting. |
| 02:24:19 | 16 | Q.  Have you had any further contact with Mr. Dillon |
| 02:24:22 | 17 | since that time? |
| 02:24:23 | 18 | A.  No. |
| 02:24:26 | 19 | MR. HUNT:  Thank you, Ms. Fishman.  I don't |
| 02:24:28 | 20 | have any further questions. |
| 02:24:29 | 21 | MS. HERNANDEZ:  Thank you, Your Honor I just |
| 02:24:30 | 22 | have a few follow-up questions for Ms. Fishman. |
| 02:24:34 | 23 | - - - |
| 02:24:34 | 24 | JORDAN FISHMAN, CROSS-EXAMINATION |
| 02:24:36 | 25 | BY MS. HERNANDEZ: |

02:24:36  1      Q.   Would you prefer that I refer to you as Ms. Arkin

02:24:39  2   or Ms. Fishman?

02:24:40  3      A.   So, yes.  You can refer to me as Fishman.  Arkin

02:24:44  4   is on my declaration because I haven't legally changed

02:24:47  5   my last name yet, just due to flights being booked under

02:24:51  6   my unmarried name.

02:24:53  7      Q.   Thank you, Ms. Fishman.  Do you recall if in your

02:24:57  8   meeting with Mr. Dillon, did you hand him a copy of the

02:25:02  9   first amended complaint?

02:25:04  10      A.   I did not.

02:25:06  11      Q.   Did you explain to him the nature of the named

02:25:11  12   plaintiff's allegations against your clients, the

02:25:14  13   defendants?

02:25:15  14      A.   I generally explained it.  I didn't say there

02:25:18  15   were four counts in the complaint and these are the

02:25:21  16   counts in the complaint, but I said that a lawsuit was

02:25:23  17   brought by Brandon Kelly and Wai Man Tom against the

02:25:28  18   restaurant.  Basically they've asserted claims against

02:25:32  19   the restaurant based on an alleged improper tip pooling

02:25:36  20   arrangement or improper tip pooling practices.  I said

02:25:40  21   one of the two.

02:25:41  22      Q.   Did you explain to them that it was brought as a

02:25:43  23   collective class action and that he could potentially be

02:25:47  24   a putative class member in this action?

02:25:50  25      A.   I don't recall if I did.

02:25:54   1       Q.   Do you recall explaining to him that his rights

02:26:01   2   could be affected by speaking with you?

02:26:04   3       A.   No.

02:26:05   4       Q.   Did you ask him if he was represented by counsel?

02:26:09   5       A.   I don't recall if I did, but I have in my

02:26:19   6   previous interviews.  So sitting here today I don't

02:26:24   7   recall if I did, but I have before, so it makes me think

02:26:27   8   I probably did as my normal practice.

02:26:30   9            I do recall looking at PACER, it was either that

02:26:33  10   morning or the morning before that, and seeing that he

02:26:35  11   hadn't filed a consent to sue.

02:26:39  12       Q.   Do you recall asking him if he had a right to

02:26:43  13   have counsel present during the course of his discussion

02:26:46  14   with you?

02:26:47  15       A.   No.

02:26:47  16       Q.   Did you explain to him the purpose of the meeting

02:26:51  17   with you?

02:26:53  18       A.   I told him that the purpose of him meeting with

02:26:55  19   us is for us to find out the truth regarding the

02:26:59  20   allegations that were alleged in the complaint that was

02:27:03  21   filed against the restaurant.

02:27:05  22       Q.   Did you explain to him that the information that

02:27:08  23   you would be gathering could be used in this action

02:27:12  24   against the plaintiffs?

02:27:16  25       A.   I don't think I explicitly said:  The information

| | | |
|---|---|---|
| 02:27:20 | 1 | you give us will be used against you.  But I did say |
| 02:27:23 | 2 | that we are collecting statements in connection with |
| 02:27:26 | 3 | this lawsuit. |
| 02:27:28 | 4 | Q.  So did you or did you not explain to him that you |
| 02:27:32 | 5 | would be utilizing those statements in this action? |
| 02:27:36 | 6 | A.  Yes, I did.  I said:  We plan on using these |
| 02:27:41 | 7 | statements in connection with the litigation. |
| 02:27:43 | 8 | Q.  You did explain that to him? |
| 02:27:45 | 9 | A.  Yes. |
| 02:27:48 | 10 | Q.  And just for the record, Ms. Fishman, that |
| 02:27:51 | 11 | information is not in your declaration, that you |
| 02:27:55 | 12 | specifically advised him of such information. |
| 02:27:58 | 13 | MR. HUNT:  Objection. |
| 02:28:00 | 14 | THE COURT:  Is that a question? |
| 02:28:02 | 15 | MS. HERNANDEZ:  I'm sorry, Your Honor. |
| 02:28:04 | 16 | Strike that.  It's just a comment/statement/observation, |
| 02:28:09 | 17 | if you will. |
| 02:28:10 | 18 | BY MS. HERNANDEZ: |
| 02:28:11 | 19 | Q.  Now, did you also advise Mr. Dillon that he would |
| 02:28:15 | 20 | be -- he could take the declaration home with him to |
| 02:28:18 | 21 | review it before signing it? |
| 02:28:20 | 22 | A.  No. |
| 02:28:24 | 23 | Q.  Did you explain to him the nature of the |
| 02:28:30 | 24 | statement, signing under penalty of perjury and its |
| 02:28:33 | 25 | legal significance? |

A.   I made a comment about this being a sworn

statement, which is why I wanted it to be 100 percent

accurate and truthful.  And I believe that came up twice

during our conversation where I said:  I'm looking for

the truth.  I'm typing this up.  I hope it's accurate.

If it's not, this is a sworn statement, so I want you to

have the opportunity to correct it, correct any

misstatements.

Q.   So, Ms. Fishman, thank you very much for that,

but it's a very simple yes-or-no answer.  Did you

explain to Mr. Dillon the significance of that

statement, signing under penalty of perjury?

                MR. HUNT:  Objection.  Ambiguous.

                THE COURT:  Overruled.

A.   I explained to him that it was a sworn statement

that he was signing.  And I believe it also says "Under

penalty of perjury" right above where he signed.  But

yes, I did explain to him that it was a sworn statement.

Q.   Did you explain to him what a sworn statement

means?

A.   No.

Q.   Did you also -- did you explain to him that by

speaking with you or signing that declaration under

penalty of perjury could actually -- could potentially

limit any potential rights that he might have in the

02:30:05　1　action?

02:30:06　2　　A.　No.

02:30:11　3　　　　　　MS. HERNANDEZ:  Ms. Fishman, thank you very

02:30:12　4　much.  I have no further questions.

02:30:15　5　　　　　　THE COURT:  Any redirect?

02:30:17　6　　　　　　MR. HUNT:  No, Your Honor.

02:30:18　7　　　　　　THE COURT:  Thank you.  You can step down.

02:30:20　8　And if you want to bring both your paralegal and have

02:30:23　9　the attorney stay in the courtroom at this point, I

02:30:26　10　don't think they're going to be recalled.

02:30:29　11　　　　　　MR. HUNT:  Thank you, Your Honor.

02:30:33　12　　　　　　THE COURT:  Any further evidence?

02:30:34　13　　　　　　MR. HUNT:  No, Your Honor, only that in

02:30:42　14　connection with our response, we did submit a

02:30:44　15　declaration from Ms. St. Pierre, who is the receptionist

02:30:50　16　in our office, and I would like the Court to receive

02:30:53　17　that into evidence.

02:30:54　18　　　　　　THE COURT:  Okay.  So noted.

02:30:58　19　　　　　　Anything else?

02:30:58　20　　　　　　MR. HUNT:  Other than that, no, Your Honor.

02:31:00　21　　　　　　THE COURT:  Do you want to make your closing

02:31:02　22　argument?

02:31:03　23　　　　　　MS. HERNANDEZ:  Yes, Your Honor.  Just a

02:31:04　24　couple of minutes.

02:31:09　25　　　　　　THE COURT:  You can be seated.  And we close

02:31:11  1    off the screens now, take them down, having heard all

02:31:17  2    the evidence.

02:31:23  3            MS. HERNANDEZ:  Your Honor, I think the

02:31:24  4    evidence here certainly shows that while this wasn't

02:31:30  5    anything like Quezada where people were being called

02:31:34  6    over a loud speaker and being asked to meet in some

02:31:38  7    room, dark room with just managers, the similarities

02:31:42  8    relate to the context of the information that was being

02:31:47  9    given to these individuals, the putative class members,

02:31:54  10   and insuring that they fully understood the nature and

02:31:58  11   the purpose of the meeting and how the evidence would be

02:32:01  12   used in their own involvement -- own potential

02:32:05  13   involvement in the action, Your Honor.

02:32:06  14           THE COURT:  Don't you agree that I've got to

02:32:10  15   make some credibility decisions here?  Because there was

02:32:12  16   a very different picture painted by Mr. Dillon versus

02:32:16  17   painted by defense counsel and the paralegal from the

02:32:22  18   witness stand.  There was internal inconsistency within

02:32:27  19   the testimony of Mr. Dillon.  Do you want to talk about

02:32:33  20   that?

02:32:34  21           MS. HERNANDEZ:  Your Honor, simply I think

02:32:38  22   that there are a lot of consistencies in terms of the

02:32:43  23   information based on the recording of the discussion,

02:32:48  24   the telephonic discussion.  And there's no indication

02:32:53  25   from Ms. St. Pierre's declaration that she fully

02:32:59  1   explained the nature of the lawsuit to Mr. Dillon or

02:33:03  2   that Ms. Whitlock explained the nature of the lawsuit to

02:33:07  3   Mr. Dillon and how his rights could be affected.

02:33:09  4          And this, Your Honor, is obviously very --

02:33:13  5   it's perplexing.  It is surprising because, again, given

02:33:18  6   the impending motion for conditional class

02:33:21  7   certification, it's important that counsel simply allow

02:33:27  8   the Court to rule on such a motion so that the notice

02:33:32  9   that is going out to these putative plaintiffs if the

02:33:35  10  Court, again, rules in granting the motion for notice

02:33:38  11  and certification that they're getting timely and

02:33:41  12  accurate notice and that they understand when they're

02:33:44  13  reading the notice how that can potentially affect them

02:33:48  14  in making decisions on whether or not they wish to

02:33:51  15  participate.

02:33:52  16         But I think that in looking at all of the

02:33:56  17  evidence, including the testimony, I think that there is

02:34:00  18  a lot of information that just was not fully disclosed.

02:34:04  19  And from a third party kind of spectator position it

02:34:11  20  would suggest that defendants had basically had a desire

02:34:17  21  to somehow circumvent the Court's authority, usurping

02:34:22  22  the Court's authority in making a determination about

02:34:24  23  this collective class action whether or not to be

02:34:27  24  certified and giving people notice.

02:34:30  25         So if the Court finds that the defendants'

02:34:34 1 communications were, in fact, improper, plaintiffs ask

02:34:38 2 that the Court certainly grant the motion for protective

02:34:44 3 order, precluding prospective communications with

02:34:48 4 putative class members, essentially precluding the usage

02:34:53 5 of these declarations in support of a motion for partial

02:34:56 6 summary judgment that is anticipated in terms of filing

02:34:59 7 by the defendants or in opposition to plaintiff's motion

02:35:02 8 for conditional class certification. And also that

02:35:09 9 these putative class members receive some sort of

02:35:11 10 corrective notice which can also be utilized in the

02:35:14 11 actual notice in support of the motion for class cert

02:35:20 12 should the Court grant it.

02:35:22 13 This is now the third time, Your Honor, I've

02:35:24 14 had to file a motion for protective order. And in both

02:35:27 15 cases there was more information given by defendant's

02:35:30 16 counsel than was done here. So I hope, Your Honor, that

02:35:33 17 you will at least take all of the information, all of

02:35:35 18 the evidence into consideration and insure that there's

02:35:41 19 a levelled playing field, if you will.

02:35:45 20 Thank you very much.

02:35:46 21 THE COURT: All right. Thank you, counsel.

02:35:48 22 Do you wish to be heard?

02:35:49 23 MR. HUNT: Yes, Your Honor. Just briefly.

02:35:53 24 I think as Your Honor pointed out, there are some

02:35:57 25 internal inconsistencies in what Mr. Dillon said versus

02:36:01  1   what he told the Court in the affidavit that plaintiff's
02:36:04  2   counsel filed with the motion.  For one thing, it
02:36:07  3   appears that he knew from the get-go that he was being
02:36:11  4   interviewed and talked -- or he was speaking with the
02:36:14  5   defendant's law firm.  And there really wasn't any
02:36:17  6   confusion in his mind as to where everybody stood and
02:36:21  7   what their relative positions were.  So he knew exactly
02:36:25  8   what the story was, so to speak, in terms of who was
02:36:29  9   asking questions and what kind of information was being
02:36:33  10  requested.  He also was aware of the lawsuit.  He'd
02:36:38  11  known that for at least a year.  Apparently he and Mr.
02:36:42  12  Kelly or he and Mr. Tom were friends, and apparently he
02:36:47  13  reached out to them right after his conversation with
02:36:50  14  Ms. Fishman.  Nevertheless, he went ahead and still
02:36:53  15  executed -- he didn't change the affidavit.  He'd
02:36:58  16  already signed it by that time.
02:37:00  17          I think the facts show this was a completely
02:37:02  18  voluntary interview on his part.  There's no evidence of
02:37:06  19  any coercion.  There's no evidence of any promises to
02:37:10  20  him.  In fact, in terms of the questions that were
02:37:14  21  asked, if one reviews this transcript of the telephone
02:37:18  22  conversation, practically every single question is
02:37:21  23  either "how," "why," "what," "where," "when?"  They're
02:37:26  24  all completely open-ended.  I don't think there's one
02:37:29  25  leading question in here.  None of these suggested any

02:37:32  1   outcome.  They were simply attempts to obtain facts and

02:37:35  2   information from Mr. Dillon.

02:37:38  3        And when Ms. Fishman or Ms. Whitlock met

02:37:42  4   with him, they proceeded to follow up on that

02:37:44  5   conversation.  Ms. Whitlock already had one.  And they

02:37:48  6   asked him more or less the same kinds of questions,

02:37:52  7   factual information about what his employment experience

02:37:55  8   had been with An.  And at the end of that conversation

02:37:58  9   they had him or asked him if he would sign a statement,

02:38:02  10  which he did.  And they gave him a chance to review it.

02:38:05  11  By his own admission, he did review it.  He claims he

02:38:08  12  made -- I think he said two pages worth of changes; Ms.

02:38:13  13  Fishman and Ms. Whitlock obviously say that's not true,

02:38:18  14  he changed a few words here and there, and that was the

02:38:21  15  extent of it.

02:38:22  16       But I think even more, once the Court heard

02:38:28  17  Ms. Whitlock and Ms. Fishman's version of it, after this

02:38:31  18  was all said and done, and he had reached out to Ms.

02:38:35  19  Whitlock again, initially he said he wanted to make

02:38:38  20  changes to his affidavit.  Well, he didn't make any.  He

02:38:41  21  expressly said:  Well, no, I'm not going to make any

02:38:44  22  changes.  I think he said:  I was just sort of going

02:38:48  23  over it in my mind.  Well, that doesn't amount to

02:38:51  24  coercion.  It doesn't amount to undue influence.

02:38:53  25  There's nothing that occurred during the course of this

| | |
|---|---|
| 02:38:56 | 1 |
| 02:39:00 | 2 |
| 02:39:04 | 3 |
| 02:39:08 | 4 |
| 02:39:11 | 5 |

interview that would be improper under the Manual for
Complex Litigation and its section on what kinds of
things defense counsel can ask during precertification
interviews.  I don't think there's anything that even
comes close to one of those.

So with the greatest respect we urge that
the plaintiff's motion be denied.  I don't think it
meets -- comes anywhere close to meeting the high
standard that would require judicial intervention at
this point.

I'd also add that at this point there are no
more witness interviews to be done.  We have reached the
point in the case where we're in the process of
responding to the plaintiff's motion for certification.
So the record, more or less, at this juncture is fixed.
And there really isn't anything to be gained from a
further order regarding communications outside of one
the Court might issue if it were inclined to grant the
motion for initial certification.

So all that being said, we respectfully ask
that the motion be denied.

THE COURT:  Okay.  Well, this could only be
decided with benefit of a hearing, and that hearing has
been held.  And I do not believe at this point in time
that involvement by the Court is appropriate, and so I

```
02:38:56   1   interview that would be improper under the Manual for
02:39:00   2   Complex Litigation and its section on what kinds of
02:39:04   3   things defense counsel can ask during precertification
02:39:08   4   interviews.  I don't think there's anything that even
02:39:11   5   comes close to one of those.
02:39:13   6           So with the greatest respect we urge that
02:39:16   7   the plaintiff's motion be denied.  I don't think it
02:39:21   8   meets -- comes anywhere close to meeting the high
02:39:23   9   standard that would require judicial intervention at
02:39:26  10   this point.
02:39:27  11           I'd also add that at this point there are no
02:39:30  12   more witness interviews to be done.  We have reached the
02:39:34  13   point in the case where we're in the process of
02:39:37  14   responding to the plaintiff's motion for certification.
02:39:40  15   So the record, more or less, at this juncture is fixed.
02:39:43  16   And there really isn't anything to be gained from a
02:39:49  17   further order regarding communications outside of one
02:39:54  18   the Court might issue if it were inclined to grant the
02:39:57  19   motion for initial certification.
02:39:59  20           So all that being said, we respectfully ask
02:40:01  21   that the motion be denied.
02:40:02  22           THE COURT:  Okay.  Well, this could only be
02:40:17  23   decided with benefit of a hearing, and that hearing has
02:40:22  24   been held.  And I do not believe at this point in time
02:40:26  25   that involvement by the Court is appropriate, and so I
```

02:40:29  1    deny the plaintiff's motion.

