**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:17-cv-00098-FL**

| | |
|---|---|
| WAI MAN TOM, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| HOSPITALITY VENTURES, LLC, d/b/a UMSTEAD HOTEL AND SPA, NC CULINARY VENTURES LLC, d/b/a ÃN ASIAN CUISINE, and SAS INSTITUTE, INC., | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiffs in this action are former servers and server assistants who worked at defendant Ãn Asian Cuisine, an upscale restaurant that previously operated in Cary, North Carolina. They primarily contend that Ãn failed to pay them the minimum wage required by the Fair Labor Standards Act, and they additionally claim they did not receive proper overtime compensation.

Nevertheless, the facts are undisputed that Ãn was relatively unique among restaurants in that a substantial and consistent portion of its business came from large parties of six guests or more. Ãn regularly applied an automatic service charge of

20% to the bills of such groups. It then distributed the proceeds among its service staff, including the plaintiffs.

This practice resulted in the plaintiffs regularly earning over time and one half the federal minimum wage of $7.25 per hour and receiving over half of their compensation in a "representative period" from service charges. Indeed, some of Ãn's servers earned between $60,000 and $80,000 per year as a consequence of the restaurant's service charge distributions. Accordingly, plaintiffs came within the commission employee exemption to overtime established under 29 U.S.C. § 207(i) of the FLSA (herein referred to interchangeably as "§7(i)," or "§7(i) exemption"), during the overwhelming majority of the weeks they worked for Ãn. *See Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir.1987). Moreover, as plaintiffs had a regular rate of pay that exceeded time and one-half the minimum wage, it is axiomatic that they cannot now claim to have received less than the minimum wage.

In addition, plaintiffs allege that Ãn violated the FLSA's minimum wage requirements because it operated an "illegal tip pool" that wrongly included the restaurant's sushi chefs and expeditor as participants. This claim, however, is inherently precluded because the plaintiffs satisfied the time and one-half requirement of the §7(i) exemption rendering the tip pool superfluous. Even so, the evidence also establishes that there was nothing unlawful about Ãn's tip pool. The

employees whom the plaintiffs cite as improper participants, actually were integral to the restaurant's stream of customer service and had more than de minimis interaction with Ãn's guests. Thus, they were every bit as eligible to participate in the pool as the plaintiffs. Defendants, therefore, respectfully submit that for these reasons and those stated below, they are entitled to summary judgment in their favor on all of the plaintiffs' claims.[1]

## STATEMENT OF FACTS

Defendant NC Culinary Ventures, LLC, d/b/a Ãn Asian Cuisine ("Ãn") operated as an upscale, fine-dining restaurant in Cary, North Carolina, serving local residents as well as business people traveling to the Research Triangle area until it closed its doors on January 28, 2017.[2] Ãn was unique in that it did most of its business during the week, specifically Monday through Thursday.[3] A large portion of Ãn's income came from large groups, especially businesses hosting meetings, holiday parties and other events in the private or semi-private dining rooms.[4] On

---

[1] Defendants deny that defendants Hospitality Ventures, LLC, d/b/a Umstead Hotel and Spa, and SAS Institute, Inc., were the plaintiffs' employers under the FLSA or the North Carolina Wage and Hour Act. *See* Answer to Amended Complaint, Affirmative Defense No. 5, Doc. 69, p. 31. Nevertheless, this issue is not material to the present Motion which is filed on behalf of all defendants.

[2] Statement of Undisputed Material Facts ("SMF") at ¶ 1.

[3] An was closed on Saturdays and Sundays except for the dinner shift on Saturday. *Id*. at ¶ 2.

[4] "We had groups from SAS. We also had groups from Biogen, Cisco Systems. We had Verizon, John Deere, a lot of other large companies around here, MetLife. And they took advantage of the fact that we did have private rooms available." *Id*. at ¶ 3.

weeknights, it was not unusual for the dining room to be empty and the private dining rooms to be full.[5]

The plaintiffs in this action are former servers and server assistants - referred to as "front waits" and "back waits" respectively - who worked at Ãn.[6] Both front waits and back waits were responsible for knowing the menu fully and for ensuring guest satisfaction.[7] Named plaintiff, Wai Man Tom ("Tom"), and former named plaintiff Brandon Kelly ("Kelly") were front waits as well as "captains."[8] They were given the title of "captain" based on their experience at An and their familiarity with the operations of the restaurant.[9]

As discussed more fully in the Statement of Material Facts, sushi chefs and expeditors had interaction with guests on a daily basis.[10] Sushi chefs engaged with guests while making sushi at the sushi bar, occasionally serving the sushi directly to the guest.[11] The primary expeditor, Nicholas Papas[12], ensured that guests dining at Ãn experienced the level of service expected of a fine dining restaurant, which included receiving the correct dish, with the appropriate modifications, while the

_____

[5] *Id.*
[6] *Id.* at ¶ 4.
[7] *Id.* at ¶ 5.
[8] *Id.* at ¶ 6.
[9] Tom and Kelly also received a two-percent (2%) premium from the tip pool due to their status as "captains". *See id.*
[10] *Id.* at ¶¶43 and 46.
[11] *Id.* at ¶ 46.
[12] *Id.* at ¶ 49.

food was still fresh and hot.[13] To do this, the expeditor had to "connect" with the guests regarding the menu.[14]

While working at Ãn, all plaintiffs received direct hourly wages, tips, and service charges.[15] A new hire would start at $2.13 per hour, whereas some more experienced servers/servers' assistants received more than that.[16] In addition to their hourly wage, plaintiffs received tips, which they understood to be additional amounts left by guests at their discretion.[17] For parties of six or more people, including private dining parties, plaintiffs received a non-discretionary, automatic gratuity (hereinafter "service charge") of twenty-percent (20%) of the total amount reflected on the guests' bill. So, if the bill for a private party amounted to over one thousand dollars, which it frequently did, plaintiffs would receive at least two hundred dollars in the form of a service charge. Guests had the option of leaving a tip in addition to the service charge, but they were required to pay the 20 % service charge.[18]

---

[13] *Id.* at ¶ 52.
[14] *Id.* at ¶ 53.

[15] *Id*. at ¶ 7.
[16] *Id*.
[17] Q:    You said that the auto-gratuity is something that the manager would put on and it would automatically charge someone 20 percent of their check –
A:    Correct.
Q:    -- but a tip, on the other hand, is discretionary; right? …
A:    A tip is voluntary.  Correct.
*Id*. at 7.
[18] *Id*. at ¶ 8.

Case 5:17-cv-00098-FL   Document 102   Filed 05/01/18   Page 5 of 42

Prior to the implementation of a tip pool system in July 2014, servers did not pool their tips.[19] The impetus behind this policy change was upper management's observation of favoritism towards certain servers, including named plaintiff Tom and former named plaintiff Kelly.[20] Management was assigning Tom, Kelly and other tenured servers the majority of the large parties that dined at Ãn. This practice operated to the detriment of servers with less seniority who waited on less lucrative tables while helping run food to the larger parties without reaping any of the benefits. The result was a lack of team work among the servers. At a five-star, fine-dining restaurant like Ãn, where the goal was "to provide [the] guests with the highest level of service possible," team work is essential. In order to instill more of a 'team mentality' amongst the service staff, Ãn implemented a tip pool.[21]

After Ãn's PM[22] Tip Pool policy (the "Tip Policy") was implemented, servers pooled the tips and service charges that they received from guests, and this amount was allocated among the rest of the service team as follows:

Regular Dining Tip Policy:  From the Ãn's PM Tip Pool, the following percentages are "tipped out" during regular dining shifts (Buyouts and Special Events have a different tip pool allocation, as described below):

---

[19] Front waits retained sixty-five percent (65%) of their tips and 'tipped out' the remaining thirty-five (35%) to the other members of the service team, specifically, server assistants/runners, expediter, bartenders, and sushi chefs. *Id*. at ¶ 9. In the words of former Ãn Executive Chef, Josh Hughes, it was a "dog eat dog" policy, and there were complaints that it was unfair because the more experienced servers were given the best tables and thus received the majority of the tips. *Id*.
[20] *Id*. at ¶ 10.
[21] *Id*. at ¶10 (after the tip pool was implemented, the distribution of tips seemed more fair.)
[22] The new tip pool policy only applied to the p.m. shift. *Id.* at ¶ 11.

