IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CV-98-FL

| | | |
|---|---|---|
| WAI MAN TOM on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| HOSPITALITY VENTURES LLC doing business as Umstead Hotel and Spa, SAS INSTITUTE INC., and NC CULINARY VENTURES LLC doing business as An Asian Cuisine, | ) ) ) ) ) ) | |
| Defendants.[1] | ) ) | |

This matter is before the court on plaintiff's motion for conditional and class certification (DE 79), plaintiff's motion to seal (DE 82), defendants' motion for summary judgment (DE 99), and defendants' motion for hearing (DE 124). The motions for certification and for summary judgment have been briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendants' motion for summary judgment is granted with respect to plaintiff's federal law claims, and plaintiff's state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). Plaintiff's motion for certification is denied as moot, and plaintiff's motion to seal is denied. Defendants' motion for hearing also is denied.

---

[1] The court dismissed former defendant Ann B. Goodnight on September 5, 2017, and the court has constructively amended the caption of this order to reflect her dismissal.

## STATEMENT OF THE CASE

Former named plaintiff Brandon Kelly ("Kelly") commenced this action on February 21, 2017, asserting claims on behalf of himself and all others similarly situated against defendants, under the Fair Labor Standards Act (FLSA) and the North Carolina Wage and Hour Act (NCWHA), based upon their alleged failure to pay adequate wages and overtime compensation, as well as alleged acts of retaliation, while operating a restaurant in Cary, North Carolina named Ãn Asian Cuisine ("Ãn," "AN," or the "restaurant"), between 2014 and January, 2017.  Kelly sought damages for unpaid minimum wages; overtime compensation; liquidated and statutory damages; further damages and other relief for retaliation; as well as fees, costs, and interest.

On February 22, 2017, Kelly filed a consent to join the suit as a "named plaintiff," and he filed a consent to join the suit by current plaintiff Wai Man Tom ("Tom") as an opt-in plaintiff. Between May 9 and May 15, 2017, Kelly filed six additional consents to join the suit by the following individuals as opt-in plaintiffs: Shelley Thorne ("Thorne"),[2] Elaina Tanski ("Tanski"), Evelyn Hunter ("Hunter"), Gregory J. Evenson II ("Evenson"), Deion Dorsey ("Dorsey"), and Anne-Yael Okale-Weeks ("Weeks").

On September 5, 2017, the court allowed in part Kelly's motion to amend the complaint to substitute Tom for Kelly as named plaintiff and to add new factual allegations.  In the first amended complaint, filed September 8, 2017, which is the operative complaint in this action, plaintiff Tom (herein "plaintiff" or "plaintiff Tom") asserts claims on behalf of himself and opt-in plaintiffs (hereinafter "party plaintiff[s]"), as follows:

---

[2]  The parties filed a stipulation of dismissal pertaining to party plaintiff Thorne on February 5, 2018.

In his first claim for relief ("Count One"), plaintiff asserts defendants improperly took a "tip credit" by using an invalid "tip pool" comprised of employees who did not "customarily and regularly receive tips," and thus failed to pay party plaintiffs the required minimum wage of $7.25 per hour, in violation of the FLSA, 29 U.S.C. §§ 203(m) & 206. (Compl. ¶¶ 94-96).[3] Plaintiff asserts that defendants' failure to pay minimum wage was willful, because defendants previously internally investigated a similar practice and were subject to a similar lawsuit pertaining, in part, to alleged improper tip credit practices.[4]

In his second claim for relief ("Count Two"), plaintiff asserts defendants failed to pay party plaintiffs overtime wages of $10.88 per hour for all hours worked over 40 in a single workweek, in violation of FLSA, 29 U.S.C. § 207, on the same basis as Count One, where plaintiff asserts defendants willfully used an invalid "tip credit" practice. (Id. ¶¶ 110-113).

In his third claim for relief ("Count Three"), plaintiff asserts defendants willfully took invalid or unauthorized deductions from wages, in violation of the NCWHA, N.C. Gen. Stat. §§ 95-25.6 and 95-25.8, based upon the invalid "tip pool" as asserted in Counts One and Two. Plaintiff also asserts that defendants failed to pay party plaintiffs for all paid time off (PTO) hours due as part of their final paycheck, upon closure of the restaurant, and failed to continue insurance benefits for the final pay period, following closure of the restaurant, in violation of the NCWHA, N.C. Gen. Stat. §§ 95-25.6.

---

[3] Hereinafter, all citations to the complaint ("Compl.") are to the first amended complaint, unless otherwise specified.

[4] In particular, a prior lawsuit raising claims under the FLSA and NCWHA against North Carolina Culinary Ventures, LLC, resolved with settlement in 2011. See Buckner, et al v. North Carolina Culinary Ventures, LLC et al, 5:10-CV-583-D (E.D.N.C., Feb. 10, 2011).

3

In his fourth claim for relief ("Count Four"), plaintiff asserts defendants retaliated against him and party plaintiff Kelly after they complained of the aforementioned minimum wage, overtime, and tip pool issues, by reducing the amount of hours they were permitted to work; by reducing the number of customers they served; and by informing other prospective employers of plaintiff's and party plaintiff Kelly's complaints.

On October 10, 2017, the court entered case management order providing for bifurcated discovery, with a Phase I of bifurcated discovery addressing issues of conditional certification of class and collective actions, with some expansion to accommodate discovery regarding whether plaintiff and any potential party plaintiffs are subject to an exemption from overtime pay set forth in 29 U.S.C. § 207(i) (the "§ 7i exemption"). The court noted:

> The parties may conduct discovery regarding the § 7i exemption, but such discovery may or may not result in an early judicial resolution on the merits, depending on how issues are framed in conjunction with conditional certification of class or collective actions.
>
> Generally, this court and others have resolved issues regarding conditional certification of class or collective actions prior to conclusive determinations on merits issues. [citations omitted]. Accordingly, while the court does not preclude, in the deadlines below, any party from filing an early summary judgment motion, the primary goal of Phase I discovery is to facilitate resolution of a motion for conditional certification of class or collective actions.

(Case Management Order (DE 70) at 1-2).

The court set a February 28, 2018, deadline for Phase I discovery, and a deadline of March 31, 2018, for plaintiff to file a motion for conditional certification of class or collective action. The court did not set any separate deadline for dispositive motions. In addition, the court stated that "Determination of scope and limitations of Phase II discovery shall be determined following the court's ruling on any motion for conditional certification of class or collective actions." (Id. at 2).