02:40:32  2            There's not been sufficient credible

02:40:34  3    consistent testimony that would meet the standard for

02:40:37  4    Court intervention or for striking Mr. Dillon's

02:40:41  5    affidavit that defendant is going to rely on.  These

02:40:48  6    weren't misleading or intimidating communications by the

02:40:53  7    defendant.  It is a finding that I make that Mr. Dillon

02:40:59  8    knew he was talking to defense counsel.  He knew that

02:41:03  9    based on the recorded -- the contacts with the law firm

02:41:09  10   by telephone, and it was reiterated to him at the

02:41:13  11   meeting at the Starbucks at the Marriott on Fayetteville

02:41:19  12   Street.  I find defense counsel's testimony very

02:41:22  13   convincing.  And I think ultimately Mr. Dillon admitted

02:41:26  14   it on the witness stand that he knew he was talking to

02:41:29  15   defense counsel; he knew there was a lawsuit involving

02:41:33  16   the restaurant.  And I don't find credible his testimony

02:41:37  17   that he had to revise two and a half pages of his

02:41:40  18   affidavit.  That's just not been shown.  Simply not

02:41:47  19   being clear on a certain point that would be a more

02:41:53  20   expansive explanation of the lawsuit or a more involved

02:41:58  21   explanation of Mr. Dillon's potential involvement

02:42:01  22   doesn't rise to the level of warranting a Court

02:42:05  23   intervention.  He knew there was a lawsuit against An.

02:42:09  24   He knew his testimony was going to be relied on.  He had

02:42:14  25   an opportunity to review it, including the oath block,

02:42:26 1    knowing -- with the opportunity to ask questions about

02:42:29 2    the sworn aspect of his testimony.  And when he asked

02:42:36 3    for his copy of his affidavit, it ultimately was

02:42:40 4    provided, and he didn't have any changes.

02:42:43 5           I think he appears conflicted about what he

02:42:47 6    has or hasn't done in this case.  He's obviously friends

02:42:50 7    with the two individuals, Mr. Tom and the other.  And he

02:42:59 8    wasn't a very convincing witness in terms of a

02:43:06 9    presentation that this was coercive, intimidating

02:43:10 10   communication.  Really even by his own testimony he

02:43:13 11   undercut that.  So no, the relief that plaintiff

02:43:21 12   requests is not allowed.

02:43:23 13           So in four days your response is due; is

02:43:28 14   that right?

02:43:28 15           MR. HUNT:  Yes, Your Honor.  I believe it's

02:43:30 16   four business days.

02:43:32 17           THE COURT:  So is there anything if we talk

02:43:33 18   about now might bring efficiencies to the case?   Is

02:43:37 19   there anything, plaintiff, you can think about?

02:43:40 20           MS. HERNANDEZ:  No, Your Honor, nothing from

02:43:42 21   the plaintiff.

02:43:43 22           THE COURT:  Since we're all together.

02:43:44 23           MR. HUNT:  Not pending the Court's ruling on

02:43:46 24   the upcoming motions, no, Your Honor.

02:43:53 25           (Discussion had off the record.)

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 02:43:53 | 1  | MR. HUNT: Oh, I guess one item, Your Honor. |
| 02:44:01 | 2  | Your Honor, in the course of preparing our brief, we may |
| 02:44:08 | 3  | need an extension of the page limit, the number of |
| 02:44:12 | 4  | pages. If the Court could give us ten additional pages |
| 02:44:16 | 5  | on the summary judgment motion, we would greatly |
| 02:44:20 | 6  | appreciate it. |
| 02:44:21 | 7  | THE COURT: And you're going to file that |
| 02:44:23 | 8  | within -- at the same time? |
| 02:44:26 | 9  | MR. HUNT: Yes. What we're trying to do, |
| 02:44:28 | 10 | because a large number of exhibits are the same, we |
| 02:44:32 | 11 | wanted to make it -- |
| 02:44:33 | 12 | THE COURT: It's a unified? |
| 02:44:35 | 13 | MR. HUNT: We were going to try to attempt |
| 02:44:38 | 14 | to do that so that the same exhibits for summary |
| 02:44:41 | 15 | judgment are the same exhibits in response to the |
| 02:44:43 | 16 | plaintiff's motion for -- |
| 02:44:46 | 17 | THE COURT: But how does that affect your |
| 02:44:47 | 18 | briefing? |
| 02:44:48 | 19 | MR. HUNT: Oh, it doesn't. I mean, we're |
| 02:44:54 | 20 | trying to -- we just need more pages for the motion for |
| 02:45:01 | 21 | summary judgment is all. |
| 02:45:02 | 22 | THE COURT: Okay. The memorandum? |
| 02:45:04 | 23 | MR. HUNT: Yes, I'm sorry, the memorandum. |
| 02:45:06 | 24 | THE COURT: So you want an extra ten pages? |
| 02:45:08 | 25 | Well, do you need anything? |

02:45:10  1          MS. HERNANDEZ:  Your Honor, actually I would
02:45:12  2     like to respond to that.  I would certainly --
02:45:17  3     plaintiffs would not be opposed to such an extension to
02:45:19  4     the page limit.  However, I do want to address the
02:45:24  5     earlier question about efficiencies.
02:45:26  6          Now, earlier in the litigation during a case
02:45:30  7     management discussion Your Honor indicated if plaintiffs
02:45:36  8     felt that certainly there was a reason to defer ruling
02:45:39  9     on a motion for summary judgment, that that could be
02:45:41  10    addressed.  In recent joint motions for extension of
02:45:46  11    time, plaintiffs have made clear that any sort of filing
02:45:52  12    by the defendants on the motion for partial summary
02:45:54  13    judgment would not necessarily preclude the plaintiffs
02:45:59  14    from filing a motion to hold such a brief in abeyance.
02:46:03  15    So the question, Your Honor, is whether or not we could
02:46:08  16    file that motion for -- to hold that briefing in
02:46:12  17    abeyance following the full briefing on the motion for
02:46:18  18    conditional class cert because what we were thinking at
02:46:21  19    this point was to file a motion to hold that briefing in
02:46:25  20    abeyance simultaneously with a response in opposition to
02:46:29  21    the motion for summary judgment in the event that the
02:46:33  22    Court would deny the motion to hold the briefing on
02:46:36  23    summary judgment in abeyance, then at that point the
02:46:41  24    Court would have plaintiff's opposition brief.
02:46:43  25          Does that make sense, Your Honor?  I know

02:46:46  1    that's a mouthful right there.

02:46:47  2         THE COURT:  Okay.  So on the position of

02:46:51  3    holding briefing in abeyance to allow the Court to focus

02:46:56  4    on the certification issue, what's your response?

02:47:00  5         MR. HUNT:  Well, Your Honor, I think because

02:47:04  6    of the nature of the summary judgment motion it may well

02:47:07  7    be that that will either eliminate or certainly cut into

02:47:14  8    the certification issue.  If the Court were to grant the

02:47:18  9    motion, that would moot the question of initial

02:47:21  10   certification, at least on part or all of it.  I really

02:47:25  11   think that the proper way or the best way to address it

02:47:28  12   would be the way we agreed at the outset, which would be

02:47:32  13   to file the opposition to certification at the same time

02:47:36  14   we file the motion for summary judgment.  If the

02:47:39  15   plaintiff believes that she needs to file a Rule 56

02:47:45  16   request to --

02:47:46  17        THE COURT:  Remind me, I agreed that you

02:47:49  18   could file your summary judgment motion on the same day

02:47:51  19   that you file your opposition to plaintiff's motion, or

02:47:55  20   did I set a schedule where you file your summary

02:47:58  21   judgment motion on the same day that she files her --

02:48:03  22        MR. HUNT:  No, the schedule was that we

02:48:06  23   would file --

02:48:07  24        THE COURT:  That's right, with the response.

02:48:09  25        MR. HUNT:  Right.  When we respond to her

02:48:11  1  motion for initial certification, then we also file for

02:48:14  2  summary judgment.  That's what's due in four business

02:48:17  3  days.  And we think that would be the best way to

02:48:20  4  proceed.

02:48:22  5          MS. HERNANDEZ:  Your Honor, if I may just

02:48:23  6  briefly respond.  There was no specific deadline in

02:48:27  7  terms of defendant's motion for summary judgment and

02:48:30  8  when that would be filed.  The Court actually went ahead

02:48:33  9  and basically cited to some authority where plaintiffs

02:48:38  10  usually file their motion for conditional certification,

02:48:42  11  class certification first, then any sort of briefing on

02:48:46  12  merits usually comes in the second phase.

02:48:49  13          Now, in your case management order you

02:48:51  14  indicated:  Having said that, though, this is not

02:48:54  15  necessarily precluding the defendant's filing of the

02:48:56  16  motion for summary judgment, but I will determine

02:48:59  17  whether or not it is appropriate in relationship to

02:49:02  18  plaintiff's motion for conditional class certification.

02:49:14  19          THE COURT:  Which order was that?

02:49:17  20          MR. HUNT:  I think she's referring to the

02:49:20  21  order --

02:49:20  22          MS. HERNANDEZ:  I think it was in October,

02:49:22  23  and it might have been docket 70.

02:49:25  24          THE COURT:  I've got that in front of me.  I

02:49:27  25  don't see -- I'm not seeing that language.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 02:49:39 | 1  | MS. HERNANDEZ: My colleague, Michael Cohen,                  |
| 02:49:41 | 2  | is looking for that.                                         |
| 02:49:42 | 3  | THE COURT: I've got it. It's on page 2.                      |
| 02:50:11 | 4  | So what I've got is an oral motion. You're                   |
| 02:50:14 | 5  | making an oral motion here today?                            |
| 02:50:15 | 6  | MS. HERNANDEZ: That is correct, Your Honor.                  |
| 02:50:17 | 7  | THE COURT: And I can't decide it until I                     |
| 02:50:20 | 8  | see what the basis is for his summary judgment motion.       |
| 02:50:24 | 9  | So you want me just to let it linger, then I'll make a       |
| 02:50:27 | 10 | decision when I see his summary judgment motion. And         |
| 02:50:33 | 11 | then when I make my decision -- do you want a chance to      |
| 02:50:37 | 12 | brief it, or do you just want to -- I know the grounds       |
| 02:50:40 | 13 | for your request. And what I can do is just -- and I         |
| 02:50:47 | 14 | know you oppose it. And so what I can do is make my          |
| 02:50:51 | 15 | decision when I see his motion whether or not I should       |
| 02:50:56 | 16 | stay your response time or whether or not I feel I need      |
| 02:51:01 | 17 | for you to go ahead and respond to it. Then I'll             |
| 02:51:03 | 18 | trigger your response time from the date that I make         |
| 02:51:06 | 19 | that decision. How about that?                               |
| 02:51:08 | 20 | MS. HERNANDEZ: Your Honor, I think that                      |
| 02:51:09 | 21 | would be perfect. Just because otherwise we're going to      |
| 02:51:12 | 22 | be responding and then filing an opposition brief in         |
| 02:51:15 | 23 | conjunction with a motion -- the briefing in abeyance.       |
| 02:51:19 | 24 | So I think that strategy is perfect.                         |
| 02:51:22 | 25 | THE COURT: All right. So I won't expect to                   |

02:51:24   1   get any writing from you to convey your oral motion or

02:51:28   2   the reason for it.  I understand it.  I understand your

02:51:30   3   opposition.  I'll hold my decision on plaintiff's motion

02:51:35   4   to stay responsive briefing in abeyance until I see what

02:51:39   5   you have offered to the Court.  And then maybe it will

02:51:43   6   take me a week to focus on that.  And your time is not

02:51:49   7   ticking away; it won't start ticking until I enter a

02:51:52   8   short order.

02:51:53   9            MS. HERNANDEZ:  Thank you, Your Honor.

02:51:54  10            THE COURT:  Now, I want everybody, including

02:51:56  11   Ms. Collins, to spend a few minutes with Ryan Willett,

02:52:00  12   who is our IT coordinator here in New Bern.  It's not

02:52:05  13   going to satisfy the training requirement should this

02:52:09  14   case go to trial.  There's a separate training session.

02:52:12  15   He finds in his experience that if he gives it now, more

02:52:16  16   often than not it gets forgotten.  So it has to do with

02:52:20  17   dealing with the jury and that kind of thing.  But he's

02:52:22  18   going to give you enough so that if we have another

02:52:25  19   hearing, it will go a bit more efficiently than it did

02:52:29  20   today for everybody.  Do you want a five-minute break

02:52:32  21   before he starts up?

02:52:35  22            MR. HUNT:  Your Honor, if I may, I have a

02:52:38  23   personal -- I have a court appearance in New York

02:52:41  24   tomorrow that I need to catch an airplane for.

02:52:45  25            THE COURT:  What time does your plane leave?

02:52:47  1          MR. HUNT:  I'm trying to get a 3:00 flight,

02:52:49  2   but it's from Raleigh.

02:52:51  3          THE COURT:  You'd better get going.

02:52:53  4          MR. HUNT:  If that would be okay.

02:52:54  5          THE COURT:  Well, you get going.

02:52:56  6          MR. HUNT:  I'd be happy to come back and

02:53:00  7   look forward to it.

02:53:01  8          THE COURT:  You all can stay?  It benefits

02:53:03  9   you just if you would come to this district again.

02:53:07  10          MR. HUNT:  Yes.

02:53:07  11          THE COURT:  So go, catch your flight.  How

02:53:09  12   about you?

02:53:10  13          MS. HERNANDEZ:  We can absolutely stay, Your

02:53:12  14   Honor.  We have no conflicts whatsoever.

02:53:13  15          THE COURT:  Well, I don't make any

02:53:15  16   predictions as to whether -- but you'd better get on the

02:53:20  17   road.

02:53:20  18          MR. HUNT:  Thank you, Your Honor.

         19          (Concluded at 11:40 a.m.)

         20                        - - -

         21

         22

         23

         24

         25

1

**C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7   /s/ Tracy L. McGurk_____                    ___4/28/18___

8   Tracy L. McGurk, RMR, CRR                      Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3   Examinations                                    Page

 4

 5   JUSTIN DILLON, DIRECT EXAMINATION                 17

 6   BY MS. HERNANDEZ:

 7   JUSTIN DILLON, CROSS-EXAMINATION                  24

 8   BY MR. HUNT:

 9   JUSTIN DILLON, REDIRECT EXAMINATION               46

10   BY MS. HERNANDEZ:

11   JUSTIN DILLON, RECROSS-EXAMINATION                53

12   BY MR. HUNT:

13   ERIN WHITLOCK, DIRECT EXAMINATION                 57

14   BY MR. HUNT:

15   ERIN WHITLOCK, CROSS-EXAMINATION                  70

16   BY MS. HERNANDEZ:

17   JORDAN FISHMAN, DIRECT EXAMINATION                74

18   BY MR. HUNT:

19   JORDAN FISHMAN, CROSS-EXAMINATION                 83

20   BY MS. HERNANDEZ:

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2   No.        Description                              Page

 3

 4        Whereupon Defendant's Exhibits 1 and 2 are       45

 5        admitted into evidence

 6        Whereupon Defendant's Exhibit 3 is admitted into  63

 7        evidence

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/s** [1] - 104:7

## 1

**1** [11] - 32:4, 32:17, 45:21, 45:25, 46:11, 46:14, 46:15, 46:24, 53:19, 54:12, 106:4
**10** [1] - 49:6
**100** [2] - 80:6, 87:2
**11** [3] - 41:19, 53:19, 53:25
**11:40** [1] - 103:19
**12** [4] - 48:16, 54:2, 54:15
**14** [1] - 72:11
**15** [3] - 3:12, 60:10
**16** [1] - 60:10
**17** [2] - 48:23, 105:5
**19** [6] - 3:15, 3:21, 33:22, 48:25, 64:12, 75:20
**19th** [2] - 3:24, 64:10

## 2

**2** [14] - 25:6, 40:1, 40:3, 40:23, 41:5, 45:22, 45:25, 46:12, 51:7, 51:10, 51:22, 101:3, 106:4
**2011** [1] - 5:23
**2013** [1] - 6:23
**2016** [1] - 24:22
**2017** [1] - 43:24
**2018** [6] - 1:5, 3:12, 3:21, 25:7, 63:12, 64:12
**21st** [1] - 68:9
**23** [4] - 3:14, 4:1, 5:8, 21:23
**24** [2] - 1:5, 105:7
**28560** [1] - 1:18
**2:30** [2] - 33:22, 75:20

## 3

**3** [6] - 54:12, 63:15, 63:19, 68:15, 72:7, 106:6
**392-6626** [1] - 1:18
**3:00** [1] - 103:1

## 4

**4/28/18** [1] - 104:7
**413** [1] - 1:17
**419** [1] - 1:18
**45** [1] - 106:4
**46** [1] - 105:9

## 5

**5** [1] - 49:14
**53** [1] - 105:11
**56** [1] - 99:15
**57** [1] - 105:13
**5:17-CV-98** [1] - 2:9
**5:17-cv-98-FL** [1] - 1:4

## 6

**63** [1] - 106:6

## 7

**7** [2] - 51:21, 52:12
**70** [2] - 100:23, 105:15
**74** [1] - 105:17

## 8

**8** [1] - 49:19
**83** [1] - 105:19

## 9

**9** [3] - 47:22, 48:1, 48:16
**9:21** [1] - 2:1

## A

**a.m** [2] - 2:1, 103:19
**abeyance** [7] - 98:14, 98:17, 98:20, 98:23, 99:3, 101:23, 102:4
**able** [2] - 16:2, 40:15
**above-entitled** [1] - 104:4
**absolutely** [5] - 7:10, 11:17, 27:8, 44:9, 103:13
**abuse** [1] - 14:19
**abusive** [3] - 6:2, 6:6
**acceptable** [1] - 15:7
**access** [1] - 38:2
**accomplishments** [1] - 81:14
**accord** [2] - 52:17, 55:16
**according** [5] - 4:7, 12:18, 13:4, 36:15, 42:16
**accountable** [1] - 18:11
**accurate** [12] - 16:7, 31:25, 59:5, 62:20, 63:6, 63:10, 78:18, 80:6, 81:18, 87:3, 87:5, 90:12
**action** [20] - 3:16, 4:18, 4:24, 5:5, 8:23, 8:24, 10:21, 11:21, 14:23, 16:18, 71:1,