- Captain: 2% Premium of the Ãn's PM Tip Pool
- Server: 54% of the Ãn's PM Tip Pool
- Bartender: 4% of the Ãn's PM Tip Pool
- Sushi Chef: 4% of the Ãn's PM Tip Pool
- Server Assistant/Runner/Expo: 36% of the Ãn's PM Tip Pool
- Hostess: 100% of all Tips received from TO-GO orders

Before the initial implementation of the Tip Policy, each person participating in the tip pool signed off on the Tip Policy, and subsequently, each new hire was required to sign off on the Tip Policy, which was outlined in the employee handbook.[23] Plaintiffs were aware of the Tip Policy and how it operated.[24]

The Tip Pool policy operated for nearly three years before the restaurant closed its doors.[25] Plaintiffs complained about their tips, as is common, if not expected, among servers.[26] Notably, however, no one quit their job at Ãn due to compensation, presumably because plaintiffs were earning an income of anywhere from $60,000 to $80,000 each year, exceeding the salaries of most managers at Ãn.[27] In fact, as discussed more fully below and as detailed in the Statement of Undisputed Material Facts, plaintiffs satisfied the §7(i) exemption from overtime-pay for the majority of the weeks they worked at Ãn. In other words, their regular rate of pay

---

[23] *Id*. at ¶ 12.

[24] *Id*. at ¶ 13.

[25] *Id*. at ¶ 14.

[26]    Q:    "[I]n your 36 years of experience in the restaurant industry, have you ever worked at a restaurant where the tipped employees did not complain about sharing their tips?
    A:    No.
Clore Dep. at 121:7-11.

[27] SMF at ¶ 14.

was 1.5 times the minimum wage and over one-half their compensation came from service charges. Further, while plaintiffs contend that the participation of the sushi chefs and expediter invalidated Ãn's tip pool, as discussed more fully below and as detailed in the Statement of Undisputed Material Facts, the sushi chefs and expediter fully participated in the stream of customer service at the restaurant and thus were proper participants in the tip pool.

## ARGUMENT

I.  <u>Summary Judgment Standard of Review.</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When no genuine issue of any material fact exists, summary judgment is appropriate. *See Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).

II.  <u>Plaintiffs satisfied the requirements of 29 U.S.C. §207(i) as employees exempt from overtime; therefore, their claim for overtime-pay is ripe for dismissal.</u>

Plaintiffs' entire case is based on their incorrect allegation that they were not paid minimum wage and overtime as required under the Fair Labor Standards Act

(hereinafter the "FLSA"). The FLSA requires an employer to pay its employees the minimum wage for all hours up to 40 in a workweek, and at a rate not less than one and one-half times the regular rate of pay for any hours exceeding 40 in a workweek. *See* 29 U.S.C. §206(a)(1), §207(a)(1). The statute does provide, however, for certain exemptions from these requirements, and such exemptions should be given a fair interpretation. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (recognizing that "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, 'there is no reason to give [them] anything other than *a fair* (*rather than a 'narrow'*) interpretation.'") (emphasis added).

One such exemption is the exemption from overtime-pay requirement contained in 29 U.S.C. §207(i) (the "§7(i) exemption"):

> No employer shall be deemed to have violated subsection (a) by employing *any employee of a retail or service establishment* for a workweek in excess of the applicable workweek specified therein, if (1) *the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate* applicable to him/her under § 6 of the FLSA and (2) *more than half of his/her compensation for a representative period (not less than one month) represent commissions on goods or services*.(*emphasis added*)

Simply put, no overtime wage violation will be found if three requirements are satisfied: (1) the employer is a retail or service establishment; (2) the employee's "regular rate of pay" exceeds 1.5 times the applicable minimum wage ($7.25 per

hour), and (3) more than half of the employee's 'compensation for a representative period (not less than one month) represents commissions on goods or services.' *Id.*

### a. Ãn is a service establishment.

The regulations promulgated by the Department of Labor ("DOL") under §7(i) define "retail or service establishment" as "an establishment 75 per centum of whose dollar volume of sales of goods or services (or both) is not for resale and is recognized as retail sales or services in the particular industry."[28] The regulations provide a partial list of establishments whose sales or service may be recognized as retail, and restaurants appear on this list.[29] Because Ãn unquestionably was a restaurant,[30] defendants satisfy the first requirement of the §7(i).

### b. Plaintiffs' regular rate of pay exceeded one and one-half (1.5) times the minimum hourly rate in workweeks where they worked overtime.

In order to satisfy the second requirement of §7(i), defendants must establish that in workweeks where plaintiffs worked overtime, their regular rate of pay exceeded the lawful overtime rate, or $10.88 ($7.25 x 1.5 = $10.875).[31] Section

---

[28] *See* 29 C.F.R. Part 779.312 -313, 411.

[29] 29 C.F.R. Part 779.320, 779.315, 779.318; *see also* Affidavit of Mr. Jorge Rivero attached to defendants SMF as Exh. "17" and his report entitled "First Supplemental Report and Analysis" attached thereto as Exh. "A" (hereinafter "Expert Report 1") at p. 12 ("The regulations explain that Congress intended that the term 'retail or service establishment' to denote the traditional local retail or service establishment such as grocery stores, hardware stores, clothing stores, furniture stores, **restaurants**, hotels, barber shops, etc. that serve the everyday need of the community in which they are located.") Mr. Rivero is a former District Director of the DOL in South Florida.

[30] *See* Am. Compl. at ¶¶ 12, 16.

[31] This determination requires a workweek-by-workweek analysis. Expert Report 1 at p. 13.

207(e) of the FLSA defines "regular rate" so as "to include all remuneration for employment paid to, or on behalf of, the employee." 29 C.F.R. § 779.415(a). Thus, in determining plaintiffs' regular rate of pay, the Court may only consider payments directly made as compensation for an employee's employment, *to wit* an employee's wages. *Id.* For purposes of determining an employee's regular rate of pay, wages consist of: (1) the employee's hourly wage; (2) any commissions, incentive payments, non-discretionary bonuses received; and (3) any tips considered by an employer in taking a "tip credit."[32] The part of the regular rate which includes the hourly wage is just that – the base wage an employee received per hour. Tips may also be included in the regular rate, but ***any tips received above the tip credit*** (capped at $5.12 per hour ($7.25 minimum wage – $2.13 hourly wage)) ***are not considered wages*** for purposes of the FLSA and are not part of the regular rate.[33] (emphasis added). As explained below service charges are not considered tips, so they are not subject to this tip credit limitation, and are, thus, fully included as wages in the regular rate.

       i.   <u>Service charges are counted as wages and not tips.</u>

---

[32] *See id.* at p. 12-13.

[33] "29 C.F.R 531.59 makes it clear that "the credit allowed on account of tips may be less than that permitted by statute (minimum wage required by section 6(a)(1) minus $2.13); it cannot be more." Consequently, tips received by an employee in excess of the amount of the "tip credit' which an employer is permitted to take under the FLSA are not considered wages for FLSA purposes." *See id.* at p. 13.