4

Plaintiff filed the instant motion for certification on March 15, 2018, seeking conditional certification of an FLSA collective action and certification of a class action under Federal Rule of Civil Procedure 23 for NCWHA claims. Plaintiff seeks an order directing defendants to provide an "updated listing of the names, last known addresses, alternate addresses, telephone numbers, email addresses, last four digits of their Social Security of all former putative plaintiffs and [Rule 23] class members who worked for all Defendants at any time during the period from February 22, 2014 to January 30, 2017 consistent with Plaintiff's proposed class notice definition." (Motion (DE 79-1) at 1). Plaintiff's propose the following class notice definition:

> ALL FORMER EMPLOYEES OF DEFENDANTS HOSPITALITY VENTURES, LLC D/B/A UMSTEAD HOTEL AND SPA; NC CULINARY VENTURES, LLC D/B/A AN ASIAN CUISINE; AND SAS INSTITUTE, INC., WHO PERFORMED WORK THAT INVOLVED DIRECT INTERACTION WITH CUSTOMERS AS A CAPTAIN, SERVER, SERVER ASSISTANTS, RUNNER, AND/OR BARTENDER WHOM NAMED PLAINTIFF ALLEGES JOINTLY EMPLOYED HIM AND ALL OF THOSE SIMILARLY SITUATED EMPLOYEES AS HOURLY-PAID AND CUSTOMARILY TIPPED EMPLOYEES, AND WHO SUFFERED OR PERMITTED NAMED PLAINTIFF AND ALL SIMILARLY SITUATED EMPLOYEES TO BE REQUIRED TO PARTICIPATE IN AN ILLEGAL MANDATORY TIP POOL, ILLEGALLY WITHHOLDING THEIR TIPS, NOT BEING PAID THEIR APPROPRIATE MINIMUM WAGE, STRAIGHT-TIME, OVERTIME COMPENSATION FOR ALL HOURS WORKED, AND WHO WERE NOT COMPENSATED ALL OF THEIR PROMISED, EARNED, AND ACCRUED EARNINGS AND BENEFITS, INCLUDING PAID TIME OFF ("PTO") ON THEIR REGULAR PAY DATE OR AS PART OF THEIR FINAL PAY CHECK, AND AT ANY TIME FROM FEBRUARY 22, 2014, UNTIL THE CLOSURE OF THE RESTAURANT, OR UNTIL APPROXIMATELY JANUARY 30, 2017.

(Mem., Ex. 8 (DE 80-8) at 2). In the instant motion, plaintiff further seeks to be designated as the class representative and that the Law Offices of Gilda A. Hernandez, PLLC, attorneys of record, for the said named plaintiff, be authorized to serve as counsel for the classes in this action. Plaintiff also requests to be able to email and send via text message class notices.

5

In support of the instant motion for certification, plaintiff relies upon his deposition and depositions of party plaintiffs Kelly, Dorsey, and Weeks; depositions of former employees of the restaurant, Keely Gleespen ("Gleespen") and David Clore ("Clore"); deposition of former Human Resources manager for The Umstead, Rex Pysher ("Pysher"); proposed notice; the restaurant's employee handbook; plaintiff's and party plaintiff Kelly's pay stubs; the restaurant's tip pool policy and tip pool summaries; photographs of the sushi bar at the restaurant; restaurant job position descriptions; and plaintiff counsel's firm resume.[5]

Defendants filed the instant motion for summary judgment on May 1, 2018,[6] asserting that there is no genuine dispute as to any material fact and defendants are entitled to judgment as a matter of law on all of plaintiff's claims. In support of their motion, defendants rely upon a statement of material facts and the following documents, in addition to the depositions upon which plaintiff relies in support of the certification motion: 1) declarations by defendants' employees or former employees: Keith Hernandez ("Hernandez"), Laura Francis ("Francis"), Phillip Kalk ("Kalk"), Justin Dillon ("Dillon"), Joshua Hughes ("Hughes"), Steven Greene ("Greene"), Michael Golder ("Golder"), Scott Remmy ("Remmy"), Pysher, Hyun Woo Kim ("H. Kim"), Sunwon Jin ("Jin"), Josh Kim, Joshua James ("James"), Philip Lee ("Lee"), Patrick Hawthorne ("Hawthorne"), and

_____

[5] Plaintiff moves to seal the restaurant's employee handbook; plaintiff's and party plaintiff Kelly's pay stubs; the restaurant's tip pool policy and tip pool summaries; photographs of the sushi bar at the restaurant; and the restaurant job position descriptions; on the basis that defendants have identified these documents as containing trade secret information pursuant to the protective order filed November 20, 2017. However, defendants rely upon all of the same documents in support of summary judgment, without filing the same under seal (e.g., the restaurant's employee handbook (DE 100-9 at 250-302); plaintiff's and party plaintiff Kelly's pay stubs (id. at 192-240; DE 100-10 at 365-485); the restaurant's tip pool policy and tip pool summaries (DE 100-3 at 256-259; DE 100-1 at 221-246); photographs of the sushi bar at the restaurant (DE 100-24); and the restaurant job position descriptions (DE 100-1 at 199-217)). Therefore, plaintiff's motion to seal is denied.

[6] At hearing held on emergency motion for protective order, on April 24, 2018, the court extended deadlines for filing motion for summary judgment and for response to motion for certification.

Nicolas Papas ("Papas"); 2) deposition of party plaintiff Hunter; 3) declaration of defendants' expert witness, Jorge Rivero ("Rivero"); 4) transcript of April 24, 2018, motion hearing testimony of Dillon; and 5) all exhibits to the depositions upon which plaintiff relies in support of the certification motion. On the same date, defendants filed response in opposition to plaintiff's motion for certification, relying upon a declaration of Clore.

Upon review thereof, the court denied plaintiff's oral motion at prior hearing to hold in abeyance briefing on the motion for summary judgment pending ruling on the motion for certification. Plaintiff filed a response to the motion for summary judgment and a reply in support of the motion for certification on May 31, 2018. In support of plaintiff's response, plaintiff relies upon an opposing statement of facts and the following documents: 1) earning statements of plaintiff and party plaintiffs; 2) tip pool sample statement; 3) closing kitchen supervisor job description; 4) interrogatory responses of plaintiff and party plaintiffs; and 5) expert report of George Friday, Jr. ("Friday").

Defendants filed the instant motion for hearing and reply in support of summary judgment on June 21, 2018, relying upon declarations of Rivero and Pysher. Plaintiff filed a notice of supplemental authority on September 7, 2018.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows. Ãn "operated as an upscale, fine-dining restaurant in Cary, North Carolina, serving local residents as well as business people traveling to the Research Triangle area until it closed its doors on January 28, 2017." (Pl's Stmt.

(DE 113) ¶ 1).[7]  Ãn "did most of its business during the week, specifically Monday through Thursday," and it "was closed on Saturdays and Sundays, except the dinner shift on Saturday." (Id. ¶ 2).

Regarding the layout of the restaurant, there was a bar near the front entrance of the restaurant, as well as a sushi bar, which included customer seating.  (Kelly Dep. 44-49;[8] Gleespen Dep. 84, 87; Kelly Dep. Ex. 9 (DE 100-10); Photos of Sushi Bar, Defs' Appx. (DE 100-24 at 2-3)). There were regular booths and tables, as well as larger tables and "private dining rooms" for larger parties.  (Id.; Dorsey Dep. 186-188).

Plaintiff and party plaintiffs "are former servers and server assistants – referred to as 'front waits' and 'back waits' respectively –  bartenders and runners who worked at Ãn."  (Id. ¶ 4). Plaintiff's and party plaintiffs' employee earning statements in the record, within the time period from mid-2014 to February 2017, show gross earnings per bi-weekly pay periods divided into different line item categories, including the following:

1)      "Regular" earnings at an hourly rate ranging from $2.13 per hour to $2.50 per hour.

2)      "Overtime" earnings at an hourly rate at least 1.5 times that of regular earnings.