71:2, 71:5, 84:23, 84:24, 85:23, 86:5, 88:1, 89:13, 90:23
**actions** [1] - 15:25
**actual** [5] - 13:10, 19:17, 38:19, 66:24, 91:11
**add** [5] - 67:13, 67:16, 67:18, 80:17, 94:11
**added** [1] - 80:19
**adding** [1] - 68:2
**addition** [2] - 12:6, 13:18
**additional** [2] - 47:12, 97:4
**address** [3] - 64:6, 98:4, 99:11
**addressed** [3] - 5:21, 14:18, 98:10
**adequately** [1] - 7:15
**administer** [1] - 17:3
**admission** [2] - 63:15, 93:11
**admitted** [5] - 46:1, 63:19, 95:13, 106:5, 106:6
**adversarial** [2] - 9:24, 73:21
**adversary** [1] - 15:14
**advice** [1] - 79:22
**advise** [2] - 7:24, 86:19
**advised** [4] - 9:14, 48:13, 78:15, 86:12
**affect** [3] - 8:24, 90:13, 97:17
**affected** [2] - 85:2, 90:3
**affidavit** [17] - 11:3, 12:18, 12:24, 13:4, 13:6, 13:8, 13:12, 13:21, 39:4, 39:10, 81:21, 92:1, 92:15, 93:20, 95:5, 95:18, 96:3
**affiliated** [1] - 25:4
**afternoon** [4] - 33:22, 43:17, 75:20, 77:14
**aggressiveness** [1] - 37:5
**agree** [5] - 5:14, 10:18, 11:4, 11:8, 11:14, 16:16, 51:24, 64:8, 89:14
**agreed** [5] - 12:16, 33:7, 33:16, 99:12, 99:17
**agreeing** [1] - 4:16
**ahead** [5] - 13:20, 25:14, 92:14, 100:8, 101:17
**airplane** [1] - 102:24
**al** [1] - 1:7
**allegations** [7] - 9:1, 21:10, 74:1, 78:12, 79:18, 84:12, 85:20
**alleged** [2] - 84:19, 85:20
**allow** [2] - 90:7, 99:3
**allowed** [3] - 49:2, 49:4, 96:12
**ambiguous** [1] - 87:13
**amended** [3] - 21:7, 74:2,

84:9
**Amendment** [1] - 14:4
**amount** [4] - 81:21, 81:24, 93:23, 93:24
**analogous** [1] - 6:16
**answer** [9] - 3:9, 30:4, 30:25, 43:4, 55:3, 59:13, 59:16, 82:11, 87:10
**answered** [6] - 25:24, 26:12, 26:20, 29:25, 44:5, 72:20
**anticipated** [1] - 91:6
**antsy** [1] - 36:24
**apologize** [1] - 32:10
**appear** [3] - 61:9, 77:21, 83:2
**appearance** [1] - 102:23
**APPEARANCES** [1] - 1:12
**applying** [1] - 5:17
**appreciate** [2] - 78:10, 97:6
**apprised** [1] - 8:5
**approach** [3] - 32:6, 39:19, 62:4
**approaching** [1] - 14:6
**appropriate** [4] - 11:14, 51:14, 94:25, 100:17
**April** [1] - 1:5
**arbitration** [1] - 14:23
**argue** [1] - 5:1
**argument** [1] - 88:22
**Arkin** [3] - 64:17, 84:1, 84:3
**Army** [1] - 79:5
**arrangement** [2] - 79:19, 84:20
**arrived** [9] - 33:21, 34:18, 64:16, 64:17, 64:18, 64:20, 76:14, 76:15, 76:18
**arrow** [1] - 40:24
**Asian** [2] - 2:9, 77:18
**aspect** [1] - 96:2
**asserted** [1] - 84:18
**Association** [1] - 5:22
**assume** [1] - 32:2
**assumed** [3] - 34:22, 39:7, 39:17
**assure** [1] - 47:14
**Atlanta** [4] - 40:12, 57:17, 57:21, 75:8
**attached** [3] - 44:1
**attempt** [3] - 11:23, 69:10, 97:13
**attempted** [1] - 12:5
**attempting** [1] - 11:18
**attempts** [1] - 93:1
**attention** [5] - 26:25, 53:25, 56:10, 68:15, 72:6
**attorney** [7] - 22:3, 22:6, 30:6, 64:18, 75:4, 77:15, 88:9

**attorneys** [2] - 4:5, 7:18
**authority** [4] - 5:14, 90:21, 90:22, 100:9
**authorized** [1] - 5:9
**avoiding** [1] - 5:10
**aware** [6] - 30:7, 31:23, 36:5, 36:11, 38:17, 92:10

## B

**background** [2] - 3:11, 76:4
**balance** [2] - 15:23, 16:1
**based** [5] - 13:13, 27:1, 84:19, 89:23, 95:9
**baseless** [1] - 15:25
**basis** [3] - 3:7, 14:10, 101:8
**beer** [1] - 81:11
**BEFORE** [1] - 1:10
**began** [1] - 58:16
**begin** [1] - 58:10
**beginning** [3] - 6:23, 66:6, 79:17
**behalf** [3] - 28:23, 29:6, 66:8
**behind** [3] - 2:20, 34:2, 52:25
**belabor** [1] - 10:7
**believes** [1] - 99:15
**bench** [3] - 16:22, 56:25, 74:13
**benefit** [1] - 94:23
**benefits** [1] - 103:8
**Bern** [3] - 1:5, 1:18, 102:12
**Bernard** [1] - 5:17
**best** [2] - 99:11, 100:3
**better** [3] - 7:6, 103:3, 103:16
**between** [7] - 2:20, 7:12, 16:2, 46:18, 61:22, 63:4, 72:8
**beyond** [1] - 50:17
**Bible** [3] - 17:6, 57:1, 74:14
**big** [1] - 41:18
**bit** [4] - 3:11, 20:25, 40:20, 102:19
**block** [1] - 95:25
**blouse** [1] - 34:8
**blue** [1] - 69:1
**booked** [1] - 84:5
**bottom** [3] - 38:25, 41:12, 72:23
**box** [1] - 17:4
**Brandon** [14] - 9:6, 19:21, 28:10, 36:11, 36:13, 43:25, 53:7, 67:16, 67:19, 75:11, 77:19, 80:17, 82:16, 84:17
**Brandon's** [1] - 80:19
**break** [2] - 28:4, 102:20
**brief** [11] - 10:9, 12:5, 15:7,

18:22, 65:11, 74:10, 97:2, 98:14, 98:24, 101:12, 101:22
**briefing** [9] - 97:18, 98:16, 98:17, 98:19, 98:22, 99:3, 100:11, 101:23, 102:4
**briefly** [5] - 11:11, 11:16, 56:20, 91:23, 100:6
**bring** [4] - 15:24, 20:24, 88:8, 96:18
**bringing** [1] - 50:22
**broad** [2] - 22:20, 43:14
**brought** [11] - 20:13, 37:4, 38:21, 38:24, 39:7, 69:12, 71:1, 71:2, 77:19, 84:17, 84:22
**bullets** [1] - 38:22
**bunch** [1] - 38:22
**business** [8] - 2:7, 2:9, 27:2, 27:5, 27:6, 27:7, 96:16, 100:2
**busy** [1] - 31:19
**but..** [1] - 57:22
**buying** [1] - 12:22
**BY** [33] - 17:19, 18:1, 18:25, 21:18, 23:2, 24:8, 26:10, 32:21, 40:21, 41:3, 46:4, 47:25, 51:6, 51:20, 52:11, 53:16, 53:24, 57:13, 61:15, 62:22, 63:21, 70:12, 74:25, 83:25, 86:18, 105:6, 105:8, 105:10, 105:12, 105:14, 105:16, 105:18, 105:20
**by..** [1] - 54:4
**bye** [1] - 83:14

## C

**calendar** [2] - 2:3, 64:11
**calming** [1] - 37:4
**camera** [2] - 47:6, 47:10
**candid** [2] - 9:9, 10:11
**caption** [1] - 51:14
**CAROLINA** [1] - 1:1
**Carolina** [3] - 1:5, 41:16, 75:11
**carpet** [1] - 16:25
**carry** [1] - 52:19
**case** [48] - 2:6, 2:9, 5:6, 5:22, 6:17, 6:21, 6:23, 6:25, 7:1, 8:8, 8:18, 11:16, 12:8, 12:10, 12:22, 13:1, 14:8, 14:18, 14:21, 14:23, 15:11, 19:19, 24:10, 27:15, 29:22, 31:2, 35:15, 43:24, 51:14, 51:15, 51:16, 60:5, 65:12, 65:22, 72:16, 75:10, 76:5, 94:13, 96:6, 96:18, 98:6, 100:13, 102:14
**cases** [7] - 6:15, 7:6, 12:4,

15:3, 15:6, 73:5, 91:15
**casual** [3] - 22:12, 23:6, 83:15
**casually** [1] - 83:14
**catch** [2] - 102:24, 103:11
**caught** [1] - 31:11
**caused** [1] - 5:4
**cell** [2] - 61:9, 61:16
**cert** [2] - 91:11, 98:18
**certain** [1] - 95:19
**certainly** [8] - 10:7, 14:8, 56:18, 89:4, 91:2, 98:2, 98:8, 99:7
**certification** [17] - 3:14, 3:18, 11:21, 15:9, 90:7, 90:11, 91:8, 94:14, 94:19, 99:4, 99:8, 99:10, 99:13, 100:1, 100:10, 100:11, 100:18
**certified** [2] - 9:21, 90:24
**certify** [1] - 104:3
**chairs** [1] - 76:17
**chance** [4] - 17:15, 52:6, 93:10, 101:11
**change** [5] - 67:21, 80:13, 80:16, 80:21, 92:15
**changed** [4] - 82:3, 82:5, 84:4, 93:14
**changes** [20] - 13:6, 13:8, 13:15, 13:24, 13:25, 45:3, 67:23, 68:1, 68:4, 68:14, 80:14, 80:24, 81:20, 81:21, 81:22, 81:25, 93:12, 93:20, 93:22, 96:4
**characterized** [1] - 6:11
**chef** [1] - 50:7
**chefs** [4] - 22:14, 22:17, 36:18, 79:14
**chitchat** [1] - 37:9
**chose** [1] - 25:17
**Circuit** [6] - 5:22, 14:17, 14:18, 14:21, 14:24, 14:25
**circumstances** [1] - 5:2
**circumvent** [1] - 90:21
**cited** [2] - 15:6, 100:9
**claim** [5] - 12:8, 35:20, 35:21, 59:20, 59:22
**claims** [2] - 84:18, 93:11
**clarify** [1] - 52:21
**clarity** [2] - 11:2, 16:12
**class** [39] - 3:13, 3:17, 3:20, 4:1, 4:14, 4:15, 4:21, 5:8, 5:15, 5:20, 6:14, 6:18, 6:20, 6:24, 8:9, 9:21, 10:1, 11:24, 14:23, 15:8, 15:16, 16:5, 21:23, 71:2, 71:5, 73:14, 84:23, 84:24, 89:9, 90:6, 90:23, 91:4, 91:8, 91:9, 91:11, 98:18, 100:11, 100:18
**clear** [9] - 4:25, 40:24,

44:15, 48:6, 50:25, 66:13, 71:23, 95:19, 98:11
**clearly** [2] - 9:23, 67:6
**clerk** [9] - 2:2, 17:11, 32:12, 32:16, 40:4, 40:19, 47:12, 57:8, 74:20
**CLERK** [9] - 2:5, 17:5, 17:12, 56:24, 57:6, 57:9, 74:12, 74:17, 74:21
**clerk's** [2] - 56:25, 74:13
**client** [2] - 50:16, 78:4
**clients** [5] - 78:2, 84:12
**close** [5] - 8:4, 9:15, 88:25, 94:5, 94:8
**closing** [1] - 88:21
**coercion** [5] - 12:1, 14:7, 14:9, 92:19, 93:24
**coercive** [5] - 7:13, 10:23, 16:14, 16:20, 96:9
**coffee** [2] - 64:2, 72:17
**Cohen** [7] - 1:13, 2:13, 24:17, 43:18, 69:16, 69:20, 101:1
**COHEN** [1] - 2:13
**Cohen's** [1] - 47:19
**colleague** [2] - 58:8, 101:1
**collected** [1] - 7:25
**collecting** [1] - 86:2
**collective** [4] - 15:24, 71:2, 84:23, 90:23
**Collins** [2] - 17:3, 102:11
**color** [1] - 64:23
**Columbia** [1] - 5:21
**comfortable** [1] - 45:5
**coming** [2] - 34:9, 65:10
**Commenced** [1] - 2:1
**comment** [1] - 87:1
**comment/statement/
observation** [1] - 86:16
**commented** [1] - 14:21
**comments** [1] - 13:13
**communicate** [10] - 5:1, 8:22, 8:23, 14:4, 34:16, 73:4, 73:14, 73:16, 73:19, 73:22
**communicated** [2] - 6:19, 19:20
**communicating** [2] - 6:18, 15:16
**communication** [8] - 5:19, 5:24, 6:1, 6:4, 6:6, 7:18, 68:7, 96:10
**communications** [24] - 3:19, 4:9, 4:11, 4:13, 4:20, 5:4, 5:13, 5:15, 6:8, 6:12, 7:12, 7:19, 8:9, 9:22, 10:21, 12:15, 16:17, 22:7, 23:5, 73:24, 91:1, 91:3, 94:17, 95:6
**company** [1] - 25:3
**compared** [1] - 10:16

**comparing** [1] - 10:10
**compel** [1] - 14:23
**complaint** [7] - 21:7, 74:2, 78:13, 84:9, 84:15, 84:16, 85:20
**complete** [1] - 32:17
**completely** [3] - 4:9, 92:17, 92:24
**completion** [1] - 71:10
**Complex** [2] - 11:7, 94:2
**compromise** [1] - 12:8
**compulsion** [1] - 14:2
**computer** [1] - 13:9, 13:14, 38:19, 38:20, 39:6, 39:8, 39:15, 39:16, 66:23, 67:2, 67:7
**concerning** [1] - 45:16
**Concluded** [1] - 103:19
**conditional** [7] - 3:13, 3:17, 90:6, 91:8, 98:18, 100:10, 100:18
**conduct** [1] - 14:22
**conducting** [1] - 7:19
**confer** [1] - 22:3
**confidence** [1] - 6:13
**confident** [1] - 45:12
**confirmed** [6] - 4:3, 4:5, 58:12, 58:17, 68:11, 70:1
**conflicted** [1] - 96:5
**conflicts** [1] - 103:14
**confuse** [1] - 16:14
**confused** [8] - 4:9, 9:4, 12:21, 12:23, 22:22, 61:14, 70:24, 77:21
**confusing** [1] - 43:14
**confusion** [6] - 5:4, 6:11, 10:22, 16:19, 39:23, 92:6
**conjunction** [1] - 101:23
**connection** [7] - 12:19, 27:17, 29:6, 57:23, 86:2, 86:7, 88:14
**consent** [6] - 11:19, 12:10, 24:13, 59:25, 60:3, 85:11
**consequences** [1] - 16:5
**consider** [1] - 59:22
**consideration** [1] - 91:18
**considered** [2] - 6:7, 7:14
**consistencies** [1] - 89:22
**consistent** [1] - 95:3
**contact** [8] - 19:24, 23:11, 58:3, 58:5, 58:13, 60:20, 69:6, 83:16
**contacted** [6] - 4:2, 4:4, 18:3, 19:23, 43:24, 68:10
**contacts** [2] - 16:2, 95:9
**contempt** [1] - 42:11
**context** [6] - 9:24, 14:22, 20:6, 73:18, 73:21, 89:8
**continue** [2] - 42:21

**continued** [4] - 13:2, 36:25, 37:6, 42:17
**control** [1] - 5:14
**conversation** [38] - 6:24, 12:23, 18:22, 22:12, 31:8, 31:10, 31:15, 31:17, 31:22, 32:1, 34:12, 35:23, 36:6, 36:14, 37:13, 37:16, 41:20, 42:24, 44:17, 48:2, 58:10, 58:23, 59:6, 59:8, 59:19, 60:8, 60:19, 64:25, 66:7, 66:10, 66:19, 69:4, 78:19, 87:4, 92:13, 92:22, 93:5, 93:8
**conversations** [4] - 37:2, 69:10, 69:14, 69:19
**convey** [1] - 102:1
**convincing** [2] - 95:13, 96:8
**cook** [2] - 49:5, 53:1
**cooked** [1] - 52:24
**cool** [1] - 73:10
**cooperation** [1] - 6:13
**coordinator** [1] - 102:12
**copies** [4] - 61:6, 61:8, 63:6, 63:10
**copy** [20] - 11:3, 13:21, 20:10, 20:11, 20:13, 21:7, 31:25, 32:4, 38:9, 41:5, 44:11, 46:8, 47:4, 62:9, 62:13, 67:12, 68:18, 71:13, 84:8, 96:3
**correct** [63] - 24:11, 24:12, 24:14, 24:15, 24:17, 24:18, 24:19, 24:20, 25:4, 25:7, 27:15, 28:3, 28:7, 28:11, 28:17, 28:23, 29:1, 29:7, 29:23, 30:14, 30:24, 31:2, 31:6, 31:17, 31:22, 32:19, 32:24, 33:7, 33:10, 33:17, 34:19, 35:13, 35:15, 35:18, 37:11, 37:21, 38:4, 38:9, 38:15, 39:2, 40:2, 41:16, 42:12, 42:18, 43:8, 43:21, 44:19, 50:16, 51:11, 51:17, 55:10, 55:15, 55:17, 55:20, 57:25, 58:1, 61:10, 69:3, 80:8, 87:7, 101:6, 104:3
**corrections** [2] - 39:15, 39:16
**corrective** [1] - 91:10
**correctly** [10] - 49:8, 49:12, 49:17, 49:23, 50:10, 72:12, 72:18, 72:21, 73:2, 73:11
**counsel** [46] - 2:3, 2:22, 3:15, 3:18, 3:23, 4:2, 4:8, 4:16, 4:21, 6:14, 6:18, 7:23, 9:8, 10:2, 11:2, 11:3, 13:5, 13:19, 14:5, 16:3, 17:14, 18:3, 18:13, 20:3, 23:5, 23:11,