Under the FLSA, service charges are considered commissions rather than tips.[34] This fundamental difference is set forth in regulations promulgated by the DOL which distinguish between "tips" and "service charges." 29 C.F.R. §531.52. A tip is "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." *Id*. By contrast, a "service charge" is defined as a "compulsory charge for service ... imposed on a customer by an employer's establishment, [which] is not a tip, and even if distributed by the employer to its employees, cannot be counted as a tip received..." 29 C.F.R. § 531.55(a).

Service charges may be used in their entirety to satisfy the monetary requirements of the FLSA to offset an employer's minimum-wage liability as long as two prerequisites are met: (1) the service charge 'must have been included in the establishment's gross receipts[35] and (2) [the service charge] must have been 'distributed by the employer to its employees.'" 29 C.F.R. § 531.55(b); *see also Prusin v. Canton's Pearls, LLC*, No. CV JKB-16-0605, 2017 WL 5126156, at *6 (D. Md. Nov. 6, 2017) (quoting *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 246 (4th Cir. 2016)).

ii.  <u>Application</u>

---

[34] Expert Report 1 at Exh. C-2 (citing *Field Operations Handbook* Chapter 30d03).
[35] "Gross receipts" is "[t]he total amount of money or other consideration received by a business taxpayer for goods sold or services performed in a taxable year, before deductions." Gross Receipts, Black's Law Dictionary (10th ed. 2014).

Ãn satisfied the first prerequisite because all service charges received from customers were included in Ãn's gross receipts. During the entire Relevant Period,[36] Ãn recorded mandatory gratuities as gross receipts for accounting and tax purposes.[37] For each month during the Relevant Period, Ãn's revenues and expenses were grossed to include service charges and service charges were recorded as both revenue and expense to the restaurant.[38] For each month during the Relevant Period, the restaurant's sales tax expense (sales and use tax and food and beverage tax) was calculated on the incremental service charge revenues and recorded on Ãn's General Ledger as an expense and a liability.[39] For tax purposes, service charges were recorded as follows:

**Sales and Use Tax:** The State of North Carolina assessed a 4.75% tax (and Wake County assessed a 2.0% tax) on the value of all restaurant sales. For each month during the Relevant Period, the monthly food and beverage tax returns filed reflect service charges as gross revenue, and all related taxes have been paid.

**Food and Beverage Tax:** Wake County assessed a 1.0% tax on the value of all restaurant sales. For each month during the Relevant Period, the monthly sales and use tax returns filed reflect service charges as gross revenue, and all related taxes have been paid.

**Income Tax:** All income tax returns filed on behalf of Ãn during the Relevant Period include service charges in gross revenues as well as expenses.[40]

---

[36] *See* Declaration of Scott Remmy (hereinafter "Remmy Dec.") attached to defendants' SMF as Exhibit "16" at ¶ 13. For purposes of defendants' Motion the "Relevant Period" is December 23, 2013 through February 10, 2017. *Id*

[37] *Id.* at ¶ 24.

[38] *Id*. at ¶ 25.

[39] *Id*.

[40] *Id*. at ¶¶ 27-30.

Since all service charges received from customers were treated as income of the business and became part of Ãn's gross receipts for accounting and tax purposes, they are properly considered service charges for purposes of the FLSA, and the first requirement has been satisfied.[41]

Ãn also satisfied the second requirement: that all service charges received be distributed by the employer to its employees. Service charges were recorded separately from discretionary tips for employee tax withholding purposes. "Mandatory gratuities" were accounted for and were included for withholding purposes and reported biweekly in plaintiffs' paystubs.[42] Since Ãn treated service charges received like wages, paying taxes on such fees and distributing these fees to the employees in their bi-weekly paystubs, these service charges may properly be characterized as "wages."

As the record demonstrates, the regular rate of pay for plaintiffs was greater than $10.88 in the overwhelming majority[43] of workweeks where they worked overtime. Simply put, the following formula was satisfied:

---

[41] *Contra Prusin, supra* at *7 (holding the failure to record all mandatory gratuities as part of the restaurant's gross receipts fatal to employer's claim that such charges are properly classified as wages).

[42] *See* Earning Statements of Plaintiff and Opt-In Plaintiffs (hereinafter "Earning Statements") attached to defendants' SMF as Exhibit "19"; *see also* Remmy Dec. at ¶¶ 7-20.

[43] Expert Report 1 at p.13, Exhibit F-1 and F-2; *see also* Remmy Dec. at 22(a)-fn.1.

$$\frac{\textit{Direct Hourly Wages}+ \textit{Service Charges}^{44}}{\textit{Hours worked}^{45}} \qquad = \qquad \geq \$10.89 \textit{ per hour}$$

Thus, the second requirement of §7(i) is satisfied as to those workweeks.[46] Defendants are entitled to summary judgment on plaintiffs' claims under the FLSA for overtime pay because the §7(i) exemption applies.[47]

### c. Commissions, or "service charges," comprised more than half of the plaintiffs' compensation.

To satisfy the third requirement of §7(i), defendants must prove that "more than half [of plaintiffs'] compensation for a representative period (not less than a month) represents commissions on goods or services." Thus, in performing this analysis, it is necessary to total all compensation paid to or on behalf of an employee

---

[44] Plaintiffs' tips were not included in the equation because the tips plaintiffs' received exceeded the tip credit and thus could not be considered compensation for purposes of the FLSA. Expert Report 1 at p. 13 (citing 29 C.F.R. 531.29).

[45] For purposes of this formula, "hours worked" equals hours worked in a representative workweek. Expert Report 1 at p.13 ("This step requires a workweek-by-workweek analysis.")

[46] Defendants concede that there are certain workweeks that did not meet this requirement and, upon the resolution of this case, are prepared to issue the appropriate compensation to plaintiffs for these workweeks. *See* Expert Report 1 at p. 14-15 (calculation of back wages due to plaintiffs amounting to less than $2,000).

[47] The exemption excludes only those weeks in which plaintiffs worked overtime and did not receive more than one and one-half times the minimum wage. *See* Expert Report 1 at Exh. F; *see also Pittman v. McClain's R.V., Inc.*, No. 4:12-CV-542, 2013 WL 12139092, at *12 (E.D. Tex. June 12, 2013) (holding that 29 U.S.C. § 207(i) exemption applies, except with respect to those weeks in which Plaintiffs did not receive more than one and one-half times the minimum wage).

as remuneration for his or her employment during the period and then determine what percentage of that compensation consists of commissions.[48]

      i.    <u>Service Charges Received by Plaintiffs Qualified as Commissions for Purpose of §7(i).</u>

In addition to being wages, service charges may qualify as commissions for purposes of §7(i).[49] As stated by the DOL,

> a service charge, of which all or part is paid directly to service employees, is a 'commission' for purposes of section 7(i), because it is keyed to sales in the sense that it bears a direct relationship to the goods and services which an establishment sells. It is a specific percentage of the bill which the customer is required to pay. We do not believe that tips are commissions for the purposes of section 7(i).[50]

The DOL has issued interpretative guidance for understanding the §7(i) in its Field Operations Handbook.[51] Specifically, the DOL has stated that: "A service charge levied on its customers by an establishment (e.g. hotel, motel, or restaurant), for services rendered by waiters, waitresses, or other such service employees, may

---

[48] The DOL has issued a regulation, 29 C.F.R. §779.415, which interprets §7(i) and states, in pertinent part,

> In determining for purposes of section 7(i) whether more than half of an employee's compensation "represents commissions on goods or services" *it is necessary first to total all compensation paid to or on behalf of the employee as remuneration for his employment during the period* …

[49] *See* Expert Report 1 at p. 10, Exh. D.