3)      "Auto Gratuity" in a flat amount.

4)      "Gratuity" in a flat amount.

---

[7] Plaintiff's statement of material facts (DE 113) incorporates defendants' statement of material facts (DE 101) and specifies with each numbered paragraph undisputed and disputed facts.  Accordingly, citations to paragraphs in plaintiff's statement of material facts correspond to the same numbered paragraph in defendants' statement of material facts.  For efficiency of reference in these instances of undisputed facts, where it would be duplicative to cite also to defendants' statement of material facts, the court cites solely to plaintiff's statement of material facts.

[8] Citations to depositions in the record specify page numbering as shown on the face of the deposition transcript, not the page number specified by the court's electronic case filing (ECF) system, particularly where a single deposition is filed multiple times in the record, sometimes in condensed form and sometimes not.

(E.g. DE 81-1, 112-1, 112-2 (plaintiff and party plaintiff Kelly); DE 112-3 (Hunter); DE 100-3 at 255 (Thorne); DE 112-6 (Weeks); DE 112-7 (Dorsey); DE 112-9 (Tanski); DE 112-10 (Evenson)). The following is a representative example of a portion of an earnings statement of plaintiff, for a two-week pay period ending April 25, 2014:

| Earnings | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|
| Regular | 2.25 | 67.77 | 152.50 | 1466.64 |
| Overtime | 5.88 | 6.11 | 35.90 | 466.40 |
| Vacation | 2.17 | 0.00 | 0.00 | 52.08 |
| Auto Gratuity - Server | | | 657.77 | 7679.97 |
| Auto Gratuity - Server Assist | | | 0.00 | 33.57 |
| Auto Gratuity - Sushi Chefs | | | 0.00 | 95.05 |
| Gratuity - Server | | | 780.86 | 8464.63 |
| Gratuity - Server Assistants | | | 0.00 | 34.97 |
| PTO Difference | | | 0.00 | 121.92 |
| Regular Temp | 2.25 | 0.00 | 0.00 | 0.05 |
| **Gross** | | 73.88 | 1627.03 | 18415.28 |

(DE 112-1).

Generally, with some exceptions discussed in the analysis herein, when the restaurant presented bills to customers comprised of parties of six or more people, the bills included automatically a gratuity (hereinafter, an "auto-gratuity") in the amount of 20% of the meal charge. For customers comprised of parties of fewer than six people, the bills did not include automatically a gratuity, but rather a line on the bill for the customer to specify a gratuity (hereinafter, a "tip") in any amount. For example, the image below is a bill in the record for eight guests, with an auto-gratuity specified by the restaurant on the bill, and a blank line for "additional tip" to be specified by the customer:

9

```
                                        IBER.PRT
                AN Cuisine
        2800 Renaissance Park Pl
            Cary, NC 27513
            919-677-9229


Server: Shelley               06/21/2016
Table 250/1                      8:35 PM
Guests: 8                          20012


Iced Tea (2 @3.00)                  6.00
Ahi Tuna                           30.00
VEG MANGO (2 @12.00)               24.00
Crispy Prawns                      27.00
Asparagus (2 @9.00)                18.00
AN Ramen (4 @26.00)               104.00
Highland IPA                        7.00
Snapper                            28.00
Potstickers                        12.00
FRESH SALMON (2 @6.00)             12.00
JAPANESE HAMACHI (2 @8.00)         16.00
Chicken & waffle                   27.00
Salmon Crunch                      15.00
RAINBOW ROLL                       17.00

Subtotal                          343.00
Tax                                26.58

Total                             369.58
Gratuity 20.00%                    68.60
Total                             438.18


VISA #XXXXXXXXXXXX0750            438.18
   Auth:089546


  + Additional Tip    _____


= Total:             _____




X_____



            Thank you !
     Please visit Us Online At
          www.ancuisines.com
      For Upcoming Events. To
     book a private room please
    call Ashley at 919-447-4136


                                      Page 1
```

(Weeks Dep. 100 & Ex. 7 (DE 100-27 at 196)).

Starting in July 2014, defendants implemented a system in which all such auto-gratuities and tips paid by customers during the evening shift were collected and then redistributed in bi-weekly earnings to certain employees as part of the "AN PM Tip Pool" policy. (Pl's Stmt. (DE 113) ¶ 11; AN PM Tip Pool policy (DE 81-2 at 6)).[9] The AN PM Tip Pool policy provided as follows: "All tips (including cash), and auto-gratuities received by all AN PM servers are pooled each shift ('AN's PM Tip Pool') which is calculated from 5:00 pm (or open of restaurant) though the close of the shift ('serving shift')." (Id.) "[T]his amount [then] was allocated among the rest of the service team as follows:"

> Regular Dining Tip Policy: From the Ãn's PM Tip Pool, the following percentages are 'tipped out' during regular dining shifts . . . :
>
> • Captain: 2% Premium of the Ãn's PM Tip Pool
> • Server: 54% of the Ãn's PM Tip Pool
> • Bartender: 4% of the Ãn's PM Tip Pool
> • Sushi Chef: 4% of the Ãn's PM Tip Pool
> • Server Assistant/Runner/Expo: 36% of the Ãn's PM Tip Pool
> . . . .

(Pl's Stmt. (DE 113) ¶ 11; See AN PM Tip Pool policy (DE 81-2 at 6)). During the period of implementation of the AN PM Tip Pool policy, the restaurant employed an individual, Nicholas Papas ("Papas"), who performed activities of an "Expo" or "Expediter" and who received a portion of his bi-weekly pay through the AN PM Tip Pool policy. (Pl's Stmt. ¶ 51). Another individual, Michael Golder ("Golder") occasionally performed activities of an "Expo," but he "did not participate in the tip pool." (Id.).

---

[9] For page numbers specified with parentheses along with docket entry number, the citation specifies the page number generated by the court's ECF system and not the page number, if any, showing on the face of the underlying document.

In addition, during the same period, the restaurant employed a number of individuals who performed activities of "sushi chef" or "sushi chef helper," and who received a portion of their bi-weekly pay through the AN PM Tip Pool policy. (Id. ¶ 42). The head sushi chef, H. Kim, by contrast, "was salaried and . . . not part of the tip pool." (Id.; see H. Kim Decl. ¶¶ 4, 6).

Additional facts and evidence pertinent to the issues raised will be set forth in the analysis herein.

## COURT'S DISCUSSION

A.     Motion for Summary Judgment

Where defendants assert that there is no genuine dispute as to any material fact and defendants are entitled to judgment as a matter of law on all of plaintiff's claims, the court begins with analysis of the motion for summary judgment.

1.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

12

247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2.      Analysis

a.      Section 7(i) Exemption

Defendants assert they are exempt from liability under plaintiff's first two claims because it is undisputed that defendants paid plaintiff and party plaintiffs at least the minimum wage and

overtime wage for nearly all of the workweeks at issue in this case, without need for reliance upon a "tip credit" to do so.