28:7, 40:13, 43:12, 47:4, 48:5, 51:11, 53:5, 68:10, 68:12, 69:17, 71:7, 85:4, 85:13, 89:17, 90:7, 91:16, 91:21, 92:2, 94:3, 95:8, 95:15
**counsel's** [4] - 46:19, 48:2, 53:18, 95:12
**country** [2] - 14:13, 75:9
**counts** [2] - 84:15, 84:16
**couple** [6] - 18:23, 46:5, 60:23, 62:19, 78:12, 88:24
**course** [18] - 22:6, 23:4, 31:8, 35:13, 36:5, 44:10, 58:2, 60:23, 63:22, 69:9, 69:14, 69:19, 73:24, 75:14, 79:20, 85:13, 93:25, 97:2
**COURT** [112] - 1:1, 2:2, 2:10, 2:19, 2:23, 6:25, 8:11, 8:17, 10:18, 11:1, 11:10, 13:7, 13:16, 14:16, 15:4, 15:10, 17:2, 17:13, 17:23, 18:18, 21:17, 22:1, 22:10, 22:25, 26:3, 26:8, 28:19, 30:1, 32:5, 32:7, 32:9, 32:11, 32:16, 32:20, 39:21, 39:25, 40:4, 40:8, 40:11, 40:13, 40:15, 40:18, 40:24, 45:23, 46:11, 46:15, 46:21, 46:25, 47:5, 47:10, 47:17, 47:21, 47:24, 50:20, 51:4, 51:19, 52:6, 52:9, 53:22, 55:2, 55:24, 56:3, 56:6, 56:9, 56:14, 56:18, 56:22, 57:4, 61:13, 62:6, 62:9, 62:13, 62:15, 62:18, 63:16, 63:18, 70:7, 74:8, 82:11, 86:14, 87:14, 88:5, 88:7, 88:12, 88:18, 88:21, 88:25, 89:14, 91:21, 94:22, 96:17, 96:22, 97:7, 97:12, 97:17, 97:22, 97:24, 99:2, 99:17, 99:24, 100:19, 100:24, 101:3, 101:7, 101:25, 102:10, 102:25, 103:3, 103:5, 103:8, 103:11, 103:15
**court** [4] - 15:3, 27:24, 57:25, 102:23
**Court** [46] - 1:17, 2:5, 2:25, 3:8, 3:10, 3:12, 5:7, 5:9, 5:16, 5:18, 5:22, 5:23, 7:22, 14:19, 15:6, 15:12, 15:18, 15:19, 17:7, 32:8, 39:20, 48:5, 57:2, 57:4, 62:17, 74:15, 74:17, 88:16, 90:8, 90:10, 90:25, 91:2, 91:12, 92:1, 93:16, 94:18, 94:25, 95:4, 95:22, 97:4, 98:22, 98:24, 99:3, 99:8, 100:8, 102:5

**Court's** [4] - 16:6, 90:21, 90:22, 96:23
**Court-authorized** [1] - 5:9
**courtroom** [4] - 8:16, 19:14, 40:9, 88:9
**Courts** [2] - 7:14, 16:2
**courts** [1] - 5:14
**covered** [1] - 79:25
**crazy** [1] - 33:11
**Crazy** [2] - 15:11, 15:15
**credibility** [1] - 89:15
**credible** [2] - 95:2, 95:16
**critical** [1] - 69:16
**CROSS** [6] - 24:7, 70:11, 83:24, 105:7, 105:15, 105:19
**CROSS-EXAMINATION** [6] - 24:7, 70:11, 83:24, 105:7, 105:15, 105:19
**CRR** [2] - 1:17, 104:8
**Cuisine** [3] - 2:8, 2:9, 77:18
**Culinary** [1] - 75:11
**current** [2] - 7:2, 11:22
**customers** [1] - 79:14
**cut** [3] - 55:12, 55:13, 99:7

## D

**D-i-l-l-o-n** [1] - 17:9
**dark** [1] - 89:7
**date** [2] - 58:8, 101:18
**Date** [1] - 104:8
**days** [4] - 43:15, 96:13, 96:16, 100:3
**deadline** [1] - 100:6
**deal** [2] - 7:23, 19:4
**dealing** [1] - 102:17
**debbie** [1] - 1:16
**Debbie** [1] - 2:22
**deceptive** [2] - 7:13, 9:23
**decide** [1] - 101:7
**decided** [1] - 94:23
**decision** [6] - 14:25, 101:10, 101:11, 101:15, 101:19, 102:3
**decisions** [3] - 16:8, 89:15, 90:14
**declaration** [33] - 8:5, 8:6, 9:16, 10:17, 13:4, 20:9, 20:11, 21:20, 22:3, 37:17, 41:6, 41:12, 44:11, 44:14, 44:17, 44:22, 45:7, 50:24, 51:1, 51:10, 66:24, 67:1, 67:14, 71:12, 79:4, 82:18, 82:22, 84:4, 86:11, 86:20, 87:23, 88:15, 89:25
**declarations** [1] - 91:5
**declare** [2] - 41:14, 45:10
**defendant** [13] - 4:3, 4:6, 10:20, 11:11, 14:22, 17:15,

56:10, 70:18, 73:15, 77:18, 95:5, 95:7

**Defendant** [1] - 1:14

**defendant's** [24] - 3:18, 4:2, 4:13, 4:16, 4:20, 5:19, 6:18, 7:23, 10:2, 14:3, 18:2, 18:13, 20:3, 23:5, 46:19, 47:4, 48:2, 51:11, 53:5, 91:15, 92:5, 100:7, 100:15

**Defendant's** [14] - 32:4, 40:23, 41:5, 45:25, 46:6, 46:8, 51:7, 51:9, 51:22, 63:15, 63:19, 72:7, 106:4, 106:6

**Defendants** [1] - 1:8

**defendants** [22] - 2:14, 2:16, 2:18, 4:8, 8:22, 11:22, 12:2, 12:7, 13:1, 24:10, 27:21, 29:21, 36:7, 42:12, 57:25, 66:2, 75:12, 77:17, 84:13, 90:20, 91:7, 98:12

**defendants'** [2] - 9:8, 90:25

**defense** [7] - 7:18, 11:2, 89:17, 94:3, 95:8, 95:12, 95:15

**defer** [1] - 98:8

**definitely** [2] - 48:17, 49:6

**DeGidio** [1] - 15:10

**degrees** [1] - 81:8

**deleted** [1] - 82:4

**deleting** [1] - 20:22

**demands** [1] - 54:20

**denied** [3] - 14:15, 94:7, 94:21

**deny** [2] - 95:1, 98:22

**describe** [1] - 77:10

**described** [1] - 11:7

**Description** [1] - 106:2

**desire** [1] - 90:20

**detail** [1] - 7:23

**detailed** [1] - 22:21

**details** [3] - 7:16, 10:5, 10:15

**determination** [1] - 90:22

**determine** [2] - 5:18, 100:16

**determines** [1] - 5:23

**determining** [1] - 7:11

**DeWar** [3] - 1:16, 2:21, 2:22

**different** [5] - 14:14, 20:5, 28:5, 35:12, 89:16

**dillon** [1] - 8:16

**DILLON** [8] - 17:18, 24:7, 46:3, 53:15, 105:5, 105:7, 105:9, 105:11

**Dillon** [83] - 3:9, 3:22, 4:7, 8:9, 8:11, 9:4, 9:14, 11:18, 12:1, 14:4, 17:8, 17:21, 18:2, 23:4, 24:4, 24:9, 40:7, 40:22, 41:4, 41:20, 46:5, 46:20,

48:1, 48:12, 48:21, 49:8, 50:1, 50:10, 51:1, 51:8, 51:9, 51:13, 51:21, 52:12, 52:22, 53:4, 53:13, 53:17, 58:3, 59:6, 59:20, 59:25, 60:9, 60:20, 60:24, 61:1, 61:22, 63:4, 63:23, 64:14, 64:19, 64:22, 65:1, 68:7, 69:2, 69:5, 69:10, 69:11, 69:15, 69:23, 70:13, 72:8, 73:25, 75:16, 75:18, 75:19, 75:25, 76:7, 76:10, 76:18, 82:7, 83:16, 84:8, 86:19, 87:11, 89:16, 89:19, 90:1, 90:3, 91:25, 93:2, 95:7, 95:13

**Dillon's** [4] - 68:19, 68:21, 95:4, 95:21

**direct** [2] - 53:25, 68:15

**DIRECT** [6] - 17:18, 57:12, 74:24, 105:5, 105:13, 105:17

**directly** [1] - 14:18

**disagree** [1] - 45:8

**disclose** [1] - 66:17

**disclosed** [1] - 90:18

**discontinued** [1] - 42:24

**discrepancies** [1] - 50:22

**discuss** [3] - 63:23, 63:25, 69:20

**discussed** [3] - 60:13, 80:3, 81:5

**Discussion** [1] - 96:25

**discussion** [13] - 46:7, 46:18, 48:7, 48:13, 50:24, 51:25, 70:14, 70:15, 71:17, 85:13, 89:23, 89:24, 98:7

**discussions** [1] - 75:25

**disdainful** [1] - 15:12

**dispute** [1] - 16:6

**distinguishes** [1] - 12:3

**District** [4] - 5:22, 14:19, 15:6, 16:1

**DISTRICT** [3] - 1:1, 1:1, 1:11

**district** [2] - 15:3, 103:9

**DIVISION** [1] - 1:2

**docket** [1] - 100:23

**Docket** [1] - 1:4

**document** [8] - 8:3, 9:14, 13:11, 32:8, 39:20, 67:24, 68:5, 68:16

**Document** [1] - 62:16

**documents** [1] - 62:23

**done** [6] - 6:20, 8:15, 13:10, 77:13, 78:23, 83:4, 91:16, 93:18, 94:12, 96:6

**door** [2] - 67:8, 81:3

**doubt** [1] - 20:25

**down** [10] - 20:16, 28:4, 34:21, 34:24, 37:4, 48:11, 56:3, 65:9, 72:23, 74:8,

76:16, 77:8, 88:7, 89:1

**downtown** [5] - 12:12, 64:4, 64:7, 72:20, 72:24

**drink** [1] - 81:11

**due** [5] - 5:3, 15:14, 84:5, 96:13, 100:2

**during** [30] - 7:3, 22:6, 23:4, 23:1, 31:8, 31:14, 34:11, 35:13, 36:5, 41:20, 58:2, 59:8, 59:18, 63:9, 63:11, 65:17, 66:10, 69:9, 69:14, 69:19, 73:24, 75:14, 75:25, 78:22, 85:13, 87:4, 93:25, 94:3, 98:6

**E**

**early** [1] - 58:7

**EASTERN** [2] - 1:1, 1:2

**edit** [2] - 45:12, 68:11

**edited** [2] - 13:5, 38:6

**edits** [4] - 67:3, 67:4, 68:17, 80:9

**effect** [4] - 5:5, 6:9, 10:20, 16:18

**efficiencies** [3] - 41:1, 96:18, 98:5

**efficiently** [1] - 102:19

**either** [5] - 7:4, 77:2, 85:9, 92:23, 99:7

**eliminate** [3] - 4:14, 4:23, 99:7

**eliminating** [1] - 5:10

**email** [3] - 44:24, 68:13, 69:22

**emailed** [3] - 44:23, 68:12, 68:13

**emergency** [1] - 3:7

**employee** [1] - 7:20

**employees** [7] - 7:2, 7:3, 7:12, 7:16, 8:2, 16:7, 35:12

**employees'** [1] - 15:23

**employer** [4] - 7:15, 7:19, 14:22, 15:12

**employers** [5] - 5:1, 7:13, 79:3, 79:4, 79:5

**employers'** [1] - 15:25

**employment** [15] - 16:5, 24:21, 31:6, 34:25, 35:6, 35:13, 37:11, 45:16, 59:11, 59:17, 60:13, 66:18, 70:18, 72:5, 93:7

**enacted** [1] - 15:20

**encourage** [2] - 28:15, 69:11

**end** [11] - 22:21, 35:23, 36:8, 36:9, 44:16, 66:19, 80:1, 82:6, 83:10, 83:12, 93:8

**ended** [5] - 14:7, 14:9, 80:2, 82:7, 92:24

**ending** [1] - 83:15

**engaged** [2] - 3:18, 12:15

**engaging** [1] - 50:16

**English** [4] - 22:15, 22:18, 36:18, 79:15

**enter** [1] - 102:7

**entire** [2] - 23:13, 50:5

**entirely** [2] - 9:9, 50:25

**entitled** [1] - 104:4

**equipment** [2] - 40:9, 40:16

**equivalent** [1] - 14:9

**Erin** [21] - 8:21, 18:19, 26:14, 46:20, 48:3, 52:1, 57:3, 65:6, 72:15, 75:23, 76:3, 76:15, 77:3, 77:7, 77:16, 78:8, 80:25, 81:1, 81:3, 81:15

**ERIN** [5] - 57:5, 57:12, 70:11, 105:13, 105:15

**error** [1] - 68:2

**escort** [1] - 7:5

**essentially** [2] - 4:10, 91:4

**established** [1] - 5:16

**et** [1] - 1:7

**event** [1] - 98:21

**evidence** [26] - 8:1, 11:25, 12:7, 12:9, 12:13, 13:20, 32:15, 45:22, 46:1, 46:22, 51:2, 56:6, 56:7, 62:15, 63:20, 88:12, 88:17, 89:2, 89:4, 89:11, 90:17, 91:18, 92:18, 92:19, 106:5, 106:7

**exact** [7] - 28:4, 58:8, 65:18, 66:2, 66:4, 67:17, 67:20

**exactly** [6] - 18:3, 18:8, 48:9, 76:19, 81:5, 92:7

**EXAMINATION** [16] - 17:18, 24:7, 46:3, 53:15, 57:12, 70:11, 74:24, 83:24, 105:5, 105:7, 105:9, 105:11, 105:13, 105:15, 105:17, 105:19

**Examinations** [1] - 105:3

**examining** [1] - 32:12

**except** [2] - 22:18, 34:20

**exceptions** [1] - 5:3

**excessive** [1] - 15:21

**exchange** [1] - 69:5

**exchanged** [2] - 63:7, 63:11

**exchanges** [1] - 32:23

**excuse** [4] - 52:5, 54:2, 69:4, 69:22

**excused** [2] - 43:1, 56:14

**executed** [2] - 38:14, 92:15

**Executed** [1] - 39:1

**exhibit** [2] - 62:5, 68:25

**Exhibit** [22] - 32:4, 32:17,

39:22, 39:24, 39:25, 40:2, 40:23, 41:5, 46:6, 46:9, 46:14, 46:15, 46:24, 51:7, 51:9, 51:22, 53:19, 63:15, 63:19, 68:15, 72:7, 106:6

**exhibits** [3] - 97:10, 97:14, 97:15

**Exhibits** [3] - 45:21, 45:25, 106:4

**exit** [1] - 19:13

**exits** [1] - 8:16

**expansive** [1] - 95:20

**expect** [1] - 101:25

**expediter** [2] - 49:15, 50:13, 55:9

**expediters** [1] - 50:7

**experience** [4] - 27:1, 27:6, 93:7, 102:15

**experiences** [1] - 35:11

**explain** [32] - 8:25, 9:11, 9:16, 9:17, 19:18, 20:8, 21:2, 21:6, 21:9, 21:12, 21:19, 21:22, 22:2, 22:5, 70:18, 71:1, 71:4, 71:10, 71:19, 71:21, 72:3, 84:11, 84:22, 85:16, 85:22, 86:4, 86:8, 86:23, 87:11, 87:18, 87:19, 87:22

**explained** [9] - 10:4, 19:1, 23:21, 52:23, 78:6, 84:14, 87:15, 90:1, 90:2

**explaining** [1] - 85:1

**explanation** [5] - 11:4, 74:1, 74:4, 95:20, 95:21

**explicitly** [1] - 85:25

**explore** [1] - 72:25

**expo** [7] - 49:15, 50:11, 50:15, 51:23, 52:15, 54:8

**express** [2] - 59:13, 78:1

**expressed** [1] - 79:19

**expressly** [1] - 93:21

**extension** [3] - 97:3, 98:3, 98:10

**extensive** [2] - 67:24, 67:25

**extent** [2] - 29:8, 93:15

**extra** [1] - 97:24

---

**F**

**F'** [2] - 82:14, 82:16

**F-i-s-h-m-a-n** [1] - 74:18

**face** [1] - 18:6

**fact** [12] - 7:18, 12:3, 13:19, 16:11, 24:21, 25:3, 42:7, 44:16, 45:9, 49:21, 91:1, 92:20

**factors** [1] - 7:15

**facts** [10] - 4:18, 6:16, 7:1, 14:8, 14:10, 15:15, 45:16,

79:13, 92:17, 93:1

**factual** [3] - 14:10, 78:12, 93:7

**failed** [1] - 7:24

**failure** [1] - 11:3

**failures** [1] - 9:13

**false** [1] - 6:12

**familiar** [2] - 3:1, 30:10

**family** [1] - 81:6

**far** [2] - 33:25, 34:9

**fashion** [1] - 35:21, 60:6, 69:20

**Fayetteville** [2] - 33:14, 95:11

**felt** [6] - 10:12, 20:1, 45:4, 54:18, 60:15, 98:8

**females** [2] - 34:4, 34:5

**few** [11] - 16:24, 53:17, 64:21, 64:24, 67:5, 70:8, 82:2, 82:4, 83:22, 93:14, 102:11

**field** [1] - 91:19

**figured** [1] - 47:20

**file** [16] - 12:10, 28:14, 60:3, 91:14, 97:7, 98:16, 98:19, 99:13, 99:14, 99:15, 99:18, 99:19, 99:20, 99:23, 100:1, 100:10

**filed** [14] - 3:13, 11:19, 24:13, 28:11, 29:22, 30:13, 36:12, 57:24, 59:25, 78:13, 85:11, 85:21, 92:2, 100:8

**files** [1] - 99:21

**filing** [5] - 91:6, 98:11, 98:14, 100:15, 101:22

**final** [1] - 67:12

**fine** [2] - 64:3, 72:20

**finger** [1] - 42:8

**fingers** [1] - 82:14

**finish** [1] - 63:9

**finished** [3] - 4:4, 17:14, 55:24

**firm** [17] - 25:25, 26:13, 26:22, 27:11, 27:20, 28:2, 29:12, 29:21, 30:7, 44:1, 57:20, 57:21, 64:18, 69:16, 75:6, 92:5, 95:9