[50] This opinion letter was relied upon by the court in *Mechmet v. Four Seasons Hotels, Ltd.*, 639 F. Supp. 330 (N.D. Ill. 1986), which decision was later affirmed by Judge Posner of the Seventh Circuit in *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir. 1987) (percentage service charges used to compensate banquet waiters could only be classified as 'commissions').

[51] U.S. Dept. of Labor, FOH 21a00 et seq., *Field Operations Handbook – 04/07/2016* (2016). Considerable deference is to be accorded to the agency's reasonable interpretations of statutory construction. *National Treasury Employees Union v. Federal Labor Relations Authority*, 732 F.2d 703, 705 (9th Cir.1984).

qualify as a commission pursuant to section 7(i)" provided the other tests under §7(i)
– the regular rate is at least 1.5 times the minimum wage, and at least half of the
employee's pay is from commissions – are satisfied.[52]

The Seventh Circuit has agreed with the DOL, concluding in the landmark
decision *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir. 1987), that
where waiters waited on "big ticket" parties and were not underpaid, the income they
received from service charges could properly be classified as "commission income"
for statutory purposes.[53] *Id*. at 1177.

Following the DOL's guidance and the courts' decisions, the service charges
plaintiffs received should be considered 'commissions' for purposes of satisfying
the §7(i) exemption from overtime. Similar to the service charges in *Mechmet,* the
service charges at Ãn represent a fixed, non-discretionary percentage, *to wit* twenty
percent (20%), of the bill which tables with six or more customers were required to
pay.[54] Because these service charges represented "a specific percentage of the bill
which the customer was required to pay" as distinguished from "a gift or gratuity in

---

[52] *See* Expert Report 1 at p. 10 (the DOL's enforcement policy regarding the qualification of
service charges as commission payments); *see also* U.S. Dept. of Labor, FOH 21h07(a) *Field
Operations Handbook – 04/07/2016.*

[53] "The service charge is more like a commission (which in common parlance often just means a
percentage-based charge or fee) than a gratuity; and to classify it as a commission not only fits the
language of the statute comfortably but also carries out the statute's purposes. The fact that a
contrary interpretation might cause considerable turmoil in a major industry without benefiting
anyone except lawyers…is not a sufficient reason for our decision, but it is not an irrelevant
consideration either." *Mechmet*, 825 F.2d at 1177.

[54] Ãn charged a fixed percentage of 20% for all tables with six or more customers. SMF at ¶15.

recognition of [] services performed"[55] where the customer has an unrestricted right to determine the amount of payment, they are properly classified as 'commissions'.[56]

## ii. Application.

The record establishes that more than half of plaintiffs' compensation during a month-long representative period came from commissions.[57] To determine whether commissions, or 'service charges', made up more than half of plaintiffs' compensation during a month-long period, defendants applied the following formula:

$$\frac{\textit{Total service charges}}{(\textit{Total service charges} + \textit{hourly wages})^{58}} = \begin{array}{l}\textit{the percentage of compensation}\\\textit{plaintiff earned from services}\\\textit{fees in a representative period.}\end{array}$$

For example,[59] during the April 13, 2014 – May 10, 2014 pay periods, named plaintiff Tom's service charges equaled 81% of his total compensation:

$$\frac{\textit{Total service charges}}{(\$1,777.87)} = .8095 \textit{ or } 80.95\% \quad \begin{array}{l}\textit{\% of compensation}\\\textit{plaintiff earned}\end{array}$$

---

[55] 29 C.F.R. § 531.52.; 29 C.F.R. §778.117.

[56] The DOL and the IRS classify service charges as 'commissions' rather than 'tipped income'. *See* Expert Report 1 at p. 9, Exh. D (Federal Insurance Contributions Act (Revenue Ruling 2012-18) and FOH 21h07).

[57] *See* Remmy Dec. at ¶¶ 21-23; SMF at ¶ 27.

[58] During their employment, plaintiffs received hourly wages, discretionary tips and service charges (referenced by most plaintiffs as "auto gratuities"). While it is undisputed that plaintiffs also received discretionary tips from guests, none of these tips would be counted as wages in workweeks where plaintiffs' rate of pay exceeded the minimum wage based on their hourly wage and service charges because Ān could not count those tips for purposes of claiming a tip credit.

[59] Additional examples are detailed in defendants' Statement of Undisputed Material Facts.

$$\frac{(Total\ service\ charges + hourly\ wages)}{(1,777.87 + \$418.26)}$$
$$(\$2,196.13)$$

*from services fees*
*in a representative*
*period.*

An analysis of each plaintiff's pay records shows that "commissions paid to plaintiffs' each pay period were always far greater than the hourly amounts paid, and the greater-than-50% commissions condition was clearly met."[60] Accordingly, defendants satisfy the third and final requirement of the §7(i) exemption from overtime.

For the above reasons, plaintiffs satisfy the §7(i) exemption from overtime-pay so their overtime violation claim fails as a matter of law.

III.  Since Plaintiffs Satisfied the Requirements of 29 U.S.C. §207(i) and Plaintiffs' Wages Exceed the Federal Minimum Wage in all Workweeks Worked, the Tip Credit Requirements of 29 U.S.C. §203(m) are Irrelevant.

The statutory language in the tip credit provision of the FLSA does not contemplate a claim for wages other than minimum or overtime wages.[61] *Trejo v. Ryman Hosp. Properties, Inc.*, 795 F.3d 442 (4th Cir. 2015) (emphasis added) ("§203(m) 'does not state freestanding requirements pertaining to all tipped employees,' but rather creates rights and obligations for employers attempting to use tips as a credit against the minimum wage."). Accordingly, based on the

---

[60] *See* Expert Report 1 at p. 12.
[61] Congress enacted the FLSA with the clear intent of "protect[ing] all covered workers from substandard wages and oppressive working hours…" *Trejo v. Ryman Hosp. Properties, Inc.*, 795 F.3d 442 (4th Cir. 2015).

unambiguous language of § 203(m), the tip credit requirements set forth in §203(m) only apply in situations where an employer is taking a tip credit—using an employee's tip to make up the difference when the employer does not pay minimum wage. *Id.* An employer does not take a tip credit – and thus cannot be found to have violated the tip credit provision of the FLSA – when it satisfies the minimum wage requirement without using any portion of the employees' tips. *Cumbie, supra* (9th Cir.2010).[62]

As discussed above, the evidence shows that plaintiffs' wages, specifically their hourly wage plus commissions, exceeded the federal minimum wage of $7.25 per hour for all weeks worked at Ãn. Since the evidence establishes that plaintiffs received the federally prescribed minimum wage without applying a tip credit, plaintiffs are not entitled to recover under 29 U.S.C. §203(m) as a matter of law.