The FLSA requires that employees covered by the Act be paid a minimum wage of $7.25 an hour and an overtime wage of at least "one and one-half times the regular rate," or $10.25 an hour. See 29 U.S.C. § 206(a) & 207(a). The FLSA "permits an employer, in certain circumstances, to take a credit against the minimum wage by using an employees' [sic] tips as 'wages.'" Trejo v. Ryman Hosp. Properties, Inc., 795 F.3d 442, 447 (4th Cir. 2015) (citing 29 U.S.C. § 203(m)). In particular, pursuant to § 203(m), "commonly called the tip credit provision," "[a]n employer can . . . pay tipped employees (1) a cash wage of $2.13 plus (2) an additional amount in tips that brings the total wage to the federal minimum wage," id., provided the employer can meet conditions for a valid tip pool. See 29 U.S.C. § 203(m).

An employer need not rely upon the tip credit provision or follow the requirements of § 203(m), however, if the employer has met minimum wage and overtime requirements of the FLSA through other means. See Trejo, 795 F.3d at 448. One such method is through an exemption to the overtime pay requirement, which defendants assert here, contained in 29 U.S.C. § 207(i) ("the § 7(i) exemption"):

> No employer shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). Defendants assert that by including auto-gratuities in plaintiff's and party plaintiffs' "regular rate of pay," and counting them as "commissions on goods or services," they

14

Case 5:17-cv-00098-FL   Document 129   Filed 12/18/18   Page 14 of 36

have met the § 7(i) exemption for most workweeks where plaintiff and party plaintiffs worked overtime. They also contend that by counting auto-gratuities they have paid plaintiff and party plaintiffs the minimum wage for nearly all of their workweeks.

Defendants' argument raises a threshold legal issue for resolution by the court whether the auto-gratuities paid to plaintiff and party plaintiffs constitute "commissions on goods or services," that can be counted towards their "regular rate of pay" under § 207(i) and minimum wages under § 206(a), as opposed to tips that are subject to tip credit requirements under § 203(m). These terms are not defined in the statute, and the Fourth Circuit has addressed this issue only partially and indirectly. In McFeeley v. Jackson St. Entm't, LLC, 825 F.3d 235, 246 (4th Cir. 2016), the court addressed whether "performance fees" paid to exotic dancers by club patrons could qualify as "service charges" used to satisfy minimum wage requirements. Relying upon Department of Labor regulations interpreting the FLSA and an out-of-circuit district court opinion, the court held that they could not so qualify based upon the following reasoning:

> For purposes of the FLSA, a "service charge" is a "compulsory charge for service ... imposed on a customer by an employer's establishment." 29 C.F.R. § 531.55(a). There are at least two prerequisites to counting "service charges" as an offset to an employer's minimum-wage liability. The service charge "must have been included in the establishment's gross receipts," [Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 929 (S.D.N.Y. 2013)], and it must have been "distributed by the employer to its employees," 29 C.F.R. § 531.55(b). These requirements are necessary to ensure that employees actually received the service charges as part of their compensation as opposed to relying on the employer's assertion or say-so. See Hart, 967 F.Supp.2d at 930.

McFeeley, 825 F.3d at 246. In McFeeley, the court found no qualifying service charges because the employer did not include service charges in gross receipts and did not distribute service charges to its employees. See id. The auto-gratuities imposed in the instant case, by contrast, satisfy these prerequisites for "service charges" as set forth in McFeeley. It is undisputed that the auto-gratuities

15

were included in the restaurant's gross receipts and that they were distributed by defendants to plaintiff and party plaintiffs as part of the AN PM Tip Pool policy. (See Remy Decl. ¶¶ 24-30 (gross receipts); AN PM Tip Pool policy (DE 81-2 at 6)).

McFeely, however, does not address the § 7(i) exemption directly, and it does not address other factors bearing upon whether a service charge should be treated as part of an employee's regular rate of pay, as opposed to a tip, for determining minimum wage and overtime wage compliance. Absent binding Fourth Circuit authority on point, the court turns to pertinent regulations and other case law bearing on the issue.

A "tip" for purposes of the FLSA is "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52. "Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity." Id. By contrast, "[a] compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) . . . ." 29 C.F.R. § 531.55(a) (emphasis added). "[S]ervice charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act." 29 C.F.R. § 531.55(b) (emphasis added). Instead, "[w]here such sums are distributed by the employer to its employees, . . . they may be used in their entirety to satisfy the monetary requirements of the Act." Id. (emphasis added). "Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate." 29 C.F.R. § 778.117.

16

Consistent with these regulations, the Seventh Circuit has held that "service charges" distributed to hotel and restaurant employees may be treated as commissions and used in their entirety to satisfy overtime requirements, in accordance with § 7(i). <u>Mechmet v. Four Seasons Hotels, Ltd.</u>, 825 F.2d 1173, 1174 (7th Cir. 1987). In particular, "percentage service charges that hotels and restaurants characteristically add to the bill for a banquet, to compensate banquet waiters over and above their regular hourly wage, are 'commissions on goods or services'" and as such "the overtime provisions are inapplicable." <u>Id.</u> In <u>Mechmet</u>, a hotel added "an 18 percent service charge to every banquet charge and distribute[d] 16 percent among the staff serving the banquet, according to rank (captain, waiter, busboy, etc.), and the rest among the banquet sales staff." <u>Id.</u> The court "attach[ed] no weight to the fact that the collective bargaining agreement between the [hotel] and its waiters describes the waiters' income from the service charge as a 'gratuity' rather than as a 'commission,'" noting that the service charge in that case was "not discretionary with the customer." <u>Id.</u> at 1178.

In light of the foregoing law, auto-gratuities imposed by the restaurant and distributed to plaintiff and party plaintiffs qualify as "service charges" and "commissions" that may be used in their entirety to satisfy the monetary requirements of the FLSA. They are not "tips," because whether an auto-gratuity is applied, and its amount, are not "matters determined solely by the customer." 29 C.F.R. § 531.52. Indeed, based on the following evidence, it is undisputed that whether to impose the auto-gratuity and the amount thereof is dictated by management:

1)    Q: . . . [T]he auto-gratuity is something that the manager would put on and it would automatically charge someone 20 percent of their check – A. Correct." (Tom Dep. at 89).

2)    "[I]f I were to ask a manager to remove the gratuity because I felt that they would tip the gratuity or exceed the customary 20 percent, they would do that." (<u>Id.</u> at 86).

17

3) "[I]f [an auto-gratuity] was already on there, I have asked for it to be removed before and they would oblige." (Id. at 88).

4) "[G]ratuities were assigned based on management." (Kelly Dep. at 80).

5) "Auto grats were gratuities that were added onto any parties that were in the dining room with six or more people or it was a large group having a private function. An auto grat was automatically told that it would be added to their check, which was 20 percent." (Clore Dep. at 99-100).

6) "Q: . . . [W]hat was the percentage that AN charged for auto grats? Was it a fixed percentage for all tables? Or did it vary? A. It was a fixed percentage of 20 percent." (Clore Dep. at 106).

7) "Adding auto-gratuities on parties larger than 6 was done for all customers." (Francis Decl. ¶ 15).

8) "There were times . . . when I, or another server, may request that <u>our manager not add</u> an auto-gratuity to the check of a party of 6 or more guests, but this was rare. Not adding the auto-gratuity to a large parties' check would usually only occur when that guest was a VIP or if the service was not up to par." (James Decl. ¶ 12) (emphasis added).