**first** [24] - 4:16, 5:18, 5:23, 11:12, 18:2, 21:7, 22:20, 23:6, 28:25, 58:5, 58:18, 64:16, 64:18, 70:14, 71:16, 72:10, 72:14, 74:2, 75:18, 75:19, 76:14, 76:15, 84:9, 100:11

**First** [1] - 14:4

**Fishman** [39] - 1:15, 2:15, 10:4, 12:11, 12:17, 13:1, 13:12, 19:13, 33:17, 34:8, 34:12, 34:18, 36:15, 37:16, 41:7, 41:21, 42:3, 43:7,

45:14, 56:20, 64:17, 65:16, 65:19, 74:11, 74:16, 75:1, 77:7, 77:15, 83:19, 83:22, 84:2, 84:3, 84:7, 86:10, 87:9, 88:3, 92:14, 93:3, 93:13

**FISHMAN** [5] - 2:15, 74:24, 83:24, 105:17, 105:19

**Fishman's** [1] - 93:17

**fishy** [1] - 20:23

**fit** [1] - 50:20

**five** [4] - 76:20, 82:23, 82:24, 102:20

**five-minute** [1] - 102:20

**fixed** [1] - 94:15

**FL** [1] - 2:9

**FLANAGAN** [1] - 1:10

**flight** [2] - 103:1, 103:11

**flights** [1] - 84:5

**floor** [2] - 10:14, 16:24

**flowered** [2] - 34:5, 34:6

**FLSA** [2] - 3:14, 15:19

**focus** [2] - 99:3, 102:6

**focused** [1] - 20:18

**focusing** [1] - 79:9

**follow** [2] - 83:22, 93:4

**follow-up** [1] - 83:22

**following** [4] - 43:6, 60:19, 70:1, 98:17

**food** [10] - 52:16, 52:18, 52:19, 54:3, 54:5, 54:8, 54:11, 54:13, 55:9, 55:14

**foot** [2] - 49:7, 49:20

**forced** [4] - 25:13, 33:19, 34:15

**forecast** [1] - 8:13

**foregoing** [2] - 41:16, 104:3

**foremost** [1] - 3:6

**forgotten** [1] - 102:16

**form** [6] - 5:24, 6:1, 6:5, 14:20, 28:18, 82:10

**formal** [2] - 77:9, 77:10, 77:12

**former** [1] - 30:13

**forth** [1] - 11:6

**forward** [4] - 14:16, 56:24, 74:12, 103:7

**four** [6] - 82:23, 82:24, 84:15, 96:13, 96:16, 100:2

**Fourth** [6] - 5:22, 14:17, 14:18, 14:21, 14:24, 14:25

**free** [1] - 80:7

**friendly** [1] - 73:7

**friends** [3] - 9:5, 92:12, 96:6

**front** [10] - 10:15, 16:11, 42:19, 46:9, 48:19, 48:24, 49:3, 49:7, 49:20, 50:3, 50:12, 51:23, 52:14, 56:25, 74:13, 79:12, 100:24

**frustrated** [2] - 10:12, 10:13

**full** [1] - 98:17

**fully** [8] - 4:17, 12:25, 23:21, 36:15, 38:17, 89:10, 89:25, 90:18

**functioning** [1] - 6:3

**fundamentally** [1] - 9:22

---

**G**

**gained** [1] - 94:16

**Gamecock** [2] - 65:2, 65:4

**gather** [1] - 8:1

**gathered** [2] - 21:13, 51:3

**gathering** [3] - 9:19, 71:20, 85:23

**general** [2] - 5:15, 73:23

**generalities** [1] - 43:14

**generally** [2] - 27:5, 84:14

**gentleman** [1] - 75:15

**Georgia** [1] - 57:21

**gesture** [1] - 42:8

**gestures** [1] - 82:7

**get-go** [1] - 92:3

**Gibbons** [3] - 1:15, 2:17, 40:14

**GIBBONS** [3] - 2:17, 40:14, 40:17

**gilda** [1] - 1:13

**girls** [1] - 34:21

**given** [6] - 5:6, 44:15, 62:16, 89:9, 90:5, 91:15

**governing** [1] - 5:12

**GPS** [1] - 33:11

**grab** [1] - 72:16

**grant** [4] - 91:2, 91:12, 94:18, 99:8

**granted** [1] - 5:7

**granting** [1] - 90:10

**grass** [1] - 55:12

**gray** [1] - 69:2

**great** [1] - 7:23

**greatest** [1] - 94:6

**greatly** [2] - 78:10, 97:5

**grounds** [1] - 101:12

**guess** [5] - 71:23, 72:14, 73:6, 79:16, 97:1

**guests** [1] - 79:16

**Gulf** [3] - 5:16, 5:18, 11:6

**guys** [5] - 29:14, 32:2, 36:10, 42:15, 44:3

---

**H**

**Hahah** [1] - 73:1

**hair** [1] - 64:23

**half** [6] - 20:15, 37:23, 80:12, 82:24, 95:17

**halfway** [7] - 12:23, 20:20,

22:13, 23:8, 36:8, 36:14, 42:13

**hand** [10] - 17:5, 17:6, 56:25, 57:1, 74:14, 74:15, 77:7, 77:8, 80:8, 84:8

**handed** [5] - 32:8, 39:20, 39:21, 47:4, 67:2

**hands** [2] - 54:12, 56:17

**happy** [2] - 18:9, 103:6

**hard** [1] - 68:18

**head** [1] - 68:18

**hear** [4] - 8:12, 11:11, 47:8, 73:1

**heard** [4] - 18:2, 89:1, 91:22, 93:16

**hearing** [8] - 2:6, 3:7, 10:23, 47:15, 50:18, 94:23, 102:19

**Hearing** [1] - 1:6

**HEARING** [1] - 1:10

**heart** [1] - 16:14

**held** [4] - 7:2, 18:11, 79:3, 94:24

**hello/good** [1] - 77:14

**help** [1] - 40:20

**helpful** [2] - 16:10, 61:13

**helps** [1] - 16:6

**Hernandez** [10] - 1:13, 2:11, 3:4, 12:24, 17:13, 24:16, 43:13, 43:18, 69:16, 69:20

**HERNANDEZ** [61] - 2:11, 3:5, 7:10, 8:18, 10:25, 11:8, 15:2, 17:1, 17:19, 17:25, 18:1, 18:25, 21:18, 23:2, 24:4, 26:1, 28:18, 29:24, 46:4, 46:14, 46:17, 47:3, 47:14, 47:19, 47:22, 47:25, 50:21, 51:6, 51:20, 52:11, 53:12, 56:1, 56:5, 56:7, 61:12, 63:17, 70:8, 70:12, 74:5, 82:10, 83:21, 83:25, 86:15, 86:18, 88:3, 88:23, 89:3, 89:21, 96:20, 98:1, 100:5, 100:22, 101:1, 101:6, 101:20, 102:9, 103:13, 105:6, 105:10, 105:16, 105:20

**herself** [3] - 34:19, 65:9, 65:17

**hesitant** [1] - 65:5

**hi** [1] - 77:1

**high** [1] - 94:8

**highlight** [3] - 3:3, 7:9, 7:22

**himself** [6] - 9:2, 10:12, 53:2, 55:11, 67:5, 80:14

**hired** [1] - 50:3

**hold** [5] - 98:14, 98:16, 98:19, 98:22, 102:3

**holding** [1] - 99:3

**home** [1] - 86:20

**honesty** [1] - 35:22

**Honor** [87] - 2:21, 3:5, 3:11, 3:15, 4:7, 4:12, 4:25, 5:12, 6:14, 6:17, 6:21, 6:23, 7:10, 7:21, 8:8, 8:18, 9:3, 9:7, 9:12, 10:25, 11:9, 11:13, 12:19, 15:2, 15:5, 17:20, 26:6, 32:3, 32:10, 32:15, 32:19, 39:19, 40:10, 40:14, 40:17, 45:20, 45:21, 46:14, 46:23, 47:15, 47:22, 50:18, 50:21, 55:23, 56:1, 56:5, 56:8, 56:12, 62:4, 62:8, 63:14, 63:17, 70:8, 74:7, 74:11, 83:21, 86:15, 88:6, 88:11, 88:13, 88:20, 88:23, 89:3, 89:13, 89:21, 90:4, 91:13, 91:16, 91:23, 91:24, 96:15, 96:20, 96:24, 97:1, 97:2, 98:1, 98:7, 98:15, 98:25, 99:5, 100:5, 101:6, 101:20, 102:9, 102:22, 103:14, 103:18

**HONORABLE** [1] - 1:10

**hope** [3] - 82:16, 87:5, 91:16

**Horse** [2] - 15:11, 15:15

**Hospitality** [2] - 1:7, 2:6

**hostile** [1] - 26:7

**Hotel** [1] - 2:7

**hourly** [2] - 50:8, 50:14

**hours** [1] - 7:3

**house** [24] - 2:22, 10:15, 48:18, 48:19, 48:20, 48:24, 49:1, 49:3, 49:7, 49:11, 49:14, 49:20, 50:3, 50:8, 50:12, 50:13, 50:14, 50:15, 51:23, 52:14, 52:20, 79:12

**hundreds** [1] - 14:13

**Hunt** [4] - 1:14, 2:14, 24:9, 47:4

**HUNT** [81] - 2:14, 11:13, 13:9, 13:18, 15:5, 21:16, 21:25, 22:9, 22:23, 23:24, 24:8, 26:6, 26:10, 32:3, 32:6, 32:10, 32:14, 32:19, 32:21, 39:19, 39:23, 40:2, 40:6, 40:10, 40:12, 40:21, 41:3, 45:18, 46:23, 50:17, 51:18, 52:3, 52:8, 53:16, 53:21, 53:24, 55:22, 56:12, 56:19, 57:13, 61:15, 62:4, 62:8, 62:12, 62:14, 62:22, 63:14, 72:20, 74:4, 74:7, 74:10, 74:25, 83:19, 86:13, 87:13, 88:6, 88:11, 88:13, 88:20, 91:23, 96:15, 96:23, 97:1, 97:9, 97:13, 97:19, 97:23, 99:5, 99:22, 99:25, 100:20,

102:22, 103:1, 103:4, 103:6, 103:10, 103:18, 105:8, 105:12, 105:14, 105:18

---

**I**

**identified** [2] - 25:24, 26:21

**identifies** [1] - 27:6

**identify** [1] - 62:11

**ignore** [1] - 25:19

**ignored** [2] - 25:17, 25:21

**illegal** [5] - 48:20, 49:22, 66:14, 66:15, 79:21

**immediately** [2] - 41:14, 43:10

**impartial** [1] - 5:9

**impending** [1] - 90:6

**impermissible** [1] - 11:17

**important** [1] - 90:7

**importantly** [1] - 9:3

**improper** [6] - 3:19, 79:19, 84:19, 84:20, 91:1, 94:1

**improve** [1] - 41:1

**in-house** [1] - 2:22

**inadvertence** [1] - 13:22

**Inc** [1] - 2:8

**inclined** [2] - 79:22, 94:18

**include** [1] - 6:8

**included** [1] - 32:18

**including** [5] - 7:15, 28:16, 90:17, 95:25, 102:10

**inconsistencies** [1] - 91:25

**inconsistency** [1] - 89:18

**inconsistent** [1] - 51:25

**indicate** [1] - 42:11

**indicated** [3] - 66:7, 98:7, 100:14

**indicates** [1] - 72:24

**indicating** [1] - 4:1

**indication** [1] - 89:24

**individuals** [4] - 7:24, 10:14, 89:9, 96:7

**influence** [1] - 93:24

**inform** [1] - 15:16

**information** [25] - 7:25, 8:20, 9:19, 19:4, 19:24, 21:13, 24:1, 30:16, 44:15, 47:13, 50:25, 51:24, 71:20, 85:22, 85:25, 86:11, 86:12, 89:8, 89:23, 90:18, 91:15, 91:17, 92:9, 93:2, 93:7

**informed** [5] - 4:17, 7:16, 16:8, 28:22, 76:3

**initial** [5] - 28:1, 71:16, 94:19, 99:9, 100:1

**instead** [1] - 52:17

**instilled** [1] - 50:6

**Institute** [1] - 2:8

**insure** [3] - 16:3, 16:6,

91:18

**insuring** [1] - 89:10

**intended** [1] - 16:14

**intentions** [1] - 37:15

**interacted** [1] - 79:15

**interaction** [2] - 26:24, 50:16

**interest** [2] - 15:22, 15:24

**interested** [1] - 78:14

**interests** [1] - 15:25

**internal** [2] - 89:18, 91:25

**intervention** [7] - 10:19, 11:6, 11:15, 14:20, 94:9, 95:4, 95:23

**interview** [10] - 8:4, 9:15, 9:24, 11:23, 13:2, 14:12, 75:24, 79:20, 92:18, 94:1

**interviewed** [1] - 92:4

**interviewing** [1] - 11:17

**interviews** [6] - 8:1, 77:14, 78:23, 85:6, 94:4, 94:12

**intimidated** [1] - 12:11

**intimidating** [6] - 6:12, 10:23, 16:15, 16:20, 95:6, 96:9

**intimidation** [1] - 12:1

**introduce** [4] - 2:4, 3:8, 18:15, 77:5

**introduced** [5] - 34:19, 34:20, 65:9, 65:16, 77:4

**introduction** [4] - 65:17, 77:9, 77:10, 77:12

**introductions** [1] - 77:13

**invite** [3] - 2:3, 16:22, 17:13

**involved** [2] - 14:10, 95:20

**involvement** [5] - 79:13, 89:12, 89:13, 94:25, 95:21

**involving** [3] - 10:4, 75:10, 95:15

**issue** [4] - 6:2, 94:18, 99:4, 99:8

**issues** [2] - 5:10, 8:7

**IT** [1] - 102:12

**item** [1] - 97:1

**items** [1] - 11:5

**itself** [1] - 16:13

---

**J**

**Jill** [1] - 2:11

**job** [5] - 49:5, 53:1, 53:3, 54:20, 55:16

**John** [3] - 1:14, 2:14, 24:9

**join** [1] - 19:25

**joining** [1] - 16:5

**joint** [1] - 98:10

**JORDAN** [5] - 74:18, 74:24, 83:24, 105:17, 105:19

**Jordan** [13] - 1:15, 2:15,

64:17, 65:8, 65:11, 65:14, 65:16, 65:19, 66:24, 67:10, 74:16, 77:6, 77:15
**Jordan's** [1] - 37:2
**JUDGE** [1] - 1:11
**judgment** [17] - 91:6, 97:5, 97:15, 97:21, 98:9, 98:13, 98:21, 98:23, 99:6, 99:14, 99:18, 99:21, 100:2, 100:7, 100:16, 101:8, 101:10
**judicial** [5] - 10:19, 11:6, 11:15, 15:13, 94:9
**juncture** [1] - 94:15
**jury** [1] - 102:17
**JUSTIN** [9] - 17:8, 17:18, 24:7, 46:3, 53:15, 105:5, 105:7, 105:9, 105:11
**Justin** [14] - 3:9, 3:22, 17:8, 35:3, 46:20, 58:3, 61:22, 63:4, 65:6, 72:8, 72:12, 75:15, 75:16, 76:25

**K**

**keep** [2] - 41:2, 81:11
**Kelly** [11] - 9:6, 28:10, 29:22, 43:20, 43:23, 44:7, 67:16, 75:11, 77:19, 84:17, 92:12
**kind** [18] - 12:1, 14:6, 23:7, 35:8, 58:14, 65:5, 70:22, 76:22, 76:23, 76:24, 78:24, 79:11, 80:15, 81:10, 82:7, 90:19, 92:9, 102:17
**kinds** [7] - 14:14, 20:22, 59:9, 78:21, 93:6, 94:2
**kitchen** [4] - 49:2, 49:4, 52:25, 54:5
**knife** [1] - 79:5
**knowing** [1] - 96:1
**knowledge** [1] - 28:21
**known** [4] - 19:5, 29:14, 43:23, 92:11
**knows** [1] - 3:12

**L**

**lack** [4] - 8:20, 11:2, 11:3, 16:12
**lacking** [2] - 15:13, 15:21
**language** [3] - 14:17, 16:10, 100:25
**laptop** [7] - 37:18, 38:2, 78:16, 80:4, 80:8, 80:10, 80:11
**laptops** [2] - 34:22, 76:17
**large** [2] - 68:4, 97:10
**larger** [1] - 76:16
**last** [4] - 68:16, 72:15,

80:22, 84:5
**launched** [1] - 35:5
**law** [17] - 11:22, 25:25, 26:13, 26:21, 27:10, 27:20, 28:2, 29:12, 29:20, 30:7, 44:1, 57:20, 57:21, 69:16, 75:6, 92:5, 95:9
**laws** [1] - 41:15
**lawsuit** [38] - 8:2, 9:17, 10:4, 10:5, 19:2, 19:5, 19:7, 19:17, 21:7, 21:10, 21:14, 21:15, 21:20, 21:23, 23:22, 27:18, 28:11, 28:14, 28:16, 29:6, 29:13, 30:13, 36:22, 57:23, 69:11, 70:19, 77:17, 77:19, 79:17, 84:16, 86:3, 90:1, 90:2, 92:10, 95:15, 95:20, 95:23
**lawsuit-lawsuit** [1] - 36:22
**lawsuits** [1] - 16:1
**lawyers** [1] - 27:25
**lead** [1] - 26:8
**leading** [11] - 21:16, 21:25, 22:23, 22:25, 23:24, 26:1, 51:18, 52:3, 52:9, 61:12, 92:25
**learned** [3] - 3:16, 19:19, 36:25
**least** [4] - 12:20, 91:17, 92:11, 99:10
**leave** [1] - 102:25
**leaving** [1] - 34:9
**left** [10] - 17:5, 20:1, 20:2, 34:11, 42:7, 42:22, 43:2, 43:17, 56:25, 74:14
**legal** [4] - 4:19, 79:22, 79:24, 86:25
**legally** [3] - 49:1, 50:2, 84:4
**lengthy** [1] - 10:16
**less** [2] - 93:6, 94:15
**lessen** [1] - 39:23
**lesson** [1] - 47:11
**level** [1] - 95:22
**levelled** [1] - 91:19
**life** [1] - 50:5
**light** [1] - 53:18
**limit** [6] - 4:23, 9:20, 9:25, 87:25, 97:3, 98:4
**limitation** [1] - 5:19
**limited** [1] - 4:22
**limiting** [2] - 5:13, 14:20
**line** [10] - 38:25, 39:1, 48:16, 48:23, 48:25, 49:14, 49:19, 54:2, 59:9
**lines** [2] - 37:12, 78:8
**linger** [1] - 101:9
**literally** [1] - 80:8
**litigation** [7] - 6:3, 6:10, 14:14, 15:17, 15:21, 86:7, 98:6