IV. <u>Alternatively, An's Tip Pool Did Not Violate the Requirements of §203(m).</u>

a. **Applicable Law.**

Even if this Court determines that plaintiffs are not covered under §7(i), plaintiffs' claims under the FLSA fail because plaintiffs participated in a valid tip

---

[62] The court in *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080 (9th Cir. 2016), rejected, but did not overrule, the decision in *Cumbie* that "[t]he FLSA does not restrict tip pooling when no tip credit is taken." Subsequent decisions out of the Eleventh Circuit and Fourth Circuit have declined to follow the Ninth Circuit's reasoning in *Perez*. *See e.g. Aguila v. Corp. Caterers II, Inc.*, 199 F. Supp. 3d 1358, 1361 (S.D. Fla. 2016), aff'd sub nom. *Aguila v. Corp. Caterers IV, Inc.*, 683 F. App'x 746 (11th Cir. 2017) (affirming the ruling in *Cumbie* that if defendants are not paid below the minimum wage, plaintiffs' claims under the FLSA fail).

pooling arrangement with earnings exceeding the applicable minimum wage for all hours worked. Under the FLSA, employers must pay their employees the federal minimum wage, $7.25 per hour. 29 USC §206(a)(1). Tips are not ordinarily considered 'wages' under the FLSA. However, like the analysis above regarding how to calculate the regular rate, the portion of tips used to satisfy the "tip credit" may be designated as wages in order to satisfy an employer's minimum wage requirement under certain circumstances. 29 U.S.C. §203(m). The FLSA provides in relevant part:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to-
>
> (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
>
> (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title [the minimum wage]. *Id; see also Trejo v. Ryman Hosp. Properties, Inc*., 795 F.3d 442, 447 (4th Cir. 2015).

This practice, referred to as 'taking a tip credit,' is lawful under the FLSA as long as (1) tipped employees receive a direct cash wage of $2.13 per hour; and (2) the sum of the money they receive in the form of tips when added to their wages is at or above the minimum wage [$7.25]. 29 U.S.C. § 203(m); *Trejo v. Ryman Hosp. Properties, Inc.*, 795 F.3d 442, 447 (4th Cir. 2015) (citing *Cumbie v. Woody Woo,*

*Inc.*, 596 F.3d 577, 580 (9th Cir.2010)). The tip credit provision of the FLSA only applies to "tipped employees." 29 U.S.C. 203(m). A tipped employee is defined as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. §203(t); *see also* 29 U.S.C. §203(m) (pooling of tips permissible amongst "employees who customarily and regularly receive tips").

When an employee undisputedly receives over $30 a month in tips directly from customers, the employee fulfills the requirements of being a tipped employee under the FLSA, and no further analysis is necessary. *Manning v. St. Petersburg Kennel Club, Inc.*, 2015 WL 477364 at *3 (M.D. Fla. Feb. 5, 2015) (citing *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) ("if a tip-pool participating employees fulfills the subsection 203(t) requirements, she necessarily fulfills the subsection 203(m) requirements as well."). However, when tips are 'undesignated' – when an employee does not receive tips directly from customers[63] – the Court must then determine whether the employee is one who 'customarily and regularly' receives tips such that his or her participation in the tip pool is permissible

---

[63] *See Kilgore, supra* at 301(citing U.S. Dept. U.S. Dept. of Labor Field Operations Handbook § 30d04(a) ("It is not required that all employees who share in tips must themselves receive tips from customers.")).

under the FLSA. This 'undesignated tips scenario' is particularly common in the restaurant industry.[64]

Since the identification of those employees who "customarily and regularly receive tips" is not expressly defined by statute, the courts have relied on several tools to determine who may participate in a tip pool. *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186 (5th Cir. 2015). One such tool is the DOL's Field Operations Handbook which lists "waiters/waitresses"; "bellhops"; "counter personnel who serve customers"; "busboys/girls (server helpers)"; and "service bartenders" as tipped occupations and "[j]anitors"; "[d]ishwashers"; "[c]hefs or cooks"; and "[l]aundry room attendants" as non-tipped occupations. U.S. Dep't of Labor, Field Operations Handbook § 30d04(a), (c) (1988). Another such tool employed by the courts for guidance are the DOL's opinion letters. *See generally Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186 (5th Cir. 2015). The opinion letters, like the Handbook, provide guidance as to the DOL's view of which employees customarily and regularly receive tips. "The opinion letters make clear that one's status as an employee who 'customarily and regularly receives tips' is 'determined on the basis of his or her activities,' not on the employee's job title."

---

[64] *Montano v. Montrose Rest. Assocs., Inc*., 800 F.3d 186, 190 (5th Cir. 2015) (Unlike tips that are given directly to a recipient—e.g., a parking attendant or bellhop—restaurant tips are left on the table, and are usually "undesignated.") (citing *Austin v. Colonia Williamsburg Hotel Props., Inc.*, No. 4:95CV130, 1996 WL 406671, at *1 (E.D.Va. June 14, 1996) ("The tips which are left after a meal are ordinarily undesignated. That is, the customer will ordinarily leave one tip and not designate to whom any portion of the tip should be given."))

*Montano*, 800 F.3d at 191 (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 998047, at *2 (Nov. 4, 1997)); *see also* 29 C.F.R. § 531.56. As the Fifth Circuit Court of Appeals stated in *Montano*,

> [L]abels are easily molded to fit a party's goals and cannot be determinative of whether an employee customarily and regularly receives tips.[65]

Because tips, by definition, are given "in recognition of some service performed for the customer," a court or a factfinder should also consider whether the employee is engaging in customer service functions. *Montano, supra* at 193.[66] For example, in *Montano,* the Fifth Circuit denied summary judgment on behalf of the restaurant holding that a "coffeeman's level of customer interaction in a customer service role was non-existent or minor enough such that he [was] more similar to a cook or a dishwasher than [] to a waiter or a busboy where he had only de minimus customer interaction (one occasion per week). *Montano, supra* at 194–95 (The coffeeman carried large trays to the dining room about once per week but he spent "most of his time in the kitchen making coffee and did not take customer orders, did not pour water or arrange water glasses, and did not help prepare bread."). On remand, the jury (again) ruled in favor of the restaurant, and the jury's verdict was affirmed by

---

[65] "Determining whether an employee is one who 'customarily and regularly receives tips' is a fact-intensive inquiry that requires a case-by-case analysis of the employee's duties and activities." *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 194 (5th Cir. 2015).

[66] Despite plaintiffs' allegations, the proper inquiry is **not** whether the employee works in the front of the house versus the back of the house. *See Montano* at 193 ("Even an employee who works in the dining room will not be considered a tipped employee if his work is not customer service-oriented, for example, an electrician who is repairing a chandelier for the restaurant.").

the Fifth Circuit. *Montano v. Montrose Rest. Assocs., Inc.*, No. 17-20223, 2018 WL 1254909, at *1 (5th Cir. Mar. 9, 2018).[67]

By contrast, in *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998), the Sixth Circuit held that hosts were "engaged in an occupation in which [they] customarily and regularly receive[ ] ... tips" because they sufficiently interact with customers in [the restaurant industry] where undesignated tips are common. In making its determination, the *Kilgore* court distinguished hosts from other restaurant employees "like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all." *Id*. at 301.

> [L]ike bus persons, who are explicitly mentioned in 29 C.F.R. § 531.54 as an example of restaurant employees who may receive tips from tip outs by servers, ***hosts are not the primary customer contact but they do have more than de minimis interaction with the customers***. *Id*. (emphasis added).

In a subsequent decision, the Sixth Circuit held that salad preparers, who "abstained from any direct intercourse with diners, worked entirely outside the view of restaurant patrons, and solely performed duties traditionally classified as food preparation or kitchen support work [] could not be categorized as 'tipped

---

[67] The jury in *Montano* was instructed as follows:

5. Restaurant customers usually leave cash or add a tip to a charge receipt without indicating how it is to be allocated among the workers on the team whom they intend to tip. Your job is to decide whether the coffeeman is one of the workers whom customers would ordinarily intend to compensate with their tips.
6. The coffeeman must directly and substantially assist with customer service and have more than minimal exposure to customers.

employees' under section 203(m)." *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999).