Moreover, auto-gratuities were marked clearly on menus and customer bills as a fixed percentage of the total for parties of six or more people, and they were noted separately from discretionary tips. (<u>See</u> Clore Dep. 105-107; Clore Dep. Ex. 13 (DE 100-3 at 286-290) ("Menu price is before tax and 20% gratuity"); <u>see also</u> <u>id.</u> at 292 ("Included Gratuity $151.56 . . . Additional Tip____."); (Golder Decl. ¶ 20 ("If an additional tip was added on top of an auto-gratuity, the tip was kept separate from the auto-gratuity."); (Clore Dep. 140 ("Q: . . . when those additional tips were added on top of the auto gratuity, were those additional tips segregated from the auto gratuity when everything was entered . . . .? A. Yes."); (Hunter Dep. 108 ("If you are six or more persons at a regular table, it's printed in the menu."); (Tom Dep. 88 ("[I]t was written on the menu, six or more would be added a 20 percent. Usually, if there was a larger banquet or a private dining room reserved, there is a function sheet that indicates that it would be added.")).

18

Likewise, auto-gratuities are clearly distinguished on employee pay-stubs, the restaurant's tip-tracking programs, and in the AN PM Tip Pool policy from gratuities in the form of tips. (<u>E.g.</u> Earnings Statements (DE 81-1, 112-1, 112-2 (plaintiff and party plaintiff Kelly); DE 112-3 (Hunter); DE 100-3 at 255 (Thorne); DE 112-6 (Weeks); DE 112-7 (Dorsey); DE 112-9 (Tanski); DE 112-10 (Evenson)); Golder Decl. ¶ 17 ("The Excel tip out spreadsheet broke down the tips into three categories: cash tips, credit card tips, auto-gratuities (or service fees). We always kept the auto-gratuities separate from the tips. There was a formula in the Excel spreadsheet that made it clear what money was received from cash tips, credit card tips and auto-gratuity."); ¶ 21 ("The POS system was pretty elementary when it came to recording the additional tip on top of the auto-gratuity."); AN PM Tip Pool policy (DE 81-2) ("All tips (including cash), <u>and auto-gratuities</u> received by all AN PM servers are pooled each shift ('AN's PM Tip Pool') which is calculated from 5:00 pm (or open of restaurant) though the close of the shift ('serving shift').") (emphasis added)).

These undisputed facts, coupled with the fact that auto-gratuities were included in the restaurant's gross receipts, compel a conclusion as a matter of law that auto-gratuities may be used in their entirety to satisfy the overtime and minimum wage requirements of the FLSA.

Plaintiff argues that auto-gratuities should not be treated as "service charges" and "commissions" because they have several features that make them not "compulsory." In particular, plaintiff cites evidence that management would add an in advance an auto-gratuity to a reservation for a large party "50 percent of the time," (Tom. Dep. at 88); that plaintiff sometimes would "ask a manager to remove the gratuity," (<u>id.</u> at 86); that auto-gratuity could be removed "if the service was not up to par," (James Decl. ¶ 12); that party plaintiff Weeks believed customers would not leave an additional tip above the auto-gratuity because customers viewed the auto-gratuity as "a

customary tip for service" (Weeks Dep. at 135); and that one receipt in the record shows an auto-gratuity of 18.5% instead of 20% (Clore Dep. at 107).

None of this evidence cited by plaintiff, however, is determinative to whether the auto-gratuity properly is classified as a service charge as opposed to a tip. Plaintiff cites no evidence, for example, that the decision whether an auto-gratuity is applied, and its amount, are matters determined solely by the customer. Even though the auto-gratuity was not applied to every party of six or more, the material undisputed facts determinative to the analysis are that management had a policy of applying auto-gratuities to parties of six or more, and management determined when an auto-gratuity could be removed or reduced. Moreover, when the auto-gratuity was removed "it was almost never because they [the customer] asked [the server] to take it off." (Tom Dep. at 88).

Plaintiff also argues that, even if auto-gratuities constitute "commissions" under § 7(i), it is necessary to include both "tips" and "auto-gratuities" in determining total compensation under § 7(i). This argument is incorrect as a matter of law. An employer may use employee tips under § 203(m) to satisfy federal minimum wage requirements, but an employer is not required to do so if the minimum wage can be satisfied through other means. See Trejo, 795 F.3d at 448. As noted above, service charges may be "used in their entirety to satisfy the monetary requirements of the Act," 29 C.F.R. § 531.55(b), whereas "[a]ny tips received by the employee in excess of the tip credit need not be included in the regular rate" because "[s]uch tips are not payments made by the employer to the employee as remuneration for employment within the meaning of the Act." 29 C.F.R. § 531.60. Thus, in those workweeks where an employer does not need to take a tip credit, as here, because total compensation from service charges and hourly wage is sufficient to meet the minimum wage requirements of the Act, then the amount of tips received in excess of that amount

20

"need not be included in the regular rate." Id.; see also Trejo, 795 F.3d at 448 ("§ 203(m) 'does not state freestanding requirements pertaining to all tipped employees,' but rather creates rights and obligations for employers attempting to use tips as a credit against the minimum wage.") (quoting Cumbie v. Woody Woo, Inc., 596 F.3d 577, 581 (9th Cir. 2010)); Cumbie, 596 F.3d at 582 n. 13 (holding that tips received by server "were not wages under the FLSA because [the employer] did not take a tip credit").

Having so determined, the court is left with the undisputed mathematical calculations by defendants' witnesses that, by crediting auto-gratuities received, defendants paid plaintiff and party plaintiffs above the overtime rate in nearly all workweeks in which they worked overtime and paid plaintiff and party plaintiffs above the minimum wage rate in nearly all remaining workweeks in which they did not work overtime. (See Remmy Decl. ¶ 22 & n. 1 ("In the majority of workweeks where plaintiffs worked overtime, their regular rate of pay exceeded time and a half the minimum wage. . . . Brandon Kelly satisfied 149 out of the 158 workweeks he worked. Wai Man Tom satisfied 139 out of the 161 workweeks he worked. Evelyn Hunter satisfied 41 out of the 47 workweeks she worked. Anne-Yael Okale-Weeks satisfied 30 out of the 40 workweeks worked. Gregory Evenson satisfied all 26 workweeks he worked. Deion Dorsey satisfied 45 out of the 50 workweeks he worked."); Rivero Decl. 14-15 & Exs. F-1 & F-2).

In sum, defendants are entitled to summary judgment in part due to auto-gratuities. In particular, plaintiff's FLSA claims for minimum wage and overtime pay fail as a matter of law for all of those workweeks noted above where plaintiff and party plaintiffs satisfy the requirements for the § 7(i) exemption and they were paid above the minimum wage rate.

b. Tip Pool Validity

Defendants argue that for any weeks in which the § 7(i) exemption does not apply, there is no genuine issue of material fact that minimum wage and overtime requirements of the FLSA were met through the operation of a valid tip pool. Plaintiff contends that the presence of an "expediter" and "sushi chef helper" in the restaurant's tip pool invalidated it for purposes of the FLSA tip credit.