**Litigation** [2] - 11:7, 94:2
**LLC** [2] - 1:7, 2:7
**local** [1] - 40:13
**located** [2] - 64:6, 75:7
**Logistics** [1] - 6:22
**logo** [1] - 65:4
**look** [9] - 34:5, 35:2, 62:18, 64:10, 68:16, 72:10, 73:8, 81:17, 103:7
**looked** [10] - 23:14, 44:3, 45:11, 64:6, 65:5, 76:22, 80:15, 81:7, 81:16
**looking** [9] - 16:17, 34:23, 41:18, 76:23, 80:11, 85:9, 87:4, 90:16, 101:2
**looks** [1] - 41:18
**lose** [1] - 16:23
**loud** [2] - 52:13, 89:6
**loudspeaker** [1] - 7:4
**LOUISE** [1] - 1:10

**M**

**ma'am** [4] - 49:9, 49:18, 49:24, 51:12
**mail** [1] - 25:11
**main** [1] - 9:13
**majority** [2] - 4:15, 79:24
**Man** [11] - 1:4, 2:6, 8:25, 28:10, 36:12, 67:18, 71:2, 74:2, 75:10, 77:19, 84:17
**management** [5] - 49:21, 50:5, 55:17, 98:7, 100:13
**manager's** [1] - 7:2
**managers** [1] - 89:7
**Manual** [2] - 11:7, 94:1
**March** [10] - 3:12, 3:15, 3:21, 25:6, 33:22, 58:7, 63:11, 64:12, 72:11, 75:20
**mark** [2] - 32:16, 40:5, 40:25
**marked** [4] - 32:9, 39:22, 40:22, 41:5
**Marriott** [7] - 33:13, 38:8, 44:18, 67:8, 81:2, 81:15, 95:11
**match** [1] - 14:24
**material** [1] - 7:8
**matter** [2] - 11:19, 18:4, 104:5
**McGurk** [3] - 1:17, 104:7, 104:8
**mean** [26] - 9:12, 9:13, 10:15, 26:24, 30:3, 30:9, 30:22, 31:18, 32:2, 35:7, 42:20, 43:3, 43:12, 45:9, 48:17, 48:24, 49:25, 51:19, 52:21, 54:3, 54:21, 55:5, 60:14, 65:25, 73:6, 97:19

**meaning** [1] - 79:6
**means** [2] - 54:11, 87:20
**meant** [3] - 41:1, 55:7, 79:6
**mechanical** [1] - 1:23
**meet** [17] - 11:5, 12:16, 18:23, 31:12, 33:2, 33:7, 33:16, 33:19, 60:22, 64:1, 64:8, 64:14, 76:5, 77:7, 78:11, 89:6, 95:3
**meeting** [36] - 4:5, 4:11, 9:18, 12:11, 20:2, 21:2, 23:12, 32:25, 33:4, 41:7, 42:7, 42:13, 42:18, 43:6, 43:17, 63:23, 63:24, 68:6, 69:6, 76:1, 76:2, 78:9, 78:22, 80:1, 80:2, 82:6, 83:10, 83:12, 83:15, 84:8, 85:16, 85:18, 89:11, 94:8, 95:11
**meetings** [2] - 7:2, 7:4
**meets** [1] - 94:8
**member** [7] - 4:1, 8:10, 10:1, 21:23, 71:5, 73:14, 84:24
**members** [15] - 3:20, 4:14, 5:9, 5:15, 5:20, 6:19, 6:20, 6:24, 11:24, 15:8, 15:17, 89:9, 91:4, 91:9
**memorandum** [2] - 97:22, 97:23
**mentioned** [1] - 19:22
**mere** [1] - 11:2
**merits** [1] - 100:12
**message** [11] - 12:15, 44:22, 60:21, 68:8, 68:17, 68:19, 68:20, 68:21, 68:23, 69:23, 72:14
**messages** [22] - 18:5, 32:24, 33:9, 33:10, 44:10, 60:24, 61:1, 61:4, 61:7, 61:8, 61:9, 61:16, 61:20, 63:4, 63:7, 63:11, 63:22, 68:25, 69:5, 72:8, 72:11, 73:9
**met** [10] - 3:23, 12:17, 13:11, 19:16, 29:15, 33:15, 71:14, 76:7, 76:10, 93:3
**Michael** [3] - 1:13, 2:13, 101:1
**middle** [2] - 42:8, 82:14
**Middle** [1] - 1:17
**might** [9] - 11:24, 35:24, 59:20, 59:23, 67:5, 87:25, 94:18, 96:18, 100:23
**mind** [6] - 6:16, 16:15, 20:25, 23:7, 92:6, 93:23
**mine** [1] - 58:8
**minute** [1] - 102:20
**minutes** [10] - 43:16, 60:10, 60:11, 64:21, 64:24, 76:20, 82:23, 82:24, 88:24, 102:11
**miscommunication** [1] -

14:6
**misconstrued** [1] - 37:24
**misconstruing** [2] - 54:25, 55:5
**misleading** [7] - 6:12, 9:22, 10:22, 14:11, 16:14, 16:19, 95:6
**misled** [1] - 16:4
**misrepresent** [2] - 6:9, 16:18
**misrepresented** [1] - 10:20
**misrepresenting** [1] - 5:5
**missed** [1] - 18:16
**misstated** [1] - 80:7
**misstatements** [1] - 87:8
**moment** [2] - 25:5, 26:3
**Monday** [3] - 64:9, 72:17, 73:9
**money** [3] - 54:21, 55:13, 82:17
**moot** [1] - 99:9
**moreover** [1] - 11:25
**morning** [4] - 2:2, 2:21, 85:10
**most** [2] - 5:2, 18:22
**Motion** [1] - 1:6
**motion** [56] - 2:5, 2:25, 3:7, 3:13, 3:17, 5:6, 5:7, 5:11, 10:9, 12:20, 14:15, 14:23, 90:6, 90:8, 90:10, 91:2, 91:5, 91:7, 91:11, 91:14, 92:2, 94:7, 94:14, 94:19, 94:21, 95:1, 97:5, 97:16, 97:20, 98:9, 98:12, 98:14, 98:16, 98:17, 98:19, 98:21, 98:22, 99:6, 99:9, 99:14, 99:18, 99:19, 99:21, 100:1, 100:7, 100:10, 100:16, 100:18, 101:4, 101:5, 101:8, 101:10, 101:15, 101:23, 102:1, 102:3
**MOTION** [1] - 1:10
**motions** [2] - 96:24, 98:10
**mouthful** [1] - 99:1
**movant** [2] - 5:23, 5:25
**move** [4] - 32:14, 45:21, 51:4, 63:14
**moving** [1] - 6:3
**MR** [82] - 2:13, 2:14, 11:13, 13:9, 13:18, 15:5, 21:16, 21:25, 22:9, 22:23, 23:24, 24:8, 26:6, 26:10, 32:3, 32:6, 32:10, 32:14, 32:19, 32:21, 39:19, 39:23, 40:2, 40:6, 40:10, 40:12, 40:21, 41:3, 45:18, 46:23, 50:17, 51:18, 52:3, 52:8, 53:16, 53:21, 53:24, 55:22, 56:12, 56:19, 57:13, 61:15, 62:4, 62:8, 62:12, 62:14, 62:22, 63:14, 63:21, 70:4, 74:7, 74:10,
74:25, 83:19, 86:13, 87:13, 88:6, 88:11, 88:13, 88:20, 91:23, 96:15, 96:23, 97:1, 97:9, 97:13, 97:19, 97:23, 99:5, 99:22, 99:25, 100:20, 102:22, 103:1, 103:4, 103:6, 103:10, 103:18, 105:8, 105:12, 105:14, 105:18
**MS** [66] - 2:11, 2:15, 2:17, 2:21, 3:5, 7:10, 8:18, 10:25, 11:8, 15:2, 17:1, 17:19, 17:25, 18:1, 18:25, 21:18, 23:2, 24:4, 26:1, 28:18, 29:24, 40:14, 40:17, 46:4, 46:14, 46:17, 47:3, 47:14, 47:19, 47:22, 47:25, 50:21, 51:6, 51:20, 52:11, 53:12, 56:1, 56:5, 56:7, 61:12, 63:17, 70:8, 70:12, 74:5, 82:10, 83:21, 83:25, 86:15, 86:18, 88:3, 88:23, 89:3, 89:21, 96:20, 98:1, 100:5, 100:22, 101:1, 101:6, 101:20, 102:9, 103:13, 105:6, 105:10, 105:16, 105:20
**multiple** [1] - 81:8
**must** [6] - 5:18, 5:23, 6:1, 6:3, 16:2, 16:17

**N**

**name** [20] - 17:6, 18:6, 18:18, 18:19, 26:14, 26:16, 27:6, 44:1, 57:2, 57:4, 68:2, 74:15, 74:17, 75:15, 77:15, 80:19, 80:20, 84:5, 84:6
**named** [3] - 8:25, 21:10, 84:11
**names** [1] - 66:2
**nature** [23] - 4:10, 5:3, 7:17, 8:23, 8:25, 9:17, 19:1, 19:17, 21:2, 21:9, 23:21, 51:1, 51:16, 53:6, 60:12, 70:18, 71:21, 84:11, 86:23, 89:10, 90:1, 90:2, 99:6
**NC** [1] - 1:18
**necessarily** [4] - 15:3, 18:20, 98:13, 100:15
**necessary** [1] - 5:20
**need** [8] - 47:11, 52:24, 54:13, 97:3, 97:20, 97:25, 101:16, 102:24
**needed** [4] - 22:17, 38:17, 52:18, 55:12
**needs** [1] - 99:15
**negative** [1] - 69:15
**neighbor's** [1] - 55:12
**never** [10] - 3:23, 24:13, 35:15, 35:17, 35:25, 42:14,
42:15, 49:7, 49:19, 65:8
**nevertheless** [1] - 92:14
**New** [1] - 1:5, 1:18, 102:12, 102:23
**next** [7] - 60:20, 60:23, 65:7, 67:8, 73:8, 78:5, 81:3
**nice** [1] - 77:7
**Nick** [9] - 51:22, 52:14, 52:16, 53:6, 53:9, 79:9, 79:11, 79:12, 79:13
**non** [1] - 35:2
**non-vocal** [1] - 35:2
**none** [2] - 22:19, 92:25
**nonetheless** [1] - 13:2
**normal** [1] - 85:8
**normally** [3] - 25:19, 73:4, 73:13
**NORTH** [1] - 1:1
**North** [1] - 1:5, 41:16, 75:11
**noted** [2] - 15:12, 88:18
**notereading** [1] - 1:23
**notes** [3] - 66:23, 78:16, 78:17
**nothing** [8] - 11:17, 14:5, 45:7, 51:15, 55:22, 74:7, 93:25, 96:20
**notice** [11] - 5:7, 5:9, 9:9, 16:7, 90:8, 90:10, 90:12, 90:13, 90:24, 91:10, 91:11
**November** [1] - 24:22
**NRC** [1] - 2:8
**number** [16] - 12:4, 25:23, 27:7, 31:1, 31:5, 32:23, 44:2, 44:4, 44:7, 52:12, 54:1, 67:23, 81:20, 97:3, 97:10
**Number** [10] - 32:17, 39:25, 40:3, 40:23, 41:5, 51:7, 51:10, 51:22, 63:15, 72:7
**numbers** [1] - 39:24

**O**

**oath** [2] - 17:3, 95:25
**objection** [19] - 21:16, 21:25, 22:9, 22:23, 23:24, 26:1, 26:4, 28:18, 29:24, 50:17, 51:18, 52:3, 52:10, 61:12, 63:16, 82:10, 86:13, 87:13
**obligated** [1] - 54:18
**obtain** [5] - 11:18, 38:8, 76:2, 76:11, 93:1
**obvious** [3] - 6:10, 10:21, 16:19
**obviously** [5] - 3:12, 79:21, 90:4, 93:13, 96:6
**occasion** [7] - 55:8, 55:14, 58:5, 61:3, 61:6, 61:25, 75:15
**occasions** [1] - 12:14
**occur** [2] - 5:25, 6:5
**occurred** [8] - 5:25, 6:4, 13:11, 14:1, 65:7, 66:10, 78:5, 93:25
**October** [1] - 100:22
**OF** [2] - 1:1, 1:10
**offer** [3] - 12:7, 20:11, 37:20
**offered** [1] - 102:5
**office** [4] - 7:3, 19:10, 60:16, 88:16
**offices** [2] - 57:22, 75:9
**often** [2] - 33:12, 102:16
**Oil** [3] - 5:17, 5:18, 11:6
**once** [9] - 36:1, 37:3, 37:14, 43:15, 43:17, 48:9, 49:20, 67:11, 93:16
**one** [48] - 3:17, 4:13, 4:20, 5:3, 6:15, 7:6, 7:21, 20:6, 20:13, 20:18, 23:9, 23:10, 23:15, 25:13, 26:3, 33:13, 33:19, 34:2, 34:15, 34:20, 36:12, 37:16, 41:18, 45:19, 54:25, 55:2, 59:15, 62:14, 67:15, 67:16, 72:24, 74:4, 74:10, 76:1, 76:16, 79:5, 80:22, 81:1, 84:21, 92:2, 92:21, 92:24, 93:5, 94:5, 94:17, 97:1
**one-sided** [4] - 4:13, 4:20, 23:9, 23:10
**ones** [3] - 69:1, 69:2
**ongoing** [1] - 16:5
**open** [4] - 14:7, 14:9, 47:6, 92:24
**open-ended** [2] - 14:9, 92:24
**opening** [3] - 3:4, 7:8, 8:14
**opinion** [1] - 54:23
**opportunity** [8] - 31:21, 39:9, 59:2, 80:13, 82:19, 87:7, 95:25, 96:1
**oppose** [1] - 101:14
**opposed** [1] - 98:3
**opposing** [2] - 15:14, 36:23
**opposition** [8] - 3:2, 91:7, 98:20, 98:24, 99:13, 99:19, 101:22, 102:3
**opt** [2] - 3:25, 15:20
**opt-in** [2] - 3:25, 15:20
**oral** [3] - 101:4, 101:5, 102:1
**order** [12] - 5:11, 6:8, 10:10, 14:20, 16:1, 91:3, 91:14, 91:17, 100:13, 100:19, 100:21, 102:8
**ordered** [1] - 7:3
**orderly** [1] - 15:12
**organizations** [1] - 25:4

**original** [1] - 13:8
**otherwise** [2] - 6:11, 101:21
**ourselves** [1] - 77:4
**outcome** [2] - 15:22, 93:1
**outset** [3] - 8:21, 78:19, 99:12
**outside** [2] - 8:12, 94:17
**overlooked** [1] - 45:10
**overruled** [2] - 22:1, 22:10, 28:19, 30:1, 87:14
**own** [7] - 9:25, 52:17, 55:16, 89:12, 93:11, 96:10

## P

**PACER** [1] - 85:9
**Page** [2] - 105:3, 106:2
**page** [21] - 41:11, 47:6, 47:21, 47:22, 48:1, 48:16, 49:6, 52:4, 53:19, 53:20, 53:25, 54:15, 68:16, 72:10, 73:8, 80:12, 80:22, 82:24, 97:3, 98:4, 101:3
**pages** [9] - 20:15, 37:23, 81:21, 93:12, 95:17, 97:4, 97:20, 97:24
**paid** [1] - 50:14
**painted** [2] - 89:16, 89:17
**paper** [2] - 30:2, 38:24
**paperwork** [4] - 3:1, 19:3, 21:4, 35:8
**Pappas** [5] - 53:9, 55:9, 55:14, 55:19, 79:9
**Pappas's** [1] - 53:6
**paragraph** [3] - 51:21, 52:12, 52:22
**paragraphs** [2] - 80:22, 81:24
**paralegal** [11] - 2:19, 8:21, 30:7, 46:19, 46:20, 48:3, 57:19, 75:23, 77:16, 88:8, 89:17
**part** [8] - 11:2, 14:2, 18:9, 18:22, 42:15, 53:9, 92:18, 99:10
**partial** [2] - 91:5, 98:12
**participate** [7] - 12:9, 16:9, 28:16, 42:18, 60:5, 69:11, 90:15
**participated** [1] - 29:16
**participation** [2] - 31:9, 31:16
**particular** [8] - 5:24, 6:1, 6:5, 6:15, 7:9, 29:13, 83:5, 83:8
**parties** [3] - 15:14, 16:3, 48:6
**party** [2] - 6:3, 90:19
**past** [1] - 77:13