The commonality of analysis in the opinions issued by the Department of Labor and interpretative case law establishes that all that is required for an employee to participate in a tip pool is for the employee to "have more than a de minimis interaction with the customers who leave the undesignated tips."[68] To be disqualified from receiving tips under the FLSA, an employee must "abstain [] from ***any*** direct intercourse with diners, work[] ***entirely outside*** the view of patrons, and ***solely*** perform [] duties traditionally classified as food preparation or kitchen support work …" *Mould v. NJG Food Service, Inc.*, 37 F.Supp.3d 762, 770 (D. Md. 2014) (citation omitted) (emphasis added). In sum, to determine whether an employee is one who 'customarily and regularly receives tips', a court or a fact finder must conclude that: (1) an employee's customer interaction is more than *de minimus*, and (2) the employee performs important customer service functions. *See generally Kilgore, supra*; *see generally* Expert Report 2.

### b. Only Employees Who "Customarily and Regularly" Received Tips Participated in Ãn's Tip Pool and Thus Ãn's Tip Pool was Lawful.

---

[68] *Montano*, 800 F.3d at 193; *see also* Affidavit of Jorge Rivero attached to defendants' SMF as Exh.17 and his report entitled "Second Supplemental Report and Analysis" attached thereto as Exhibit "B" (hereinafter "Expert Report 2") at p. 13, Exh. C-2 (In recognizing barbacks as "tipped employees," the Wage and Hour Division acknowledged that ***even occasional interaction with customers was sufficient*** to bring them into an occupation recognized as one in which employees customarily and regularly receive tips and, therefore, eligible to participate in a tip pool.).

In this case, plaintiffs contend that the sushi chefs as well as the expediter at Ãn were not employees who 'customarily and regularly' received tips. However, the evidence shows that the interactions of these employees with customers was more than *de minimus,* and they performed important customer service functions. Thus, these employees were properly included in Ãn's tip pool. Defendants will address each position in turn.

Ãn's Sushi Chefs[69]:

Unlike other positions in the restaurant industry, the DOL has issued guidance regarding whether sushi chefs are "tipped employees." In a 2008 opinion letter, the DOL advised that sushi chefs who prepare and serve meals directly to customers are tipped employees because they provide customer service similar to counter persons. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2008 WL 5483058, at *1 (Dec. 19, 2008). The DOL's Opinion Letter relied, in relevant part, on the following representations:

> Your letter states that itamae-sushi and teppanyaki chefs have direct contact and interact with the customers. Itamae-sushi chefs prepare and serve sushi to customers in the bar area. Teppanyaki chefs, on the other hand, prepare meals on the teppan table located at customer tables and serve meals to customers. Servers assist itamae-sushi and teppanyaki chefs by taking orders for meals and drinks, and bussers remove plates and serve water.[70]

_____

[69] The term 'sushi chef' was used interchangeably with 'sushi chef helper.' SMF at ¶ 42.
[70] *Id*. at *1; *see also* Expert Report 2 at p. 13 (The DOL has recognized sushi chefs as an occupation in which employees customarily and regularly receive tips because they have direct contact and interaction with the customers and prepare and serve meals to customers in the sushi bar area.).

Here, Ãn's sushi chefs fit the description set forth in the DOL's opinion letter because they had direct contact with and interacted with customers.[71] Located in the front of the house near the main dining room, Ãn's sushi bar was plainly visible to customers.[72] Although the sushi chefs were classified as "back of house" employees due to their preparation of food, they spent most of their time in the front of house, working in front of the guests and interacting with the guests on a daily basis.[73] They frequently interacted with customers who sat at the sushi bar. They entertained customers; greeted and thanked customers; and engaged in dialogue with customers if they had questions about the menu, needed extra sauce or garnish or if they expressed an interest in what the chef was preparing. They also engaged in conversations with customers ordering the "chefs special." They even engaged in casual conversation with "regulars" about where they worked and football. The sushi chefs – who were all capable of speaking, at minimum, broken English – engaged in conversations with the customers in hopes that they would return.[74]

---

[71] Despite plaintiffs' allegations, the sushi chefs were all capable of speaking English well enough to interact with guests and other employees. SMF at ¶ 43. They also attended kitchen line ups which were conducted exclusively in English. *Id.* at ¶ 44.

[72] When guests entered the restaurant, they would immediately see the sushi chefs working at the sushi bar. *Id.* at ¶ 45.

[73] *Id.* at ¶ 46.

[74] *Id.*; *see also* Declaration of Michael Golder attached to defendants' SMF as Exhibit "15" ("Golder Dec.") at ¶ 25 ("Sushi chef assistants who worked during lunch spoke conversational English but sushi chef assistants who worked the dinner shift were completely bilingual. There was never anyone scheduled to work the dinner shift who could not speak English.").

It was not uncommon for a guest – especially a "regular" – to order directly from the sushi chefs as opposed to their server.[75] As a front wait at Ãn averred,

> It was not uncommon for [sushi chefs] to take orders from [guests sitting at the sushi bar], and then ask a server to enter the order into the POS. Then, when the food was ready, [the sushi chefs] may hand the sushi directly to the guest, as opposed to a server, if the guest asked for it.[76]

Notably, sushi chefs sometimes received tips from guests directly.[77] This fact lends further support to customers' intent to provide tips to sushi chefs.

Because the sushi chefs at Ãn interacted with customers on more than a *de minimus* basis and performed important customer service functions, it is proper for this Court to conclude that they work in an occupation that 'customarily and regularly' receives tips.[78]

<u>Nick Papas, the Expediter:</u>

Plaintiffs allege that the primary expediter, Mr. Nick Papas ("Papas"), was "a supervisory/managerial employee, and/or a purely-back-of-house employee" and thus did not customarily and regularly receive tips. Am. Compl. at ¶¶45,49. These allegations, however, are unsubstantiated by the record.

First, the evidence establishes that Papas interacted with customers on more than a *de minimus* basis and engaged in important customer service functions, e.g.

---

[75] *Id.* at ¶ 47.
[76] *Id.*; *see also* Golder Dec. at ¶ 44 (VIPs were always served food directly by the sushi bar staff.)
[77] *Id.* at ¶ 48.
[78] *See* Expert Report 2 at p. 7-8; 13.

running food to customers.[79] As an expediter, Papas was responsible for ensuring that guests dining at Ãn experienced the level of service expected of a fine dining restaurant, which included receiving the correct dish, with the appropriate modifications, while the food was still fresh and hot.[80] He was also responsible for presenting the menu to guests.[81] Since Papas created glossaries for servers when new menus were 'rolled out', he was in a unique position to provide an accurate description of the food and to 'connect' with the guests regarding the menu.[82] Papas also assisted with running food to guests.[83] As server assistant, Justin Dillon, recently testified in open court, "[Papas] takes it upon himself to [carry food to the table] because he just wants to go see people."[84] He was in the dining room area as much as he needed to be.[85] It really depended on how busy the restaurant was on any given dinner shift.[86] Anytime he was needed to run food, he would run food.[87] If he wanted

---

[79] *Id*. at p. 13; *see also* SMF at ¶¶ 52-58.

[80] SMF at ¶ 52.

[81] *Id*. at ¶ 53.

[82] *Id*.

[83] *Id*.

[84] *Id*. at ¶ 56.

[85] He ran food to guests from once per shift to ten times per shift, or 20% of the time, depending on how busy the restaurant was. *Id*. at ¶ 54.

[86] *Id*.