As noted above, pursuant to § 203(m), "commonly called the tip credit provision," "[a]n employer can . . . pay tipped employees (1) a cash wage of $2.13 plus (2) an additional amount in tips that brings the total wage to the federal minimum wage," Trejo, 795 F.3d at 447, provided the employer can meet additional conditions of a valid tip pool, including the following at issue here:

> shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m)(2)(A) (emphasis added).

Neither the Fourth Circuit nor this court has addressed before the requirements for validly "pooling . . . tips among employees who customarily and regularly receive tips." Id. Regulations implementing the FLSA provide limited elaboration of the concept, stating for example:

> [the tip issue] where an accounting is made to an employer for his information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his own are counted as his tips for purposes of the Act. Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips.

22

29 C.F.R. § 531.54. The regulations also include discussion regarding employees in dual jobs, which has some relevance to the classification of expediter and sushi chef helper position in the instant case:

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

29 C.F.R. § 531.56 (emphasis added).

The Fifth Circuit, in Montano v. Montrose Rest. Assocs., Inc., 800 F.3d 186, 190–91 (5th Cir. 2015), discussed in detail the concept of an employee who customarily and regularly receives tips in a published opinion, relying largely on United States Department of Labor ("DOL") regulations, opinion letters, and "Field Operations Handbook." Id. There, the Fifth Circuit examined whether a "coffeeman" properly could be included in a tip pool. In that context, the Fifth Circuit noted:

> The DOL has provided examples of occupations that "customarily and regularly receive tips" and those that do not. Its Field Operations Handbook ("Handbook") lists "waiters/waitresses"; "bellhops"; "counter personnel who serve customers"; "busboys/girls (server helpers)"; and "service bartenders" as tipped occupations and "[j]anitors"; "[d]ishwashers"; "[c]hefs or cooks"; and "[l]aundry room attendants" as non-tipped occupations. U.S. Dep't of Labor, Field Operations Handbook § 30d04(a), (c) (1988). A coffeeman is not on either list and, more critically, the Handbook provides no explanation why the selected employees fall into one or the other category.

Id. at 190–91 (emphasis added). In addition:

23

The DOL also has issued opinion letters responding to inquiries about whether certain employees qualify as tipped employees under the FLSA. The opinion letters make clear that <u>one's status as an employee who "customarily and regularly receives tips" is "determined on the basis of his or her activities,"</u> not on the employee's job title. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 998047, at *2 (Nov. 4, 1997); see also 29 C.F.R. § 531.56 (recognizing that some employees have dual jobs and an employee is only a "tipped employee" when engaged in that job in which he is tipped)

Id. at 191 (emphasis added). Directly pertinent to the classification of sushi chef helpers in the

instant case, the Fifth Circuit observed:

chefs are one of the classic examples of those with whom tipped employees cannot be required to share tips. See Handbook § 30d04(c) . . . . <u>But sushi chefs who work at a counter in the dining room and directly serve customers may participate in tip pools</u>. See U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2008 WL 5483058, at *1 (Dec. 19, 2008). . . . The DOL has advised that itamae-sushi and teppanyaki chefs who prepare and serve meals directly to customers are tipped employees because they provide customer service similar to counter persons. [<u>Id.</u>]

<u>Id.</u> (emphasis added). Also pertinent to the classification of the expediter in this instance, the Fifth

Circuit described one unpublished case as an example:

The [subject] workers inspected completed food orders from the kitchen, garnished plates, and delegated to servers and bussers the delivery of food to customers. . . . . [W]e found that the jury could have found that [such] workers did not customarily and regularly receive tips. We drew a distinction between front-of-the-house staff (who customarily receive tips) and back-of-the-house staff (who do not) and held that direct customer interaction was "highly relevant" to tip eligibility.

<u>Id.</u> at 192-93. Ultimately, the Fifth Circuit summarized:

The common thread of the cases and the DOL opinion letters is to require a tipped employee to have <u>more than a de minimis interaction with the customers</u> who leave the undesignated tips. We agree with these persuasive authorities and hold that, in determining whether an employee customarily and regularly receives tips, a court—or a factfinder—must consider the extent of an employee's customer interaction. This rule is faithful to the goal of the inquiry: determining the customer's intent. <u>A customer is more likely to tip someone with whom he has contact, or at least sees assisting in the service</u>. A court or factfinder should <u>also consider whether the employee is engaging in customer service functions</u>. Even an employee who works in the dining room will not be considered a tipped employee if his work is not

> customer service-oriented, for example, an electrician who is repairing a chandelier
> for the restaurant.

Id. at 193 (emphasis added). The Sixth Circuit also addressed similar criteria for determining whether an employee customarily and regularly receives tips, in the context of restaurant hosts. The court noted: "It is not required that all employees who share in tips must themselves receive tips from customers." Kilgore v. Outback Steakhouse of Fla., Inc., 160 F.3d 294, 301 (6th Cir. 1998). In holding that hosts do so qualify, the court observed, for example:

> Although the parties dispute exactly how hosts spend their time working at Outback,
> hosts do perform important customer service functions: they greet customers, supply
> them with menus, seat them at tables, and occasionally 'enhance the wait.' Like bus
> persons, who are explicitly mentioned in 29 C.F.R. § 531.54 as an example of
> restaurant employees who may receive tips from tip outs by servers, hosts are not the
> primary customer contact but they do have more than de minimis interaction with the
> customers. One can distinguish hosts from restaurant employees like dishwashers,
> cooks, or off-hour employees like an overnight janitor who do not directly relate with
> customers at all.

Id. at 301-302 (emphasis added).

Based on the specific examples in the regulations, field handbook, and opinion letters, coupled with these circuit court opinions, the court considers in its analysis several key criteria in determining whether there is a genuine issue of fact as to qualification of the expediter and sushi chef helpers as valid tip pool participants. First, they must have more than a "de minimis interaction with the customers." Id.; Montano, 800 F.3d at 193. Second, they must perform some functions of their job in the "front-of-the-house" where they are at least seen by customers. Montano, 800 F.3d at 192. Third, they must engage in "customer service functions" as a part of their job. Id.

The court turns next to applying these criteria to the expediter and sushi chef helpers at issue in this case.

i.    Expediter

Papas, who held the position of expediter at the restaurant at all times relevant to this action,

meets the criteria of a valid tip pool participant.

First, Papas had more than de minimis interaction with the customers of the restaurant.

Regarding own activities, Papas states:

> I frequently interacted with guests.  Both Chef Greene and Chef Hughes wanted me
> to interact with guests because they knew I would give them the best description of
> the food.  The chefs knew I could connect best with the guests regarding our menu.

(Papas Decl. ¶ 8).   In addition, Papas states: "I frequently served sushi to guests at the sushi bar."

(Id. ¶ 11).   Regarding service at the sushi bar, one sushi chef, Josh Kim, notes:

> The Expo person focused on tending to the guests. Whenever servers missed an item
> or a guest had a complaint, the Expo would come to the sushi bar to double check on
> things. When a customer communicated a special request, it was relayed to us by the
> expo.

(Josh Kim Decl. ¶ 8).  Keely Gleespen ("Gleespen"), a front-of-the-house manager, also confirmed

that Papas served customers and delivered food to customers. (Gleespen Dep. 125).