**pay** [2] - 36:3, 53:8
**paying** [1] - 26:25
**penalty** [10] - 8:6, 20:9, 38:15, 39:2, 41:15, 45:10, 86:24, 87:12, 87:17, 87:24
**pending** [10] - 3:16, 3:18, 4:18, 5:6, 6:9, 8:24, 15:17, 16:18, 96:23
**people** [17] - 11:23, 16:24, 18:10, 25:19, 28:16, 34:1, 34:7, 34:9, 34:25, 48:18, 53:3, 58:13, 66:15, 73:22, 81:9, 89:5, 90:24
**percent** [2] - 80:6, 87:2
**perfect** [2] - 101:21, 101:24
**perhaps** [1] - 56:20
**period** [1] - 50:4
**perjury** [8] - 8:6, 20:9, 38:15, 39:2, 41:15, 86:24, 87:12, 87:17, 87:24
**perplexing** [1] - 90:5
**person** [8] - 3:24, 20:18, 25:23, 26:12, 31:20, 34:2, 34:13, 49:15, 71:15, 73:25, 76:23
**person's** [1] - 68:2
**personal** [4] - 15:22, 25:11, 27:3, 102:23
**phase** [1] - 100:12
**phone** [23] - 3:22, 3:24, 18:5, 18:21, 25:11, 25:19, 25:24, 26:11, 26:12, 26:20, 27:3, 28:2, 31:3, 31:15, 31:20, 32:23, 43:5, 47:1, 61:10, 61:17, 61:21, 63:2, 75:24
**picture** [1] - 89:16
**Pierre** [14] - 26:17, 26:20, 27:10, 27:14, 28:1, 28:10, 28:22, 28:25, 58:9, 58:11, 70:21, 71:8, 88:15
**Pierre's** [1] - 89:25
**place** [6] - 9:24, 12:12, 17:5, 33:24, 56:25, 74:14
**plaintiff** [9] - 2:10, 3:25, 10:1, 11:12, 24:10, 96:11, 96:19, 96:21, 99:15
**Plaintiff** [1] - 1:5
**plaintiff's** [27] - 2:25, 3:7, 3:15, 3:23, 9:1, 10:9, 12:20, 13:5, 13:19, 21:10, 21:14, 23:11, 28:7, 43:12, 68:10, 91:7, 84:12, 91:7, 92:1, 94:7, 94:14, 95:1, 97:16, 98:24, 99:19, 100:18, 102:3
**Plaintiffs** [1] - 1:13
**plaintiffs** [23] - 2:12, 2:13, 3:9, 3:13, 3:20, 4:25, 5:2, 5:8, 9:2, 11:20, 12:5, 15:21, 16:4, 73:5, 78:13, 85:24,

90:9, 91:1, 98:3, 98:7, 98:11, 98:13, 100:9
**plan** [1] - 86:6
**plane** [1] - 102:25
**playing** [1] - 91:19
**point** [18] - 9:7, 9:13, 15:1, 37:16, 43:22, 58:22, 66:17, 67:17, 81:11, 88:9, 94:10, 94:11, 94:13, 94:24, 95:19, 98:19, 98:23
**pointed** [1] - 91:24
**points** [2] - 10:8, 58:15
**politely** [1] - 43:1
**pool** [4] - 19:12, 35:12, 66:13, 79:23
**pooling** [4] - 15:24, 79:19, 84:19, 84:20
**pools** [2] - 66:14, 79:21
**position** [17] - 14:3, 49:2, 50:2, 50:8, 50:9, 50:11, 50:13, 50:15, 52:19, 53:6, 54:12, 66:12, 78:25, 79:7, 79:23, 90:19, 99:2
**positions** [2] - 79:3, 92:7
**possession** [1] - 45:2
**possible** [1] - 78:18
**potential** [14] - 4:14, 4:15, 4:23, 6:10, 10:22, 15:16, 16:4, 16:19, 21:23, 71:5, 87:25, 89:12, 95:21
**potentially** [7] - 3:19, 9:20, 11:24, 21:14, 84:23, 87:24, 90:13
**practically** [1] - 92:22
**practice** [2] - 75:8, 85:8
**practices** [2] - 6:7, 84:20
**precertification** [2] - 7:12, 94:3
**preclude** [1] - 98:13
**precluding** [3] - 91:3, 91:4, 100:15
**predictions** [1] - 103:16
**preface** [1] - 14:16
**prefer** [1] - 84:1
**preparing** [2] - 13:12, 97:2
**present** [3] - 22:6, 74:4, 85:13
**presentation** [1] - 96:9
**pretty** [2] - 18:7, 18:17
**previous** [3] - 79:2, 79:3, 85:6
**previously** [4] - 28:6, 65:14, 75:24, 79:1
**principles** [2] - 5:13, 5:16
**print** [4] - 44:19, 61:25, 67:8, 81:3
**printed** [8] - 20:13, 38:21, 39:7, 62:2, 81:4, 81:16, 82:18, 82:21
**printer** [5] - 20:12, 34:22,

67:7, 80:25, 81:1
**proceed** [2] - 17:16, 100:4
**proceeded** [3] - 31:1, 80:10, 93:4
**proceeding** [1] - 15:14
**proceedings** [1] - 104:4
**Proceedings** [1] - 1:23
**process** [2] - 15:13, 94:13
**produced** [1] - 1:23
**professional** [1] - 73:18
**promises** [1] - 92:19
**prompted** [2] - 5:10, 23:11
**pronounced** [1] - 5:17
**proper** [3] - 6:2, 11:14, 99:11
**proposal** [1] - 35:17
**proposition** [1] - 15:7
**prospective** [1] - 91:3
**protective** [5] - 5:11, 6:8, 10:10, 91:2, 91:14
**provide** [1] - 5:8, 11:3
**provided** [8] - 7:23, 13:3, 13:5, 38:2, 39:9, 41:6, 44:22, 96:4
**public** [2] - 12:12, 33:24
**pull** [2] - 40:19, 47:5
**purpose** [9] - 4:11, 7:17, 8:1, 9:18, 25:11, 51:2, 85:16, 85:18, 89:11
**purposes** [2] - 9:19, 76:1
**pursuant** [1] - 3:14
**pursue** [1] - 19:22
**putative** [23] - 3:19, 4:1, 4:14, 4:21, 5:2, 5:8, 5:19, 6:18, 6:20, 6:24, 8:9, 9:2, 10:1, 15:8, 73:5, 73:14, 84:24, 89:9, 90:9, 91:4, 91:9
**puts** [1] - 54:5

## Q

**questionable** [1] - 23:16
**questioning** [1] - 37:14
**questions** [55] - 3:10, 14:7, 14:9, 14:11, 17:14, 17:15, 18:23, 20:23, 22:13, 22:20, 23:7, 23:9, 23:10, 23:25, 24:5, 31:2, 31:5, 32:20, 35:5, 35:10, 36:1, 37:5, 37:6, 37:10, 42:20, 46:5, 53:5, 53:10, 53:13, 53:17, 53:18, 59:9, 59:11, 59:14, 60:15, 62:19, 65:13, 70:7, 70:9, 70:17, 71:11, 74:6, 77:23, 78:3, 78:12, 78:21, 79:16, 83:20, 83:22, 88:4, 92:9, 92:20, 93:6, 96:1
**Quezada** [3] - 6:22, 7:22, 89:5

**quick** [2] - 24:2, 26:23
**quickly** [1] - 45:9
**quit** [2] - 19:21, 24:21

## R

**race** [1] - 81:9
**raise** [4] - 17:6, 42:1, 57:1, 74:14
**raised** [1] - 10:8
**Raleigh** [5] - 12:12, 33:21, 41:7, 75:21, 103:2
**random** [1] - 31:20
**rather** [1] - 8:12
**reach** [1] - 14:2
**reached** [4] - 27:7, 92:13, 93:18, 94:12
**read** [17] - 38:18, 39:3, 39:4, 39:6, 49:8, 49:8, 49:12, 49:17, 49:23, 52:13, 67:9, 67:11, 72:18, 72:21, 73:2, 73:11, 83:1
**reading** [6] - 20:6, 38:20, 41:7, 52:12, 72:12, 90:13
**real** [4] - 19:17, 78:16, 78:17, 80:4
**realize** [1] - 20:16
**realized** [4] - 20:20, 36:1, 42:13, 44:2
**realizing** [1] - 22:15
**really** [16] - 7:7, 16:13, 18:7, 20:16, 20:23, 20:24, 22:13, 23:15, 35:7, 66:18, 72:24, 92:5, 94:16, 96:10, 99:10
**reason** [4] - 43:3, 50:21, 98:8, 102:2
**recalled** [1] - 88:10
**recapping** [1] - 7:7
**receipt** [1] - 70:1
**receive** [3] - 16:7, 88:16, 91:9
**received** [6] - 3:21, 3:24, 25:6, 26:11, 45:24, 63:18
**recent** [1] - 98:10
**recently** [1] - 14:21
**receptionist** [1] - 88:15
**recognize** [2] - 64:23, 65:1
**recognized** [1] - 11:22
**record** [7] - 2:4, 48:12, 58:23, 86:10, 94:15, 96:25, 104:4
**recorded** [8] - 1:23, 31:24, 46:18, 48:1, 48:14, 50:23, 51:25, 95:9
**recording** [7] - 46:18, 47:2, 47:9, 48:7, 58:25, 70:15, 89:23
**recovery** [2] - 4:23, 9:21
**recross** [1] - 52:7

**RECROSS** [2] - 53:15, 105:11
**RECROSS-EXAMINATION** [2] - 53:15, 105:11
**redirect** [1] - 88:5
**REDIRECT** [2] - 46:3, 105:9
**reducing** [1] - 15:25
**reeling** [1] - 68:17
**refer** [2] - 84:1, 84:3
**reference** [2] - 18:4, 82:15
**referred** [1] - 81:20
**referring** [3] - 6:21, 46:12, 100:20
**regarding** [5] - 27:15, 79:13, 79:18, 85:19, 94:17
**reiterate** [1] - 10:8
**reiterated** [1] - 95:10
**relate** [1] - 89:8
**relation** [1] - 72:1
**relationship** [1] - 100:17
**relative** [1] - 92:7
**relevant** [1] - 4:18
**relied** [1] - 95:24
**relief** [3] - 7:14, 9:25, 96:11
**relook** [1] - 45:5
**relooking** [1] - 18:5
**reluctance** [1] - 59:13
**rely** [2] - 12:5, 95:5
**remember** [9] - 18:20, 31:20, 65:18, 66:18, 67:6, 67:17, 81:5, 81:12, 81:13
**remembered** [1] - 59:12
**remembers** [1] - 13:17
**remind** [1] - 99:17
**remotely** [1] - 14:6
**repeat** [3] - 19:15, 26:9, 59:9
**repeatedly** [1] - 9:11
**rephrase** [1] - 72:2
**replied** [1] - 54:8
**report** [1] - 7:4
**Reporter** [1] - 1:17
**represent** [11] - 4:6, 7:19, 24:2, 24:9, 26:15, 27:23, 30:21, 36:10, 36:19, 36:20, 66:3
**representation** [1] - 62:20
**represented** [31] - 4:3, 9:11, 11:20, 14:5, 18:8, 24:16, 27:21, 28:2, 29:9, 29:12, 29:14, 30:9, 36:6, 36:7, 36:16, 37:1, 43:20, 44:3, 58:17, 65:12, 65:24, 66:1, 66:5, 68:12, 70:2, 70:24, 71:7, 77:24, 78:7, 85:4
**representing** [8] - 9:1, 13:1, 18:13, 27:13, 29:21, 30:23, 73:15, 77:17

**represents** [1] - 57:20
**request** [2] - 99:16, 101:13
**requested** [1] - 92:10
**requests** [1] - 96:12
**require** [2] - 50:3, 94:9
**requirement** [3] - 15:20, 15:23, 102:13
**resolving** [1] - 59:19
**resources** [1] - 15:24
**respect** [4] - 15:13, 35:12, 42:9, 94:6
**respectfully** [2] - 14:14, 94:20
**respective** [1] - 16:3
**respond** [5] - 61:1, 98:2, 99:25, 100:6, 101:17
**responded** [2] - 33:9, 33:10
**responding** [2] - 94:14, 101:22
**response** [12] - 15:20, 32:18, 39:24, 73:1, 88:14, 96:13, 97:15, 98:20, 99:4, 99:24, 101:16, 101:18
**responsibility** [1] - 53:1
**responsible** [1] - 52:15
**responsive** [1] - 102:4
**rest** [1] - 37:9
**Restaurant** [1] - 57:24
**restaurant** [23] - 27:22, 29:7, 29:12, 30:22, 30:23, 30:24, 36:16, 36:20, 37:1, 37:7, 37:11, 48:18, 50:4, 54:22, 59:12, 76:14, 78:7, 79:7, 80:16, 84:18, 84:19, 85:21, 95:16
**restaurants** [1] - 54:14
**return** [1] - 25:13
**returned** [5] - 13:8, 25:6, 25:9, 25:14, 25:16, 26:11
**revelation** [1] - 42:17
**review** [17] - 20:19, 20:21, 31:21, 37:17, 37:19, 37:25, 39:9, 39:14, 59:2, 61:3, 80:5, 82:19, 82:21, 86:21, 93:10, 93:11, 95:25
**reviewing** [1] - 80:11
**reviews** [1] - 92:21
**revise** [2] - 37:22, 95:17
**revising** [1] - 38:23
**rights** [4] - 4:19, 85:1, 87:25, 90:3
**ring** [1] - 37:3
**rise** [1] - 95:22
**RMR** [2] - 1:17, 104:8
**road** [1] - 103:17
**role** [1] - 16:6
**room** [3] - 8:12, 89:7
**rude** [2] - 34:14, 42:25
**rule** [3] - 26:3, 54:21, 90:8
**Rule** [5] - 3:14, 4:1, 5:8,

21:23, 99:15
**rules** [1] - 90:10
**ruling** [2] - 96:23, 98:8
**run** [1] - 81:10
**runners** [1] - 52:17
**running** [1] - 81:11
**runs** [1] - 81:9
**rush** [1] - 39:12
**rushed** [2] - 39:13, 83:2
**Ryan** [1] - 102:11

## S

**Saloon** [1] - 15:11
**Sarah** [3] - 26:16, 58:8, 70:20
**SAS** [4] - 2:8, 25:1, 66:3, 75:12
**sat** [8] - 34:21, 34:24, 65:9, 76:16, 77:8, 80:11, 81:4, 82:25
**satisfy** [1] - 102:13
**savvy** [1] - 53:22
**saw** [1] - 39:2
**scared** [2] - 42:3, 42:5
**schedule** [2] - 99:20, 99:22
**Schneider** [1] - 6:22
**scope** [1] - 50:18
**screen** [9] - 40:25, 47:7, 61:18, 61:20, 61:23, 62:1, 62:3, 63:2, 63:3
**screens** [1] - 89:1
**script** [2] - 58:14, 70:22
**searching** [2] - 76:22, 76:23
**seated** [4] - 17:24, 57:10, 74:22, 88:25
**second** [4] - 5:25, 41:11, 55:2, 100:12
**secretary** [1] - 26:18
**section** [1] - 94:2
**See** [1] - 73:9
**see** [16] - 8:19, 37:19, 40:22, 48:1, 48:21, 51:19, 52:24, 53:3, 61:24, 73:10, 100:25, 101:8, 101:10, 101:15, 102:4
**seeing** [2] - 85:10, 100:25
**seek** [1] - 7:9
**seeks** [1] - 15:23
**send** [1] - 60:24
**sense** [3] - 22:16, 22:19, 98:25
**sent** [12] - 13:22, 13:23, 13:24, 43:25, 44:4, 44:7, 44:24, 60:21, 61:24, 68:8, 69:1, 69:2
**sentence** [4] - 41:18, 54:25, 82:5

**sentences** [2] - 20:5, 38:23
**separate** [1] - 102:14
**sequestering** [1] - 56:23
**series** [1] - 12:15
**server** [1] - 52:24
**servers** [2] - 10:12, 30:13
**serving** [1] - 79:14
**session** [1] - 102:14
**set** [6] - 11:6, 25:11, 49:7, 75:24, 76:17, 99:20
**settle** [3] - 12:8, 35:15, 35:20
**settlement** [2] - 35:17, 59:19
**settling** [1] - 59:22
**several** [1] - 7:14
**shake** [1] - 56:17
**shelf** [1] - 54:6
**shirt** [1] - 34:5
**shook** [2] - 77:7, 77:8
**short** [1] - 102:8
**shot** [1] - 61:18
**shots** [6] - 61:20, 61:23, 62:1, 62:3, 63:2, 63:3
**show** [14] - 5:24, 6:1, 6:3, 12:13, 13:20, 21:6, 37:21, 40:7, 41:4, 47:7, 62:5, 62:6, 62:10, 92:17
**showed** [1] - 13:14
**showing** [1] - 38:19
**shown** [2] - 82:18, 95:18
**shows** [1] - 89:4
**side** [3] - 24:3, 27:19, 36:23
**sided** [4] - 4:13, 4:20, 23:9, 23:10
**sides** [1] - 16:16
**sign** [7] - 8:4, 9:15, 36:3, 38:12, 66:20, 71:12, 93:9
**signature** [2] - 38:15, 41:12
**signed** [15] - 10:17, 21:20, 38:11, 38:13, 38:22, 39:5, 39:18, 44:12, 45:13, 51:10, 67:9, 81:18, 83:13, 87:17, 92:16
**significance** [4] - 8:5, 20:8, 86:25, 87:11
**signing** [13] - 4:16, 8:6, 20:9, 22:3, 38:24, 38:25, 51:2, 71:13, 86:21, 86:24, 87:12, 87:16, 87:23
**similar** [2] - 7:1, 77:12
**similarities** [1] - 89:7
**simple** [1] - 30:25, 87:10
**simply** [9] - 7:11, 7:24, 10:3, 14:12, 52:21, 89:21, 90:7, 93:1, 95:18
**simultaneously** [1] - 98:20
**single** [2] - 80:18, 92:22
**sister** [2] - 81:7, 81:13