[87] Defendants concede that the frequency in which Papas left the kitchen is contested and will remain contested because no one person witnessed each and every occasion in which Papas interacted with guests. Defendants proffer to the Court that the frequency in which he left the kitchen to enter the dining room is best determined by sworn testimony from Papas himself. As plaintiffs concede, their testimony is limited to what they saw with their own eyes and what they can remember. *See e.g.* Deposition of Brandon Kelly (hereinafter "Kelly Depo."), attached to defendants' SMF as Exhibit "10" at 62:18-19; Deposition of Deion Dorsey (hereinafter "Dorsey Depo."), attached to defendants' SMF as Exhibit "7" at 93:8-89. Plaintiffs cannot, in good

the food to get out, he would deliver it himself as opposed to yelling for a runner.[88]
He also assisted with the 'kaiseki menu,' which required plates to be set down and
cleared at the same time. It took multiple people to execute this style of dinner
service, and when necessary, expediters and even management assisted the servers
and server assistants.[89]

Papas also frequently served guests at the sushi bar.[90] He was responsible for
the presentation of sushi and ensuring that it was presented at the right time in
relation to the guest's meal. He would often come to the sushi bar during functions
or times where more communication was necessary to "double check on things" or
to relay a customer's special request to the sushi chefs. He also came to the sushi bar
to gather plates, deliver food and to serve customers sitting at the sushi bar.[91] Papas
worked side-by-side with the servers and server assistants, running food, folding
napkins, breaking down furniture, moving tables and chairs (during and after
service), and polishing glasses and silverware. Papas' performance of these job
duties made him critically necessary to the stream of service at Ãn.[92]

---

conscience, aver that they were privy to every interaction between Papas and the guests at Ãn.
Notably, however, there is no conflict in the sworn testimony because plaintiffs did not testify
about anything about which they had personal knowledge that conflicted with Papas' statements.
[88] *Id.* at ¶ 56.
[89] *Id.* at ¶ 57.
[90] *Id.* at ¶ 58.
[91] *Id.*
[92] *Id.* at ¶ 59.

Second, while plaintiffs argue that Papas' participation in the tip pool invalidated the tip pool because he "had job duties that were largely supervisory and managerial in nature," Am. Compl. at ¶46-48, the evidence reveals that he lacked the managerial duties necessary to qualify him as a manager and did not perform any managerial activities.[93] While Papas may have held the unofficial title of "closing kitchen supervisor,"[94] none of the plaintiffs reported to him or considered him to be their supervisor.[95] He had no authority to hire, fire or discipline employees. He was not responsible for scheduling employees and did not determine employees' pay rates, compensation or benefits.[96] Furthermore, Papas' job duties did not include managerial tasks: he did not assist with inventory, ordering or cost reduction; he was not responsible for new employee documentation.[97] His sole supervisory responsibility was "oversee[ing] the closing [of the kitchen] on occasional nights."[98] He did not have a key to the restaurant or know the alarm code so whenever he 'closed' the kitchen, a front of house manager would be in the building to close the restaurant.[99] Lastly, he was not included in conversations amongst managers and only interacted with management if he had a concern or if a manager had a question

---

[93] Plaintiff has not alleged that Papas is an "employer" thus defendants have not addressed whether he would be considered an "employer" ineligible to receive tips.
[94] *Id*. at ¶ 60.
[95] *Id*.
[96] *Id*.
[97] *Id*. at ¶ 61.
[98] Papas assisted with closing the kitchen one to three nights per week. *Id*. at ¶ 62.
[99] *Id*. at ¶ 63.

about a new employee that he was training.[100] Because Papas did not supervise the work of Ãn employees and lacked managerial job responsibilities, he was a proper participant in Ãn's tip pool.

As explained above, sushi chefs and the expediter at Ãn satisfy the criteria required of 'tipped employee' under the FLSA. Thus, defendants' inclusion of these positions in the restaurant's tip pool was proper. For these reasons, plaintiffs' claim under 29 U.S.C. §203(m) must fail.

V.   Plaintiffs' Claims Under the NCWHA Are Without Factual or Legal Foundation, and May Not Be Used as an End-Around the Opt-In Requirements of the FLSA.

Count III of the Amended Complaint attempts to allege claims under the North Carolina Wage and Hour Act, specifically N.C. Gen. Stat. §§ 95-25.6 and 95-25.8. The allegations are somewhat confusing, but it appears that plaintiffs' first urge this Court to find a violation of the NCWHA if it finds the tip pool invalid; and then also claim that defendants made "verbal representations" that plaintiffs would receive their accrued Paid Time Off ("PTO") earnings on their last paychecks, but failed to pay out the proper compensation for PTO; and that defendants did not provide the health and other insurance paid for by authorized deductions after Ãn closed. Am. Compl. ¶¶ 117-129. Count III lacks both factual and legal bases.

---

[100] *Id.*

First, the NCWHA explicitly exempts from its coverage employees covered by the minimum wage and overtime provisions of the FLSA. *See* N.C. Gen. Stat. § 95-25.14. It appears that Plaintiffs are impermissibly attempting to use the NCWHA as an end-around the FLSA by asserting that the NCWHA was violated by the distribution of the tip pool. The NCWHA's provisions with respect to tip pooling arrangements are essentially the same as the FLSA's provisions, and even reference the FLSA's tip pooling provisions. *See* N.C.Gen. Stat. § 95-25.3(f) ("Tips earned by a tipped employee may be counted as wages only up to the amount permitted in section 3(m) of the Fair Labor Standards Act, 29 U.S.C. § 203(m) … Tip pooling shall also be permissible among employees who customarily and regularly receive tips; however, no employee's tips may be reduced by more than fifteen percent (15%) under a tip pooling arrangement."); 13 NCAC § 12.0303(c) ("[I]f there is a tip pooling arrangement under 95-25.3(f), the employee may be required to surrender tips received for distribution in accord with the tip pooling arrangement.").

Second, the sections of the NCWHA being cited by the Plaintiffs are not applicable to the claims they are making. As noted, the NCWHA exempts from its coverage employees covered by the minimum wage and overtime provisions of the FLSA. To avoid this problem, Plaintiffs rely on two sections of the NCWHA, N.C. Gen. Stat. § 95-25.6 and § 95-25.8, neither of which is applicable.

N.C. Gen. Stat. § 95-25.6 states: "Every employer shall pay every employee all wages and tips accruing to the employee on the regular payday." Thus, it is a "payday" statute that applies to situations in which employees allege that they have not received timely pay for all hours worked, a claim that has not been asserted here. *See Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 68 (E.D.N.C. 2015) (NCWHA claims alleging that they "were not paid on their regular paydays" were not preempted by FLSA); *see also Martinez-Hernandez v. Butterball, LLC*, 578 F. Supp. 2d 816 (E.D.N.C. 2008) (plaintiffs alleged they were not paid for "donning and doffing" time); *Whitehead v. Sparrow Enter., Inc.*, 167 N.C. App. 178, 181, 605 S.E.2d 234, 236 (2004) (alleging failure to pay for time waiting for transportation); *Hanson-Kelly v. Weight Watchers Int'l, Inc.*, 2011 WL 2689352, at *1 (M.D.N.C. July 11, 2011) (alleging failure to compensate time spent preparing for meetings in addition to meetings themselves).