Second, on the basis of the same evidence, Papas performed some of this job functions in

the "front-of-the-house" where he was seen by customers.  In addition, on this issue, Pappas states:

> I worked side by side with servers and bussers.  As expediter, I ran food, folded
> napkins, broke down furniture, moved tables and chairs (during and after service),
> polished glasses and silverware along with the other servers.

(Pappas Decl. ¶ 9).  Michael Golder, an assistant manager at the restaurant, states: "Serving food

was a secondary task for expo, but there was a definite expectation that if you're able to help get out

food to guests, you help."  (Golder Decl. ¶ 9).  Gleespen states regarding Papas that, among other

job duties: "He'd run food. He would . . . help with large parties."  (Gleespen Dep. 92).  Regarding

appearances by Papas in the front-of-the-house, one server, Justin Dillon, noted: "He takes it upon

himself to go do that because he just wants to go see people." (Tr. (DE 29) at 52-53). Plaintiff also noted Papas' role in service at the sushi bar, which was an area of the front-of-the house attended by customers: "[The sushi chefs] were encouraged to send all sushi plates to expedite, to the expediter. And the expediter would then, in turn, send the sushi to the corresponding table." (Tom Dep. at 70).

Third, again based on all the same evidence, Papas engaged in customer service functions as part of his job. Moreover, on this issue, Papas states: "I was critically necessary to the stream of service at An. . . . Expos are critical to service in the front of the house." (Papas Decl. ¶¶ 9, 10). In addition, he states: "Every new service employee at An started as a server assistant and started training with me . . . to learn about the food, the sauces, how to put the food down in front of the guests . . . ." (Id. ¶ 12).

In sum, Papas, as expediter, was a valid tip pool participant because he had more than de minimis interaction with guests, he appeared as part of his job activities in the front-of-the-house, and he performed critical customer service functions.

Plaintiff argues that Papas was not a valid member of the tip pool for several reasons, none of which create a genuine issue of fact on the relevant criteria. First, plaintiff argues that Papas was an invalid participant because of evidence showing his job titles of expediter and closing kitchen supervisor were listed as back-of-the-house positions, written descriptions of those positions did not list front-of-the-house activities, and Papas engaged in multiple back-of-the-house functions and won a "'back-of-the-house' employee" award. (Pls' Stmt. of Facts (DE 113) ¶ 49). However, "one's status as an employee who 'customarily and regularly receives tips' is determined on the basis of his or her activities, not on the employee's job title." Montano, 800 F.3d at 191. Moreover, it is no

matter that other parts of Papas's job involved back-of-the-house functions. Indeed, the Department of Labor has recognized that a tipped employee may spend "part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses," or may "prepare[] [her] own short orders or . . . take[] a turn as a short order cook for the group." 29 C.F.R. § 531.56.

Second, plaintiff cites his and other servers' statements that Papas "very rarely ran food"; "rarely, if ever, left the kitchen during service hours"; he "was expected to stay at his post"; or he was never seen approaching a table. (Pl's Stmt. (DE 113) ¶ 49). These stated observations by individual servers, however, do not create a genuine issue of fact, because they only provide a first-person view point of time periods in which such servers were working and watching the activities of Papas, whereas Papas's statements reflect his complete first-hand account of his activities, and his managers provide an overall picture of his activities. In any event, coupling individual servers' statements that Papas "rarely" or "very rarely" left the kitchen, with statements by Papas and managers about his activities, there is no genuine issue of fact that Papas engaged in more than "de minimis" customer interaction.

Finally, plaintiff cites to evidence Papas was paid a direct wage greater than minimum wage, the tip credit was not used for him, and he did not actually receive tips from anywhere other than the tip pool. However, "[i]t is not required that all employees who share in tips must themselves receive tips from customers." Kilgore, 160 F.3d at 301. Rather it is enough that Papas had more than de minimis customer interaction, appeared in the front of the house, and engaged in critical customer service functions.

        ii.     Sushi Chef Helpers

Sushi chef helpers also meet the criteria of valid tip pool participants.

28

First and foremost, sushi chef helpers performed their job activities at a location in the "front-of-the-house," at the sushi bar, which was in view of customers entering the restaurant, and which had seats for customers directly facing the workspace of the sushi chef helpers. (James Dec. ¶ 28; J. Kim Dec. ¶ 6; Jin Dec. ¶ 6; Hughes Dec. ¶ 18).  Indeed, photos of the sushi bar show both seats for customers directly at the sushi bar and booths nearby for customers not at the sushi bar but in view of the sushi bar.  ( See Photos of Sushi Bar, Defs' App. (DE 100-24) at 2-3; see also Kelly Dep. (DE 100-10) 45 &  Ex. 9).

Second, by virtue of their location and their setup behind a bar attended by customers, sushi chef helpers had more than de minimis customer interaction and they engaged in customer service functions.  In this vein, Gleespen states:

> They needed good customer service skills because they were right in front of the guests. . . . [Y]ou know, keeping a positive attitude.  Q. How often would you say they interacted with the guests?  A. Daily.  They were right there.  They would be smiling, interacting with them.  Not every day did - - or every shift did they take orders.  But they were constantly interacting with them.

(Gleespen Dep. 90). Joshua Hughes, who was a *sous chef* and *chef de cuisine* at the restaurant, states:

> Sushi chef and the sushi chef helpers often interacted with guests. They would have conversations with them about what they were making and regulars would often order directly from them as opposed to their server. When this happened, the sushi employee would tell the server what the order was and the server would input it into the POS. Also, if a guest requested their roll from the sushi bar, the sushi helper may hand the roll directly to the guest.

(Hughes Decl. ¶ 19).  Lee, who was a sushi chef at the restaurant, states:

> I spoke to guests about everything from the quality of the fish, the menu, to where they worked, me and the other sushi chefs/helpers did this to engage the guests in hopes that they would return.

29

An had guests that came to An regularly and sat exclusively at the Sushi bar. Whenever a guest sat at the sushi bar, me and the other sushi chefs/helpers would speak to them. It would be rude to ignore them.

(Lee Dec. ¶¶ 3-4). H. Kim, who was head sushi chef at the restaurant, states: "All sushi chefs and sushi chef helpers understood English well enough to respond to customer requests and to participate in restaurant meetings that were conducted in English." (H. Kim. Decl. ¶ 6).

Plaintiff cites to his and other servers' testimony as a basis for descriptions of the job activities of sushi chef helpers. For example, plaintiff states: "They did a lot more of the prep work [than sushi chefs] . . . . They were rarely accessible to the guests. They started in the further portion. They were even behind the sushi chefs most of the time." (Tom Dep. 68). "Many of the helpers weren't that proficient with English." (Id. at 100; see also Hunter Dep. 100). As an initial matter, these stated observations by individual servers do not create a genuine issue of fact, because they only provide a first-person view point of time periods in which such servers were working and watching the activities of sushi chef helpers, whereas statements by the sushi chefs and sushi chef helpers noted above reflect their complete first-hand account of their activities.

In any event, the substance of individual servers' testimony does not create a genuine issue of material fact as to the criteria for qualification as tip pool participants. First, the testimony of the servers is qualified, (e.g., "did more prep work" "rarely accessible" "started in the further portion" "most of the time"), such that it does not undermine a finding as a matter of law that the sushi chef helpers had at more than de minimis interaction with guests, worked in view of guests, and performed customer service functions. Indeed, plaintiff's description of his viewpoint confirms more than de minimis interaction with guests:

Q: So did the sushi chefs and the sushi helpers - - were they working behind the bar?
A: Correct.