**sit** [3] - 2:23, 51:13, 53:4
**sitting** [6] - 27:9, 34:2, 34:3, 34:22, 42:19, 85:6
**situation** [1] - 12:3
**six** [1] - 76:17
**Slavinski** [1] - 5:21
**social** [1] - 81:10
**soil** [3] - 48:19, 48:24, 49:20
**someone** [5] - 18:12, 43:4, 54:20, 73:19, 76:24
**sometime** [1] - 13:19
**somewhat** [2] - 22:22, 51:24
**somewhere** [1] - 83:7
**soon** [1] - 8:14
**sorry** [14] - 4:21, 19:15, 23:3, 26:6, 27:4, 40:17, 45:19, 53:21, 57:15, 75:2, 76:9, 83:11, 86:15, 97:23
**sort** [5] - 18:10, 91:9, 93:22, 98:11, 100:11
**sounded** [1] - 80:23
**sounds** [1] - 55:7
**Spa** [1] - 2:7
**spawned** [1] - 15:21
**speaker** [1] - 89:6
**speaking** [10] - 4:8, 9:5, 22:14, 30:6, 31:3, 71:14, 71:16, 85:2, 87:23, 92:4
**specific** [1] - 100:6
**specifically** [2] - 3:21, 86:12
**specifics** [1] - 27:13
**spectator** [1] - 90:19
**Spell** [1] - 74:17
**spell** [1] - 57:4
**spelling** [2] - 68:2, 80:16
**spend** [1] - 102:11
**spent** [1] - 79:2
**spoken** [5] - 3:23, 23:19, 42:14, 44:14, 75:23
**St** [16] - 1:17, 26:17, 26:20, 27:10, 27:14, 28:1, 28:10, 28:22, 28:25, 58:8, 58:11, 70:20, 71:8, 88:15, 89:25
**staff** [1] - 9:8
**stand** [7] - 17:12, 56:24, 57:9, 74:12, 74:22, 89:18, 95:14
**standard** [6] - 5:17, 10:19, 11:5, 11:14, 94:9, 95:3
**Starbucks** [22] - 12:18, 13:12, 18:24, 31:3, 31:12, 33:3, 33:5, 33:11, 33:17, 33:21, 34:1, 41:7, 64:5, 64:6, 64:14, 68:6, 69:6, 75:20, 76:7, 76:10, 76:16, 95:11
**start** [3] - 40:18, 78:24, 102:7

**started** [15] - 20:21, 20:24, 22:12, 22:14, 22:15, 34:25, 35:4, 35:10, 36:24, 37:4, 37:14, 53:10, 65:10, 72:11, 79:8
**starts** [1] - 102:21
**state** [3] - 17:6, 57:2, 74:15
**State** [1] - 41:15
**statement** [37] - 3:4, 7:8, 8:14, 9:25, 11:18, 13:3, 37:17, 37:25, 38:6, 38:9, 38:11, 38:14, 60:18, 65:11, 66:4, 66:6, 68:11, 68:13, 71:24, 76:2, 76:6, 76:12, 78:18, 80:12, 81:3, 81:4, 81:16, 81:17, 81:19, 86:24, 87:2, 87:6, 87:12, 87:15, 87:18, 87:19, 93:9
**statements** [6] - 4:17, 37:24, 49:25, 86:2, 86:5, 86:7
**STATES** [2] - 1:1, 1:11
**status** [6] - 4:18, 5:5, 6:9, 8:24, 10:20, 16:18
**stay** [6] - 49:5, 88:9, 101:16, 102:4, 103:8, 103:13
**steak** [2] - 52:24, 53:1
**stenography** [1] - 1:23
**step** [6] - 8:11, 16:23, 52:25, 56:3, 74:8, 88:7
**stepped** [1] - 49:20
**stepping** [3] - 10:14, 48:19, 48:24
**sticker** [1] - 32:11
**still** [5] - 22:16, 36:11, 43:3, 45:5, 92:14
**Stokes** [11] - 25:25, 26:13, 26:21, 27:10, 27:20, 57:17, 57:18, 57:20, 65:19, 75:6, 77:15
**stood** [2] - 77:6, 92:6
**stop** [1] - 58:21
**stopping** [1] - 81:11
**story** [1] - 92:8
**straight** [1] - 17:2
**strategy** [1] - 101:24
**Street** [1] - 95:12
**strike** [3] - 16:1, 23:3, 71:20, 86:16
**strikes** [1] - 16:13
**striking** [1] - 95:4
**stuff** [5] - 19:12, 20:22, 30:11, 37:14, 37:23
**subject** [1] - 59:19
**submit** [2] - 32:3, 88:14
**submitted** [4] - 3:1, 12:19, 30:2, 32:2
**subpoena** [2] - 56:15, 56:16
**subsequently** [1] - 18:12

**substantial** [1] - 12:4
**substantive** [1] - 68:4
**sue** [6] - 11:20, 12:10, 24:13, 60:1, 60:3, 85:11
**sufficient** [3] - 6:7, 11:5, 95:2
**sufficiently** [1] - 7:13
**suggest** [2] - 51:15, 90:20
**suggested** [2] - 64:5, 92:25
**suggesting** [1] - 50:11
**suggestion** [1] - 50:25
**suing** [1] - 53:8
**suit** [2] - 7:17, 36:12
**summary** [17] - 91:6, 97:5, 97:14, 97:21, 98:9, 98:12, 98:21, 98:23, 99:6, 99:14, 99:18, 99:20, 100:2, 100:7, 100:16, 101:8, 101:10
**supervise** [2] - 16:2, 55:19
**supervisor** [1] - 7:5
**supervisory** [1] - 16:6
**support** [4] - 3:2, 10:9, 91:5, 91:11
**supposed** [2] - 42:21, 49:4
**Supreme** [1] - 5:16
**surprising** [1] - 90:5
**survey** [1] - 14:24
**Susanna** [2] - 1:15, 40:14
**sushi** [4] - 22:14, 22:17, 36:17, 79:14
**susie** [1] - 2:17
**sustained** [3] - 21:17, 26:5, 52:10
**sway** [1] - 20:4
**sweatshirt** [1] - 65:3
**Swiss** [1] - 79:5
**switch** [1] - 47:10
**sworn** [11] - 8:4, 9:15, 17:10, 57:7, 74:19, 87:1, 87:6, 87:15, 87:18, 87:19, 96:2

### T

**table** [15] - 2:24, 20:14, 34:3, 34:18, 52:16, 52:19, 54:3, 54:9, 54:10, 54:11, 54:12, 54:16, 54:18, 55:9, 55:15
**tables** [1] - 76:16
**team** [1] - 61:24
**technically** [1] - 53:22
**telephone** [7] - 31:4, 31:16, 31:22, 47:1, 54:1, 92:21, 95:10
**telephonic** [3] - 70:14, 71:16, 89:24
**telephonically** [1] - 73:25
**ten** [3] - 76:20, 97:4, 97:24

**term** [1] - 65:2

**terms** [12] - 5:12, 5:13, 7:11, 10:2, 10:5, 51:1, 89:22, 91:6, 92:8, 92:20, 96:8, 100:7

**testified** [1] - 50:23

**testify** [2] - 13:16, 56:20

**testimony** [13] - 8:12, 13:14, 34:24, 42:16, 52:4, 89:19, 90:17, 95:3, 95:12, 95:16, 95:24, 96:2, 96:10

**text** [34] - 12:15, 13:24, 18:9, 18:20, 24:2, 32:23, 33:9, 33:10, 44:1, 44:4, 44:10, 44:21, 60:21, 60:24, 61:1, 61:3, 61:7, 61:8, 61:9, 61:16, 61:20, 63:4, 63:6, 63:10, 63:22, 68:8, 68:17, 68:25, 69:5, 69:23, 72:7, 72:10, 72:14, 73:8

**texted** [6] - 23:18, 43:7, 43:9, 43:11, 45:1, 64:21

**thanked** [1] - 65:10

**THE** [132] - 1:10, 2:2, 2:5, 2:10, 2:19, 2:23, 6:25, 8:11, 8:17, 10:18, 11:1, 11:10, 13:7, 13:16, 14:16, 15:4, 15:10, 17:2, 17:5, 17:8, 17:12, 17:13, 17:23, 18:18, 18:19, 21:17, 22:1, 22:10, 22:25, 26:3, 26:8, 28:19, 30:1, 32:5, 32:7, 32:9, 32:11, 32:16, 32:20, 39:21, 39:25, 40:4, 40:8, 40:11, 40:13, 40:15, 40:18, 40:24, 45:23, 46:11, 46:15, 46:21, 46:25, 47:5, 47:8, 47:10, 47:17, 47:21, 47:24, 50:20, 51:4, 51:19, 52:6, 52:9, 53:22, 55:2, 55:4, 55:24, 56:3, 56:6, 56:9, 56:14, 56:16, 56:18, 56:22, 56:24, 57:3, 57:4, 57:6, 57:9, 61:13, 62:6, 62:9, 62:13, 62:15, 62:18, 62:21, 63:16, 63:18, 70:6, 70:7, 74:8, 74:12, 74:16, 74:17, 74:18, 74:21, 82:11, 82:13, 86:14, 87:14, 88:5, 88:7, 88:12, 88:18, 88:21, 88:25, 89:14, 91:21, 94:22, 96:17, 96:22, 97:7, 97:12, 97:17, 97:22, 97:24, 99:2, 99:17, 99:24, 100:19, 100:24, 101:3, 101:7, 101:25, 102:10, 102:25, 103:3, 103:5, 103:8, 103:11, 103:15

**themselves** [3] - 18:15, 34:20, 34:22

**they've** [1] - 84:18

**thinking** [1] - 98:18

**third** [2] - 90:19, 91:13

**thorough** [1] - 11:4

**thoroughly** [3] - 8:22, 8:23, 9:16

**threaten** [1] - 41:21

**threatened** [2] - 5:25, 6:5

**threatens** [1] - 6:2

**three** [1] - 20:5

**threw** [1] - 82:14

**throughout** [1] - 79:20

**ticking** [2] - 102:7

**timely** [2] - 16:7, 90:11

**tip** [14] - 10:13, 19:12, 35:12, 50:3, 50:7, 54:19, 66:13, 66:14, 79:19, 79:21, 79:23, 84:19, 84:20

**tipped** [3] - 22:18, 49:2, 50:9

**tipping** [3] - 48:19, 49:6, 49:11

**Title** [1] - 41:19

**today** [7] - 17:22, 27:9, 51:13, 53:4, 85:6, 101:5, 102:20

**together** [3] - 58:13, 80:15, 96:22

**Tom** [15] - 1:4, 2:6, 27:15, 28:10, 29:23, 43:20, 67:18, 71:2, 74:2, 75:10, 77:20, 82:16, 84:17, 92:12, 96:7

**Tom's** [1] - 8:25

**tomorrow** [1] - 102:24

**took** [5] - 37:22, 61:18, 61:20, 62:3, 63:2

**topics** [2] - 78:21, 79:25

**total** [1] - 23:18

**touch** [1] - 40:25

**toward** [1] - 82:6

**town** [1] - 66:16

**Tracy** [3] - 1:17, 104:7, 104:8

**trained** [2] - 47:16, 79:10

**training** [4] - 47:18, 79:11, 102:13, 102:14

**transcribed** [1] - 58:25

**TRANSCRIPT** [1] - 1:10

**transcript** [11] - 1:23, 31:22, 31:25, 32:4, 32:18, 46:13, 46:24, 47:1, 54:1, 92:21, 104:3

**transcription** [9] - 8:20, 9:4, 10:11, 10:16, 46:7, 46:17, 47:23, 59:3, 59:5

**transferred** [2] - 29:1, 58:9

**Transloading** [1] - 6:22

**transparency** [1] - 23:18

**transparent** [1] - 9:9

**trial** [1] - 102:14

**tried** [1] - 28:15

**trigger** [2] - 14:19, 101:18

**true** [10] - 19:17, 26:8, 31:25, 35:9, 41:16, 44:20, 59:5, 63:6, 63:10, 93:13

**trust** [1] - 39:17

**trusting** [1] - 48:9

**truth** [5] - 53:7, 78:14, 85:19, 87:5

**truthful** [2] - 9:9, 87:3

**try** [4] - 12:8, 51:4, 78:17, 97:13

**trying** [5] - 20:4, 42:11, 97:9, 97:20, 103:1

**Tuesday** [1] - 31:12

**turn** [6] - 47:6, 51:21, 53:19, 53:20, 56:9, 80:10

**turned** [1] - 19:10

**turning** [4] - 48:16, 51:7, 51:9, 72:6

**twice** [1] - 87:3

**two** [19] - 12:14, 20:15, 34:4, 34:5, 34:21, 34:25, 37:23, 42:19, 58:18, 60:13, 63:25, 66:7, 81:21, 81:24, 84:21, 93:12, 95:17, 96:7

**type** [2] - 14:19, 34:13

**types** [2] - 8:7, 73:5

**typing** [6] - 20:17, 66:23, 66:24, 67:1, 80:4, 87:5

**U**

**ultimately** [2] - 95:13, 96:3

**Umstead** [2] - 2:7, 24:24

**unaware** [1] - 9:23

**uncertainty** [1] - 78:1

**unclear** [1] - 29:8

**Under** [1] - 87:16

**under** [16] - 8:6, 11:21, 15:15, 20:9, 33:13, 38:14, 39:1, 41:15, 41:18, 45:10, 84:5, 86:24, 87:12, 87:23, 94:1

**undercut** [1] - 96:11

**underlying** [1] - 7:17

**undermine** [1] - 6:13

**understood** [13] - 4:6, 12:20, 12:25, 30:5, 30:6, 30:12, 30:19, 30:22, 36:15, 50:10, 58:15, 58:17, 89:10

**undue** [1] - 93:24

**unified** [1] - 97:12

**UNITED** [2] - 1:1, 1:11

**universally** [1] - 11:22

**unmarried** [1] - 84:6

**up** [26] - 3:24, 16:22, 17:2, 20:24, 25:11, 37:4, 39:21, 40:19, 47:4, 47:5, 47:6, 50:22, 59:20, 64:6, 65:5, 67:1, 75:24, 76:17, 77:6,

**true** [10] - 19:17, 26:8, ...

81:7, 82:14, 83:22, 87:3, 87:5, 93:4, 102:21

**upcoming** [1] - 96:24

**urge** [1] - 94:6

**usage** [1] - 91:4

**usurping** [1] - 90:21

**utilized** [2] - 7:25, 9:19, 91:10

**utilizing** [3] - 21:13, 21:20, 86:5

**V**

**vague** [4] - 10:5, 22:20, 27:24, 30:21

**vagueness** [1] - 30:19

**Ventures** [3] - 1:7, 2:7, 2:8

**version** [1] - 93:17

**versus** [10] - 2:6, 5:17, 5:21, 6:22, 15:10, 27:15, 50:24, 75:11, 89:16, 91:25

**view** [1] - 61:19

**vocal** [1] - 35:2

**voice** [2] - 25:11, 42:1

**voluntarily** [4] - 12:13, 12:14, 12:16, 14:1, 25:9, 33:16, 83:10, 83:12

**voluntary** [6] - 31:10, 31:17, 58:18, 58:20, 78:10, 92:18

**W**

**W-h-i-t-l-o-c-k** [1] - 57:5

**wages** [2] - 19:9, 19:19

**Wagner** [11] - 25:25, 26:13, 26:21, 27:10, 27:21, 57:17, 57:18, 57:20, 65:20, 75:6, 77:16

**Wai** [14] - 1:4, 2:6, 8:25, 19:21, 28:10, 36:12, 53:8, 67:18, 71:1, 74:2, 75:10, 77:19, 80:17, 84:17

**Wai's** [1] - 80:19

**wait** [2] - 26:19, 27:4

**walk** [1] - 40:18

**walked** [8] - 4:8, 20:12, 23:15, 43:10, 43:15, 65:5, 67:8, 76:24

**wants** [1] - 53:3

**warrant** [1] - 6:8

**warranting** [2] - 7:14, 95:22

**watch** [1] - 16:23

**wearing** [2] - 34:5, 64:22

**week** [2] - 72:16, 102:6

**weeks** [2] - 43:16, 60:23

**weird** [2] - 20:23, 53:11

**whatsoever** [1] - 103:14

**Whitlock** [69] - 8:21, 12:12, 12:14, 12:17, 12:25, 13:24, 18:19, 19:13, 26:15, 29:1, 29:3, 29:5, 29:11, 29:19, 29:20, 30:17, 30:20, 31:1, 31:5, 31:9, 31:15, 32:1, 32:22, 33:16, 34:8, 34:12, 36:15, 38:8, 41:6, 41:21, 42:5, 43:7, 43:9, 44:11, 45:14, 46:8, 46:20, 48:3, 48:8, 48:13, 48:23, 49:10, 52:1, 54:2, 54:16, 55:8, 56:13, 56:19, 57:3, 57:14, 62:23, 65:15, 70:4, 70:13, 72:6, 72:15, 74:5, 75:23, 76:3, 76:15, 77:16, 78:9, 90:2, 93:3, 93:5, 93:13, 93:17, 93:19

**WHITLOCK** [4] - 57:12, 70:11, 105:13, 105:15

**Willett** [1] - 102:11

**willfully** [1] - 37:20

**willing** [3] - 60:18, 60:22, 71:24

**wish** [3] - 80:9, 90:14, 91:22

**WITNESS** [11] - 17:8, 18:19, 47:8, 55:4, 56:16, 57:3, 62:21, 70:6, 74:16, 74:18, 82:13

**witness** [30] - 3:8, 3:22, 11:12, 14:12, 16:21, 17:4, 17:10, 17:12, 17:23, 26:7, 32:12, 55:25, 56:4, 56:11, 56:14, 57:7, 57:9, 62:7, 62:10, 62:16, 74:9, 74:10, 74:19, 74:22, 77:13, 78:23, 89:18, 94:12, 95:14, 96:8

**witness's** [1] - 47:7

**woman** [1] - 26:16

**women** [1] - 42:19

**WOOD** [1] - 1:10

**wooden** [1] - 16:24

**word** [2] - 48:10

**word-for-word** [1] - 48:10

**wording** [2] - 80:21, 82:5

**words** [8] - 20:4, 28:4, 28:5, 65:18, 67:20, 82:2, 82:4, 93:14

**works** [2] - 41:2, 48:11

**worth** [3] - 81:22, 81:24, 93:12

**write** [2] - 20:5, 48:11

**writing** [2] - 20:19, 102:1

**written** [5] - 7:7, 13:3, 20:16, 55:6, 80:5

**Y**

**year** [7] - 3:17, 15:11, 19:6, 19:7, 19:23, 30:18, 92:11

**yell** [1] - 41:24

**yelling** [1] - 52:17

**yes-or-no** [1] - 87:10

**York** [1] - 102:23

**yourself** [4] - 28:17, 36:16, 43:1, 77:5

**yourselves** [1] - 2:4