Count III also unsuccessfully makes an effort to come within the auspices of N.C. Gen. Stat. § 95-25.8. Section 95-25.8 prohibits deductions from an employee's paycheck without authorization, but explicitly states that "(a) An employer may withhold or divert any portion of an employee's wages when: (1) The employer is required or empowered to do so by State or federal law…" Count III's allegation about the tip pool therefore alleges a violation only if the FLSA has also been violated, thus attempting to state a claim under the NCWHA that is redundant of the

FLSA and therefore explicitly excluded by the NCWHA's preemption provision. What § 95-25.8 actually applies to are situations in which employers make specific deductions from an employee's paycheck without authorization,[101] which is not alleged in this case. *See, e.g., Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 714 (E.D.N.C. 2011) (plaintiffs alleged that employer made deductions from employee wages for protective equipment without employee authorization); *Gaxiola v. Williams Seafood of Arapahoe, Inc.*, 776 F. Supp. 2d 117, 131 (E.D.N.C. 2011) (employer admitted it did not obtain authorizations to deduct for transportation and visa expenses). With respect to the factual allegations at issue, the record provides no support for the claims that Ãn did not properly pay out PTO as provided for in the Employment Handbook.[102]   In any event, any claim for health benefits or a paid time off plan are covered by the Employee Retirement Income Security Act ("ERISA"), and ERISA fully preempts Plaintiffs' claims under the NCWHA. *Bursell v. Gen. Elec. Co.*, 243 F. Supp. 2d 460, 470 (E.D.N.C. 2003).

For the above reasons, the NCWHA has not been violated and thus plaintiffs' state law claim fails as a matter of law.

---

[101] It is undisputed that the tip pooling policy was explained to all of the putative class members weeks before it was implemented, and they all signed off on the policy. *See* Ãn Tip Pool policy signed by Plaintiff and Opt-In Plaintiffs (hereinafter "Plaintiffs' Signed Tip Policies") attached to defendants' SMF at Exhibit "14."

[102] *See* Deposition of Rex Pysher (hereinafter "Pysher Depo."), attached to defendants' SMF as Exhibit "30" at 41:2-14, 122:12-18, 123:14-19; *see also* Pysher Depo. at Ex. 16; Declaration of Rex Pysher (hereinafter "Pysher Dec.") attached to defendants' SMF as Exhibit "18" and Exhibits attached thereto.

VI.  Summary Judgment is Appropriate as to Plaintiffs' Retaliation Claim.

The present named plaintiff in this action, Wai Man Tom, has alleged a claim for retaliation against defendants. *See* Am. Compl., Count 4, ¶¶ 132-139.  Although former named plaintiff Brandon Kelly also purports to make allegations of retaliation, he presently is an opt-in plaintiff. [Dkt. 38]. As Tom does not seek collective treatment for his retaliation claim under 29 U.S.C. § 216(b), the only retaliation claim currently before the Court is the one being individually made by Tom. Defendants respectfully submit that there is no dispute of material fact concerning Tom's claim and for the following reasons, they are entitled to judgment as a matter of law.

A plaintiff asserting a claim of retaliation under the FLSA must satisfy the following three-prong test: (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; ***and*** (3) a causal connection exists between the employee's activity and the employer's adverse action. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008) (citations omitted) (emphasis added). Each prong must be satisfied for a court to find that an employer retaliated against its employee(s) in violation of the FLSA. Since the evidence before this Court does not support each

of these elements as they pertain to named plaintiff Tom, this claim must fail as a matter of law.[103]

To satisfy the second prong, a plaintiff must show "that his employer retaliated against him by engaging in an action that would have been materially adverse to a reasonable employee because the employer's actions could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Schmidt v. Bartech Grp., Inc*., 620 F. App'x 153, 155 (4th Cir. 2015) (quoting *Darveau*, 515 F.3d at 343). Plaintiffs contend that after Tom and Kelly voiced complaints about the tip pool, defendants "drastically reduced the amount of hours [they] were permitted to work" and "adjusted the floor plans that they [worked], drastically reducing the number of customers they served and diminishing the number of tips they were able to receive…" Am. Compl. at ¶¶134, 136. The evidence establishes, however, that Tom's hours were not reduced.[104] In fact, his workload increased, as did his income.[105] This testimony directly contradicts allegations that Tom's hours were cut and he was receiving less money. Am. Compl. at ¶ 136. Tom's allegations that he was inhibited from finding work elsewhere due to his complaints related to the lawsuit are similarly unsubstantiated. *Id*. at ¶ 137.

---

[103] While defendants adamantly disclaim any factual support to suggest that named plaintiff Tom engaged in activity protected by the FLSA, defendants will focus its attention on plaintiffs' inability to satisfy the second and third prongs of the retaliation claim.

[104] SMF at ¶ 64.

[105] *Id*.

Tom was hired at Elements, a local restaurant and his current employer, approximately one week after Ãn closed.

> Q:  And how long have you been working [at Elements]?
> A:  Eleven months.
> Q:  So since –
> A:  Essentially, one week after Ãn closed, … I believe February 7…[106]

Tom also has averred that his manager heard a rumor about the lawsuit but the rumor did not disclose that Tom was a part of the case, and nothing negative has happened to Tom as a result of his manager's knowledge or supposed knowledge of the lawsuit.[107]

Because Tom has not established that he suffered an adverse action, logic dictates that there can be no "causal connection between the employee's activity and the adverse action" as is required to satisfy the third prong. Thus, the Court need not engage in further analysis. Moreover, Tom specifically disclaimed any causal connection, stating "I don't feel [the adjustment to the floor plans to include less experienced servers] was a reaction to what I was saying. I think there was a trial period where he wanted to try to give other servers a chance at those parties. When there was a negative effect to having a less-than-experienced server in those larger parties, it ceased. [It lasted for] a period of two weeks."[108]

---

[106] Tom Depo. at 10:18-25.
[107] *Id.* at ¶ 34.
[108] *Id.* at ¶ 35.

For the above reasons, plaintiffs' retaliation claim fails as a matter of law, and defendants are entitled to summary judgment on Count IV.

## CONCLUSION

The undisputed material facts establish that plaintiffs received the minimum wage for all hours worked and are considered employees exempt from overtime as a matter of law. Thus, their claims under the FLSA must fail as a matter of law, irrespective of whether this Court determines that plaintiffs participated in a valid tip pool under § 203(m). However, as the undisputed evidence shows, the tip pool was, in fact, valid as all participating positions were 'customarily tipped employees.' In addition, plaintiffs state law claims fail because they are explicitly excluded by the NCWHA's preemption provision. Lastly, because named plaintiff Tom lacks support for each element of his retaliation claim, this claim must also fail as a matter of law.

For these reasons and the reasons stated herein, defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss plaintiff's Complaint with prejudice.

Dated this 1st day of May, 2017.

**STOKES WAGNER, ALC**

_/s/ Arch Y. Stokes_
Arch Y. Stokes
GA Bar No. 683100

astokes@stokeswagner.com
John R. Hunt
jhunt@stokeswagner.com
GA Bar No. 378530
Jordan Arkin
jfishman@stokeswagner.com
GA Bar No. 180796
Stokes Wagner, ALC
One Atlantic Center, Suite 2400
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404.766.0076
Facsimile: 404.766.8823

*Counsel for Defendants*

Kevin M. Ceglowski
kceglowski@poynerspruill.com
N.C. State Bar No. 35703
Poyner Spruill LLP
301 Fayetteville Street
Suite 1900
Raleigh, NC 27602-01801
Telephone: 919-783-6400
Facsimile: 919-783-1075

*Local Rule 83.1(d) Counsel for*
*Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2018, a true and correct copy of the foregoing "Defendants' Brief In Support Of Defendants' Motion For Summary Judgment" was e-filed using the Court's CM/ECF system, which will send copies of same to the counsel of record below:

Gilda A. Hernandez (NCSB No. 36812)
Michael B. Cohen (NCSB No. 50629)
**THE LAW OFFICES OF**
**GILDA A. HERNANDEZ, PLLC**
1020 Southhill Drive, Ste. 130
Cary, NC 27513
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
mcohen@gildahernandezlaw.com

*Attorneys for Plaintiffs*

*/s/ Arch Y. Stokes*
Arch Y. Stokes