Q: Would they ever interact with guests while they were working at the bar?
A: At times they would interact.
Q: And how would they interact?
A: Sometimes guests would ask them what they're preparing.· Many times, that's how the conversations started.· They are there essentially displaying their techniques and their art of making sushi.· Many times, that is the center of the conversation between guests and them.
Q: So a guest may strike up a conversation about the art that they are creating?
A: Correct.  Correct.

(Tom Dep. at 66-67).  In addition, the servers' testimony does not undermine the evidence that the sushi chef helpers worked in a location visible to and near customers and, by virtue of that location, at least occasionally interacted with customers, whether through a greeting, a nod or smile, or conversation. (See Gleespen Dep. 90; Hughes Decl. ¶ 19; Lee Dec. ¶¶ 3-4).

Moreover, undisputed evidence such as kitchen lineups conducted in English (see Stmt. of Facts ¶ 44), demonstrates that the sushi chef helpers were capable of communicating at some level in English, or at least capable of communicating in some way to have an "interaction" with customers. (See H. Kim. Decl. ¶ 6). The law does not require fluent conversation in English to constitute more than a "de minimis interaction" with customers, Montano, 800 F.3d at 193, particularly considered in the context of customers who deliberately have chosen to seat themselves in front of the sushi bar. (See, e.g., Lee Dec. ¶¶ 3-4 ("It would be rude to ignore them."); H. Kim. Decl. ¶¶ 5, 6).

Plaintiff argues that it is significant that sushi chef helpers attended such kitchen lineups, thus aligning them with "back-of-the-house" employees.  But, as with expediter, actual "front-of-the-house" activities by the sushi chef helpers trump labels, classifications, and other job duties associated with back of the house employees. See Montano, 800 F.3d at 191; Kilgore, 160 F.3d at 301. Based upon relevant evidence regarding sushi chef helpers' activities and work location in the

restaurant, there is no genuine issue of fact that they engaged in more than de minimis customer interaction, were visible to customers, and performed customer service functions. Accordingly, sushi chef helpers are not precluded from participating in the restaurant's tip pool.

In sum, plaintiff has not demonstrated a genuine issue of material fact regarding the validity of the AN PM Tip Pool, under 29 U.S.C. § 203(m). Therefore, plaintiff's FLSA claim under that provision fails as a matter of law.

c.     Retaliation Claim

Plaintiff asserts that defendants retaliated against plaintiff and party plaintiff Kelly in violation of the FLSA after they complained of minimum wage, overtime, and tip pool issues.

The FLSA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). "A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008).

With respect to the adverse action element, the Fourth Circuit has looked to Title VII case law, holding that a plaintiff must prove "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. In addition, "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision

32

causing a significant change in benefits.'" Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (quoting Burlington Indus, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  By contrast, it does not include "petty slights or minor annoyances that often take place at work and that all employees experience."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Plaintiff's retaliation claim fails as a matter of law because he has not shown that he and party plaintiff Kelly suffered an adverse employment action after complaining to management about wage and hour policies.  Plaintiff complained to General Manager, Clore, about the tip pool in September 2016.  (See Tom Dep. 117-118).  Plaintiff, however, does not identify any significant change in his employment status thereafter, such as reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  Indeed he testified that his income stayed the same or increased, his workload increased, and there was "not really a noticeable reduction" in hours.  (Id. at 114, 119).  While plaintiff testified that management moved some less-experienced servers into doing larger parties, plaintiff did not describe any significant adverse consequence to him as a result of this change.  (Id. at 120-121).

Regarding party plaintiff Kelly, he suggests that he complained to management about the tip pool in September 2016, and at various points verbally throughout the operation of the tip pool. (Kelly Dep. 194-195).  With respect to changes in his work, Kelly states: "my sections shrunk, the amount of customers shrunk, the sales shrunk, my scheduling diminished, the amount of hours I worked diminished over time, and the dialogue and communication with management completely changed."  (Id. at 195).  However, Kelly's payroll records show that he did not receive any significant difference in the amount of hourly rate, gratuities, or auto-gratuities, before and after September 2016, nor year after year in the time frame between 2014 and the closure of the restaurant

33

in 2017.  (See Kelly Dep. Ex 14 (DE 110-10 at 377-468).  Moreover, Kelly's generalized reference to "dialogue and communication with management" (Kelly Dep. 195), is not the type of material change in conditions of employment to constitute an adverse employment action.  See White, 548 U.S. at 68.  Therefore, plaintiff has not established a genuine issue of material fact as to the second element of the retaliation claim.

Plaintiff argues that consideration of defendants' motion for summary judgment on plaintiff's retaliation claim is premature and that the court's decision should be deferred until after further discovery has concluded, citing the bifurcated discovery schedule set forth in the court's case management order.  The court's case management order, however, does not preclude any party from filing an early summary judgment motion.  Federal Rule of Civil Procedure 56 allows a party to file a motion for summary judgment "at any time," and, if the moving party therein identifies a claim without a genuine issue of fact, it is incumbent upon the responding party to demonstrate a genuine issue of fact or to demonstrate why "it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(b) & (d).  Here, facts regarding plaintiff's retaliation claim have been developed through deposition testimony and earnings records.  Plaintiff has not specified any particular additional discovery that is necessary to justify his opposition to summary judgment, particularly where facts regarding adverse actions are derived in part from his own experiences.

In sum, plaintiff has not demonstrated a genuine issue of material facts as to his retaliation claim and summary judgment must be granted as a matter of law.

B.    State Law Claims

Having determined that summary judgment must be granted on all of plaintiff's federal claims arising under the FLSA, only plaintiff's state law claims arising under the NCWHA remain.

34

Where jurisdiction in this matter is based upon federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367, it is appropriate to consider whether continued exercise of jurisdiction over plaintiff's state law claims is warranted.

A district court may decline to exercise supplemental jurisdiction over a pendent state law claim if–

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367(c). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

Although defendants suggest that summary judgment on plaintiff's state law claims is required largely on the same grounds as the FLSA claims, the scope of liability and relief under the NCWHA is sharply contested by plaintiff. Neither party cites controlling Fourth Circuit or North Carolina law regarding the interpretation of the scope of the NCWHA in comparison to the FLSA. In this manner, declining jurisdiction is appropriate both due to dismissal of all federal claims as well as the novel issue of state law arising from interpretation of the NCWHA. See 28 U.S.C. § 1367(c). In these circumstances, the court declines in its discretion to exercise jurisdiction over plaintiff's pendent state law claims, and such claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

C. Motion for Certification

Having determined that defendants' motion for summary judgment should be granted with respect to plaintiff's federal law claims and that plaintiff's state law claims shall be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c), plaintiff's motion for conditional and class certification is denied as moot.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 99) is GRANTED with respect to plaintiff's federal law claims. Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c). Plaintiff's motion for conditional and class certification (DE 79) is DENIED as moot, and plaintiff's motion to seal (DE 82) is DENIED. The court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process. Accordingly, defendants' motion for hearing (DE 124) is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 18th day of December, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge